## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 15 |
| BENCH ACCOUNTING, INC., *et al.*,[1] | Case No.  25-10463 (___) |
| Debtors in a Foreign Proceeding. | (Joint Administration Requested) |

## DECLARATION OF MATTHEW B. LUNN IN SUPPORT OF THE VERIFIED PETITION FOR RECOGNITION OF FOREIGN PROCEEDING AND RELATED RELIEF AND MOTION FOR PROVISIONAL RELIEF IN AID OF THE CANADIAN PROCEEDING

Matthew B. Lunn, pursuant to 28 U.S.C. §1746, hereby declares as follows:

1.        I am a partner of the firm of Young Conaway Stargatt & Taylor, LLP, which is counsel to KSV Restructuring Inc., in its capacity as the appointed Licensed Insolvency Trustee and authorized foreign representative (the "**Trustee**") of the estates of Bench Accounting, Inc. and 10Sheet Services Inc. (together, the "**Debtors**"), in the Debtors' proceedings pending before the Supreme Court of British Columbia at Vancouver (the "**B.C. Court**") under Canada's *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, as amended.  I respectfully submit this declaration in support of the Trustee's *Verified Petition for Recognition of Foreign Main Proceeding and Related Relief* and accompanying Memorandum of Law, and the Trustee's *Motion for Provisional Relief in Aid of the Canadian Proceeding*.

2.        Attached hereto as **Exhibit A** is a true and correct copy of the Certificate of Appointment issued by the Office of the Superintendent of Bankruptcy (Canada) appointing KSV Restructuring Inc. as the Licensed Insolvency Trustee of each of the Debtors' bankruptcy estates.

---

[1]    The last four digits of the United States Tax Identification Number, or similar foreign identification number, as applicable, for each Debtor follow in parentheses:  Bench Accounting, Inc. (3574) and 10Sheet Services Inc. (3476).  The Trustee's head office is located at 220 Bay Street, Suite 1300, P.O. Box 20, Toronto, Ontario, M5J 2W4, Canada.

3.      Attached hereto as **<u>Exhibit B</u>** is a true and correct copy of the *First Report of the Trustee*, dated March 5, 2025.

4.      Attached hereto as **<u>Exhibit C</u>** is a true and correct copy of the *Order*, dated March 13, 2025, entered by the B.C. Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 13, 2025
      Wilmington, Delaware

*/s/ Matthew B. Lunn*
Matthew B. Lunn
*Attorney for KSV Restructuring Inc., as Trustee and Foreign Representative of the Debtors*

32949692.2

2

## **EXHIBIT A**

**Certificates of Appointment**

 **Industry Canada** **Industrie Canada**
**Office of the Superintendent** **Bureau du surintendant**
**of Bankruptcy Canada** **des faillites Canada**

District of:    British Columbia
Division No.: 03 - Vancouver
Court No.:    11-3171493
Estate No.:    11-3171493

## In the Matter of the Bankruptcy of:

**Bench Accounting, Inc.**

Debtor

**KSV RESTRUCTURING INC.**

Licensed Insolvency Trustee

## Ordinary Administration

| | | |
|---|---|---|
| Date and time of bankruptcy: | January 07, 2025, 11:34 | Security:    $0.00 |
| Date of trustee appointment: | January 07, 2025 | |
| Meeting of creditors: | January 27, 2025, 10:00 THE SUTTON PLACE HOTEL VANCOUVER 845 BURRARD ST, ROOM CHATEAU BELAIR VANCOUVER, British Columbia Canada, | |
| Chair: | Official Receiver | |

### CERTIFICATE OF APPOINTMENT - Section 49 of the Act; Rule 85

### -- AMENDED --

I, the undersigned, official receiver in and for this bankruptcy district, do hereby certify that:

-    the aforenamed debtor filed an assignment under section 49 of the *Bankruptcy and Insolvency Act*;

-    the aforenamed trustee was duly appointed trustee of the estate of the debtor.

The said trustee is required:

-    to provide to me, without delay, security in the aforementioned amount;

-    to send to all creditors, within five days after the date of the trustee's appointment, a notice of the bankruptcy; and

-    when applicable, to call in the prescribed manner a first meeting of creditors, to be held at the aforementioned time and place or at any other time and place that may be later requested by the official receiver.

Date: January 16, 2025, 13:01

E-File/Dépôt Electronique

Official Receiver

300 Georgia Street W, Suite 2000, Vancouver, British Columbia, Canada, V6B6E1, (877)376-9902

## **EXHIBIT B**

**First Report of the Trustee, dated March 5, 2025**



ksv advisory inc.



**Court No. B-250050**
**Vancouver Registry**
**Estate No.: 11-3171493**

**IN THE SUPREME COURT OF BRITISH COLUMBIA**
**IN BANKRUPTCY**


**IN THE MATTER OF THE BANKRUPTCY OF**
**BENCH ACCOUNTING, INC.**


**FIRST REPORT OF THE TRUSTEE**


**MARCH 5, 2025**

# Contents                                                     Page

1.0    Introduction ........................................................................................... 1

2.0    Background ............................................................................................ 3

3.0    Pre-Bankruptcy Sale Process and Events .......................................... 7

4.0    Events Leading to the Transaction ..................................................... 9

6.0    Consolidation Application .................................................................. 13

7.0    COMI................................................................................................... 13

8.0    Anticipated Next Steps ...................................................................... 15

9.0    Conclusion and Recommendation .................................................... 15

# Appendix                                                      Tab

Certificates of Appointment dated January 7, 2025............................................A

Bidder Letter dated December 29, 2025 ............................................................B

Letter of Intent dated January 1, 2025 ............................................................. C

Transition Services Agreement dated January 17, 2025................................... D

Asset Purchase Agreement dated February 25, 2025 ......................................E

Transaction Inspector Approval Resolution dated March 4, 2025 ......................F



## 1.0  Introduction

1.  On January 7, 2025 (the "**Filing Date**"), 10Sheet Services Inc. ("**10Sheet**") and Bench Accounting, Inc. ("**Bench**", and together with 10Sheet, the "**Companies**") filed assignments in bankruptcy pursuant to section 49 of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, as amended (the "**BIA**"), and KSV Restructuring Inc. ("**KSV**") was appointed the Licensed Insolvency Trustee of each of the bankruptcy estates (in such capacity, the "**Trustee**") by the Office of the Superintendent of Bankruptcy (Canada) (the "**OSB**").  Copies of the Certificates of Appointment issued by the OSB are attached as **Appendix "A"**.

2.  The appointment of the Trustee was affirmed at the first meetings of creditors held separately for each of the Companies on January 27, 2025.  John Borch, a representative of National Bank of Canada ("**NBC**"), the Companies' operating lender and largest secured creditor, was the sole inspector (the "**Inspector**") appointed in each of the Companies' bankruptcies.

3.  On February 6, 2025, the Trustee opened a bankruptcy file in these proceedings.

4.  Prior to the Filing Date, the Companies operated a combined business that provided accounting, bookkeeping, tax and other financial services to over 10,000 customers (the "**Business**") across North America.

5.  This report (the "**First Report**") is filed by KSV in its capacity as Trustee.

### 1.1  Purposes of this First Report

1.  The purposes of this First Report are to:

    a)  provide background information with respect to:

        i.  the Companies and the Business;

        ii.  the events leading to the Companies' bankruptcy filings;

        iii.  an asset purchase agreement dated February 25, 2025 (the "**APA**") pursuant to which the Trustee, as seller, and Recruiter.com Ventures Inc. ("**Recruiter**"), as purchaser, pursuant to which Recruiter will acquire substantially all of the Companies' property, assets and undertaking and will continue to operate the Business, subject to the issuance of an Approval and Vesting Order (the "**AVO**") by the Supreme Court of British Columbia (the "**BC Court**"), and recognition of

the AVO by the United States District Court for the State of Delaware (the "**US Court**"), in proceedings (the "**Chapter 15 Proceedings**") to be commenced in the US Court pursuant to chapter 15 ("**Chapter 15**") of title 11 of the *United States Code*, 11 U.S.C.§§ 101-1532 (the "**US Bankruptcy Code**"); and

iv.    a transition services agreement between the Trustee and Recruiter, whereby the Trustee made certain assets, including intellectual property, systems, services and employees of the Companies available for the use of Recruiter so that it could operate the Business until closing, all on certain terms and conditions;

b)    provide the rationale for the Trustee's view that Vancouver, BC is the Companies' center of main interest ("**COMI**") for the purpose of these and the Chapter 15 Proceedings; and

c)    provide the Trustee's recommendations that the BC Court grant:

i.    an order consolidating these proceedings with Supreme Court of British Columbia Action No. B-250047, Vancouver Registry (the "**10Sheet Bankruptcy Proceedings**");

ii.    an order (the "**Ancillary Order**") declaring that the Companies' COMI is Vancouver, BC and authorizing and empowering the Trustee to act as the Companies' foreign representative (the "**Foreign Representative**") for the purpose of commencing and otherwise carrying on the Chapter 15 Proceedings; and

iii.    the AVO approving the Transaction, the APA and the conveyance of the Purchased Assets (as defined below) to Recruiter free and clear of any and all claims, liabilities, liens, and encumbrances.

## 1.2    Restrictions

1.    In preparing this First Report, the Trustee has relied upon the Companies' unaudited financial information, books and records, information available in the public domain, and discussions and correspondence with the Companies' management and employees, representatives of Recruiter, representatives of iNovia Capital Inc. ("**iNovia**"), an investor in Bench, and DLA Piper (Canada) LP ("**DLA**"), iNovia's legal counsel.

2.  The Trustee has not audited or otherwise attempted to verify the accuracy or completeness of the financial information relied upon to prepare this First Report in a manner that complies with Canadian Auditing Standards ("**CAS**") pursuant to the Chartered Professional Accountants of Canada Handbook and, accordingly, the Trustee expresses no opinion or other form of assurance contemplated under the CAS in respect of such information.  Any party wishing to place reliance on the financial information, other than the BC Court and the US Court, should perform its own diligence.

3.  The Trustee accepts no responsibility for any reliance placed by any third party, other than the BC Court and the US Court, on the Companies' financial information presented herein.

### 1.3  Currency

1.  Canadian dollar amounts herein have been converted to US dollars using the exchange rates as of the Filing Date, being $1.434, where applicable.

2.  Canadian dollar references are noted as "C$" and US dollars references are noted as "US$".

## 2.0  Background

1.  Prior to the Filing Date, the Companies provided accounting, bookkeeping and tax services under the "Bench" name.

2.  10Sheet was incorporated on October 14, 2010 under the *Canada Business Corporations Act*.  10Sheet is a subsidiary of Bench, which is a Delaware company that was incorporated on March 8, 2012.  Bench has approximately 135 common shareholders.  Bench also raised capital through several preference share raises and secured convertible debentures.  The Companies' head office was located in Vancouver, BC.

3.  As of the Filing Date, the Companies had over 10,000 customers, substantially all of which contracted with Bench, and approximately 413 employees, substantially all of which were employed by 10Sheet.

4. A summary of the Companies' balance sheets as of the Filing Date is provided in the table below.

| (USD, $000s, unaudited) | Bench | 10Sheet | Consolidated |
|---|---:|---:|---:|
| **Assets** | | | |
| Cash | 185 | 185 | 370 |
| Accounts Receivable | 839 | 23 | 862 |
| Other Current Assets | 787 | 222 | 1,009 |
| Fixed Assets | 160 | 2,703 | 2,863 |
| Total Assets | **1,971** | **3,133** | **5,104** |
| **Liabilities**[1] | | | |
| Current Liabilities | 9,764 | 4,833 | 14,597 |
| Long-Term Debt[2] | 35,675 | 1,264 | 36,939 |
| Total Liabilities | 45,439 | 6,097 | 51,536 |
| **Equity** | | | |
| Share Capital | 89,732 | 1 | 89,733 |
| Accumulated Deficit | (133,200) | (12,632) | (145,832) |
| Translation Adjustment | - | 9,667 | 9,667 |
| **Total Liabilities & Equity** | **1,971** | **3,133** | **5,104** |

5. As reflected by the table, the book value of the Companies' assets as of the Filing Date was a small fraction of their liabilities, including a total of approximately US$34.6 million owing to NBC at that time. As of the Filing Date, the Companies had an accumulated deficit of approximately US$146 million, representing several years of recurring losses.

6. A summary of the Companies' assets as of the Filing Date is provided below.

| | 10Sheet | Bench |
|---|---|---|
| **Cash** | Represents the Companies' cash balance as of the Filing Date. | |
| **Accounts receivable** | Nil | Substantially all accounts receivable were owing to Bench. There have been no accounts receivable collections since the Filing Date. |
| **Other current asset** | Represents the net book value of the Companies' prepaid expenses. The majority of these are uncollectible. | |

---

[1] Bench is the primary borrower under the NBC facility. 10Sheet guaranteed Bench's obligations to NBC on a secured basis.

[2] Comprised of the NBC debt (US$32.2 million), convertible notes (US$3.8 million); and capital lease obligations (US$0.9 million). Excluding the portion of these liabilities included in current liabilities.

| Fixed assets | Represents the net book value of leased computers, IT peripherals and other office equipment, the Companies' head office lease, and leasehold improvements at the Vancouver head office. | Represents the net book value of computer equipment and IT peripherals. |
|---|---|---|

7.  As reflected in the table below, the Companies' losses from April 1, 2022 to December 31, 2024 totaled approximately US$59.2 million.  As of December 31, 2024, the Companies' losses were projected to continue for the foreseeable future.

| Consolidated | Audited | | 9 Months, Unaudited |
|---|---|---|---|
| USD ($000s) | March 31, 2023 | March 31, 2024 | Dec 31, 2024 |
| Revenue | 43,242 | 48,949 | 33,167 |
| Net income (loss) | (29,307) | (13,501) | (16,350) |

## 2.1   Secured Creditors

**National Bank of Canada**

1.  NBC is the Companies' operating lender and largest secured creditor.  Pursuant to a credit agreement dated June 7, 2024 (the "**Credit Agreement Date**"), as amended by a first amending agreement dated October 1, 2024, and a forbearance, funding, and second amending agreement dated December 12, 2024 (collectively, the "**NBC Credit Agreement**"), NBC made the following credit facilities available to the Companies:

    a)  a term facility in the aggregate principal amount of US$15 million;

    b)  a revolving loan facility up to an aggregate principal amount of US$20 million; and

    c)  a hedging facility up to an aggregate principal amount of C$5.5 million.

2.  Between the Credit Agreement Date and the Filing Date, NBC's loans to the Companies increased by approximately US$9.5 million.  As at the Filing Date, NBC was owed approximately US$34.6 million, before interest and fees.

3.  Fasken Martineau DuMoulin LLP ("**Fasken**"), the Trustee's legal counsel, has provided the Trustee with an opinion confirming that, subject to the standard assumptions and qualifications contained therein, NBC's security is valid and enforceable as against a trustee in bankruptcy.

**Other Secured Creditors**

1.  In addition to NBC, the following parties registered financing statements in the British Columbia Personal Property Registry against one or both Companies:

    a)  **iNovia**, as collateral agent, against each of the Companies in respect of subordinated secured convertible promissory notes issued by the Companies on September 28, 2023, with a balance outstanding of approximately US$5.6 million as of the Filing Date;

    b)  **Apple Canada Inc., Hewlett-Packard Financial Services Canada Company, Vault Creditor Corporation, and Wells Fargo Equipment Finance Company** had registrations against 10Sheet in respect of computers used by employees, IT peripherals, and security equipment; and

    c)  **Bank of Montreal ("BMO")**, the Companies' previous secured lender.  The Trustee understands that other than a small overdraft on BMO accounts[3], no amounts are owing by the Companies to BMO.

## 2.2   Unsecured Creditors

1.  The table below provides a summary of the book value of the Companies' unsecured claims as at the Filing Date.

|  | Unaudited US$000s |
|---|---|
| Bench | 11,260 |
| 10Sheet | 7,706 |
|  | 18,966 |

---

[3] The Companies continued to use BMO accounts after NBC paid out BMO.

2.   The Companies' unsecured creditors are further detailed in the tables below.

Bench:

| Creditor | Description | Unaudited US$000s |
|---|---|---|
| Bain Capital Venture Fund 2014, L.P. | Unsecured convertible note | 320 |
| Paro, Inc. | Outsourced client tax preparation | 276 |
| Altos Ivy LLC | Unsecured convertible note | 275 |
| Gusto, Inc. | Human resource management software | 242 |
| iNovia | Unsecured convertible note | 222 |
| Other | | 9,925 |
| Total | | 11,260 |

10Sheet:

| Creditor | Description | Unaudited US$000s |
|---|---|---|
| Morguard Investments Limited | Head office landlord | 4,042 |
| HGS Canada Inc. | Outsourced bookkeeping workforce | 494 |
| Sun Life Assurance Company of Canada | Employee Benefits | 361 |
| PricewaterhouseCoopers LLP | Audit and Tax services | 218 |
| Ultimate Software of Canada, Inc. | Canadian and US payroll processing | 107 |
| Other | | 2,484 |
| Total | | 7,706 |

3.   The unsecured creditor summaries above exclude off-balance sheet obligations.  In respect of Bench, these include, but are not limited to, terminated contracts and amounts owing to customers who prepaid for services (estimated to total approximately US$5.6 million).  In respect of 10Sheet, these include, but are not limited to, amounts that may be owing to employees for unpaid severance and termination pay, if any.

## 3.0  Pre-Bankruptcy Sale Process

1.   In late November 2024, the Companies advised NBC they were projected to run out of cash by mid-December 2024.  As a result, NBC engaged KSV as NBC's financial advisor pursuant to an engagement letter dated November 28, 2024.  KSV's mandate included, among other things, reviewing the Companies' weekly cash flow projection for the period ending March 1, 2025 (the "**Cash Flow Forecast**").

2.   KSV's review confirmed that the Companies were projected to run out of liquidity by the end of December 2024 and that additional funding of approximately US$7.7 million would be needed to March 1, 2025.  NBC advised the Companies that it was not prepared to provide the Companies with additional liquidity given the historical performance of the Business, the

substantial increase in its exposure since the Credit Agreement Date (approximately US$9.5 million), and the Companies' projected ongoing cash burn rate.

3.  As a service business, the Companies' primary assets are their intangible property, being their customer base, technology platform and employees.  As such, the only way to generate recoveries above liquidation value (which were estimated to be nil or negative) was to complete a going-concern sale on an expedited basis.

4.  Accordingly, beginning in early December 2024, the Companies and iNovia, with the consent of NBC, and oversight by KSV, commenced a sale process (the "**Sale Process**") with a bid deadline of December 20, 2024 (the "**Bid Deadline**") and the objective of closing a transaction shortly thereafter.

5.  The Sale Process involved the following:

    a)  the Companies prepared a virtual data room (the "**VDR**") and a non-disclosure agreement (an "**NDA**") that interested parties were required to sign in order to commence due diligence and to obtain access to the VDR;

    b)  DLA, with input from KSV, drafted a template asset purchase agreement (the "**Template APA**") which was uploaded to the VDR;

    c)  DLA, also with input from KSV, drafted a template transition services agreement (the "**TSA**"), which was also uploaded to the VDR.  The purpose of the TSA was to facilitate an expedited closing of a transaction.  The TSA provided a mechanism for a buyer to continue to perform due diligence following closing.  In this regard, if a buyer had not determined as of the closing date, *inter alia*, which contracts to assume or employees to hire, the Companies would retain, post closing, at the buyer's cost, all contracts and employees until the buyer could determine which ones it wanted to retain; and

    d)  each participant in the Sale Process was advised of the expedited timelines, including the Bid Deadline.  Certain bidders corresponded directly with KSV to understand the Sale Process, the purpose of the TSA and its terms.

6.  The Companies engaged in discussions with approximately 10 parties during the Sale Process, however, only one unacceptable offer was submitted at the Bid Deadline.

## 4.0  Events Leading to the Transaction

1.  On Friday, December 27, 2024, without liquidity to continue to operate, the Companies announced that they intended to cease operations immediately.  The Companies terminated all employees at that time.

2.  The Trustee has been advised that immediately following the Companies' announcement, the representatives of the Companies were contacted by approximately 12 parties who expressed an interest in some or all the Business.  Additionally, representatives of the Companies also reached out to parties that they believed may have an interest in the opportunity.  One of these parties was Recruiter.

3.  The Companies engaged with multiple parties and on December 29, 2024, a letter (the "**December 29th Letter**") was sent to interested parties.  A copy of the Second Bid Letter is attached as **Appendix "B"**.  Pursuant to the December 29th Bid Letter, offers needed to:

    a)  be submitted immediately;

    b)  be in the form of a binding letter of intent, setting out the purchase price, principal deal terms, and preferred transaction structure; and

    c)  confirm that the buyer would pay a material, non-refundable deposit which would be fully earned upon being selected as the successful bidder.

4.  Recruiter emerged as the lead bidder as a result of this process.  Between December 29, 2024 and January 1, 2025, Recruiter, the Companies' management and certain former and current members of the Companies' board, in consultation with KSV, as advisor to NBC, engaged in round-the-clock negotiations.  The negotiations resulted in the execution of a binding letter of intent on January 1, 2025 (the "**LOI**"), which required that Recruiter pay a C$1 million deposit, of which C$800,000 was to be paid by January 3, 2025, with the balance to paid on January 14, 2025[4].  The LOI contemplated a February 28, 2025 closing date (the "**Contemplated Closing Date**").  A copy of the LOI is attached as **Appendix "C"**.

5.  The LOI negotiations were conducted on an urgent basis to preserve the Business.  Pursuant to the LOI, Recruiter was permitted to carry on the Business until the Contemplated Closing Date.  Recruiter immediately started contracting with, or hiring, a significant number of the Companies' employees, which was necessary to minimize

---

[4] Both amounts have been paid.

disruption to the Companies' customers and to preserve the Business.  Had Recruiter not taken these steps, customers would have looked for an alternative bookkeeping service.

6.  On January 17, 2025, to facilitate Recruiter's operation of the Business until the Contemplated Closing Date, the Trustee and Recruiter negotiated a Transition Services Agreement (the "**TSA**"), a copy of which is attached as **Appendix "D"**.  The TSA has since been amended to provide that it continues until the APA closes, unless otherwise agreed by Recruiter and the Trustee.

7.  On February 25, 2025, Recruiter and the Trustee executed the APA, which is unconditional except for approval of the BC Court and recognition of the AVO by the US Court. A copy of the APA is attached as **Appendix "E"**.

8.  The outside date for completion of the Transaction under the APA is April 15, 2025. If the Transaction does not close or is not approved by the BC Court and the US Court, Recruiter is required to forthwith discontinue the Business.

## 4.1   APA[5]

1.  The following is a summary of the key terms of the APA.

a)  **Purchaser:** Recruiter.com Ventures Inc.

b)  **Seller:** the Trustee.

c)  **Purchase Price:** C$13 million, plus the assumption by the Purchaser of the Assumed Liabilities and Cure Costs.

d)  **Deposit:** C$1 million, which has been paid in full.

e)  **Purchased Assets:** substantially all of the Companies' personal tangible and intangible assets, which are used or held for use in connection with the Business, free and clear of all Encumbrances, including without limitation:

i.  all Assigned Contracts as set out in Schedule A to the APA;

---

[5] Capitalized terms not otherwise defined in this section have the meanings ascribed to them in the APA.

ii. each Company's rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Purchased Assets;

iii. originals, or where not available, copies, of all Books and Records;

iv. all Intellectual Property owned by each of the Companies and used in connection with the Business, including any registrations related thereto;

v. all Accounts Receivable;

vi. all Permits and Licenses;

vii. the goodwill of the Business, including the right to use the names "Bench" and "10Sheet"; and

viii. all other assets of the Companies set forth in Schedule A to the APA.

f) **Excluded Assets:** the Purchased Assets do not include the Excluded Contracts and all other assets of the Companies that are not Purchased Assets, including, without limitation, the assets listed in Schedule B to the APA.

g) **Assumed Liabilities:** (i) any Cure Costs which are not paid at Closing; and (ii) Liabilities relating to the Purchased Assets and Assigned Contracts, solely in respect of the period from and after the Closing Effective Time and not relating to the period prior to the Closing Effective Time.

h) **Excluded Liabilities:** any Liabilities of the Companies other than the Assumed Liabilities.

i) **Representations and Warranties:** consistent with the terms of a standard insolvency transaction (i.e., on an "as is, where is" basis, with limited representations and warranties).

j) **Closing Date:** five Business Days after obtaining the Recognition Order.

k) **Outside Date:** 11:59 p.m. (Eastern Standard Time) on April 15, 2025, unless otherwise agreed by the Vendor and the Purchaser.

l)   **Conditions to Closing:** among other things:

    i.   the AVO is a final order, i.e. not subject or potentially subject to any appeal; and

    ii.  an order from the US Court enforcing the AVO in the United States (the "**Recognition Order**") is granted.

## 5.0  Transaction Recommendation

1.   The Trustee recommends that the BC Court grant the AVO and approve the Transaction for the following reasons:

a)   it is a condition of the APA that the Transaction be approved by the BC Court, and that the US Court recognize the AVO;

b)   the Companies, in consultation with their most significant financial stakeholder, NBC, worked diligently and in good faith to attempt to sell the Business pursuant to the Sale Process, which was ultimately unsuccessful;

c)   KSV, NBC's advisor, worked with, oversaw and had input into the Sale Process, and ultimately, the LOI.  KSV, as Trustee, negotiated the APA and the TSA;

d)   NBC is the only financial stakeholder that has an economic interest in the Transaction. In this regard, NBC's representative, Mr. Borch, is the sole inspector appointed in each of the Companies' bankruptcies.  Mr. Borch voted in favour of resolutions at inspectors' meetings held in each bankruptcy proceeding to approve the APA and the Transaction and to authorize the Trustee to seek approval of the BC Court and the US Court.  Copies of the inspector resolutions are attached as **Appendix "F"**;

e)   the net realizable value of the Companies' assets outside of the Transaction are projected to be nil, or negative, once costs of realization and professional fees are considered;

f)   the Transaction provides a going-concern solution for the Companies, which results in job opportunities for a large number of the Companies' employees and provides the Companies' customers with the opportunity to avoid disruption in their accounting and bookkeeping services by working with Recruiter; and

g)   the Trustee is strongly of the view that further time spent marketing the Companies' assets and Business will not result in a superior or any transaction.

## 6.0  Consolidation Application

1.  The Trustee is seeking an order consolidating these proceedings with the 10Sheet
    Bankruptcy Proceedings.  The Trustee is of the view that consolidation of the proceedings
    is appropriate given that the Companies' share a common secured creditor (NBC), their
    assets are proposed to be sold in one transaction, and the administration of the Companies'
    estates and court proceedings would be more efficient if the proceedings were consolidated.

## 7.0  COMI

1.  The Trustee is of the view that Vancouver, BC is the COMI for the Companies for the
    following reasons:

    a)  the Companies were headquartered in Vancouver, with their only office located at 545
        Robson Street in Vancouver;

    b)  the bankruptcy filings were made in Vancouver and the OSB accepted that Vancouver
        is the appropriate jurisdiction for the filings, including for convening the first meeting
        of creditors of each of the Companies;

    c)  as a result of the bankruptcies, all of the property, assets and undertaking of the
        Companies vests in the Trustee.  From and after the Filing Date, the Trustee is the
        sole representative of the Companies.  KSV, the Trustee, is a Canadian financial
        advisory practice that focuses on restructuring and insolvency;

    d)  10Sheet is a Canadian Corporation and was the employer of nearly all of the
        employees who worked in the Business;

    e)  substantially all administrative and daily operations for the Companies, including
        accounting, financial reporting, budgeting, treasury and operational oversight, were
        performed by 10Sheet's employees, including by the VP Finance and Business
        Operations, the Chief People Officer and the Head of Technology, each of whom was
        employed by 10Sheet;

    f)  the sole member of the Board of Directors at the Filing Date was Shawn Abbott, a
        founder of iNovia, a Canadian based venture capital firm which invested in the
        Companies;

g) the Companies' cash management system was managed by employees of 10Sheet;

h) the Companies largest creditors are based in Canada, as follows:

  i. NBC is a Canadian bank, and its credit agreements are governed by the laws of British Columbia.  It is the only creditor with an economic interest in the Transaction;

  ii. iNovia, a Canadian venture capital firm, as collateral agent, against each of the Companies in respect of subordinated secured convertible promissory notes issued by the Companies on September 28, 2023 and which had a balance outstanding of approximately US$5.6 million as of the Filing Date; and

  iii. the Companies' largest unsecured creditor, Morguard, is the Companies' Vancouver landlord and is based in Toronto, Ontario;

i) the Companies' vendor relationships were managed by 10Sheet's employees;

j) the Companies' external auditors are PricewaterhouseCoopers LLP in Canada; and

k) the audited financial statements of the Companies are conducted in accordance with Canadian Generally Accepted Accounting Principles.

## 7.1  Foreign Representative

1. Bench is a Delaware company and the borrower under the NBC facility, with 10Sheet as guarantor.  As the Companies have a significant number of US suppliers and customers, Recruiter requires that the orders issued by the BC Court in these proceedings be recognized by the US Court.  Accordingly, the Ancillary Order authorizes and empowers the Trustee to act as the Foreign Representative for the purpose of commencing the Chapter 15 Proceedings in the US Court under Chapter 15 of the US Bankruptcy Code.

2. Subject to the BC Court granting the Ancillary Order and the AVO, KSV, as Foreign Representative, intends to forthwith commence the Chapter 15 Proceedings for the purpose of having the US Court recognize the AVO and any other relevant orders issued by the BC Court in these proceedings.

## 8.0  Anticipated Next Steps

1.  Subject to the BC Court granting the relief sought by the Trustee, the next steps in these bankruptcy proceedings include the following:

    a)  filing a motion with the US Court to commence the Chapter 15 Proceedings;

    b)  filing a motion with the US Court seeking the Recognition Order;

    c)  closing the Transaction;

    d)  making distributions to creditors in accordance with the BIA; and

    e)  bringing applications in due course to terminate these proceedings in Canada and the US.

## 9.0  Conclusion and Recommendation

1.  Based on the foregoing, the Trustee respectfully recommends that the BC Court make the orders granting the relief sought by the Trustee.

*    *    *

All of which is respectfully submitted,

*KSV Restructuring Inc.*

**KSV RESTRUCTURING INC.,**
**SOLELY IN ITS CAPACITY AS LICENSED INSOLVENCY TRUSTEE OF**
**BENCH ACCOUNTING, INC.**
**AND NOT IN ITS PERSONAL OR CORPORATE CAPACITIES**

Appendix **"A"**

 **Industry Canada**        Industrie Canada
**Office of the Superintendent**    **Bureau du surintendant**
**of Bankruptcy Canada**        **des faillites Canada**

District of:    British Columbia
Division No.: 03 - Vancouver
Court No.:    11-3171493
Estate No.:    11-3171493

In the Matter of the Bankruptcy of:

**Bench Accounting, Inc.**

Debtor

**KSV RESTRUCTURING INC.**

Licensed Insolvency Trustee

Ordinary Administration

| | | | |
|---|---|---|---|
| Date and time of bankruptcy: | January 07, 2025, 11:34 | Security: | $0.00 |
| Date of trustee appointment: | January 07, 2025 | | |
| Meeting of creditors: | January 27, 2025, 10:00 THE SUTTON PLACE HOTEL VANCOUVER 845 BURRARD ST, ROOM CHATEAU BELAIR VANCOUVER, British Columbia Canada, | | |
| Chair: | Official Receiver | | |

CERTIFICATE OF APPOINTMENT - Section 49 of the Act; Rule 85

-- AMENDED --

I, the undersigned, official receiver in and for this bankruptcy district, do hereby certify that:

- the aforenamed debtor filed an assignment under section 49 of the *Bankruptcy and Insolvency Act*;

- the aforenamed trustee was duly appointed trustee of the estate of the debtor.

The said trustee is required:

- to provide to me, without delay, security in the aforementioned amount;

- to send to all creditors, within five days after the date of the trustee's appointment, a notice of the bankruptcy; and

- when applicable, to call in the prescribed manner a first meeting of creditors, to be held at the aforementioned time and place or at any other time and place that may be later requested by the official receiver.

Date: January 16, 2025, 13:01

E-File/Dépôt Electronique                                        Official Receiver

300 Georgia Street W, Suite 2000, Vancouver, British Columbia, Canada, V6B6E1, (877)376-9902

Canada

**2**

 **Industry Canada**
**Office of the Superintendent
of Bankruptcy Canada**

**Industrie Canada**
**Bureau du surintendant
des faillites Canada**

District of:    British Columbia
Division No.: 03 - Vancouver
Court No.:    11-3171491
Estate No.:    11-3171491

In the Matter of the Bankruptcy of:

**10Sheet Services Inc.**

Debtor

**KSV RESTRUCTURING INC.**

Licensed Insolvency Trustee

Ordinary Administration

---

| | | | |
|---|---|---|---|
| Date and time of bankruptcy: | January 07, 2025, 11:32 | Security: | $0.00 |
| Date of trustee appointment: | January 07, 2025 | | |
| Meeting of creditors: | January 27, 2025, 11:30<br>THE SUTTON PLACE HOTEL VANCOUVER<br>845 BURRARD ST, ROOM CHATEAU BELAIR<br>VANCOUVER, British Columbia<br>Canada, | | |
| Chair: | Official Receiver | | |

<u>CERTIFICATE OF APPOINTMENT - Section 49 of the Act; Rule 85</u>

-- AMENDED --

I, the undersigned, official receiver in and for this bankruptcy district, do hereby certify that:

- the aforenamed debtor filed an assignment under section 49 of the *Bankruptcy and Insolvency Act*;
- the aforenamed trustee was duly appointed trustee of the estate of the debtor.

The said trustee is required:

- to provide to me, without delay, security in the aforementioned amount;
- to send to all creditors, within five days after the date of the trustee's appointment, a notice of the bankruptcy; and
- when applicable, to call in the prescribed manner a first meeting of creditors, to be held at the aforementioned time and place or at any other time and place that may be later requested by the official receiver.

Date: January 16, 2025, 13:03

E-File/Dépôt Electronique

Official Receiver

300 Georgia Street W, Suite 2000, Vancouver, British Columbia, Canada, V6B6E1, (877)376-9902

Appendix **"B"**



DLA Piper **(Canada) LLP**
Bay Adelaide - West Tower
Suite 5100 - 333 Bay Street
Toronto, ON  M5H 2R2
www.dlapiper.com

Edmond Lamek
edmond.lamek@dlapiper.com
**T**  416.365.3444
**C**  416.579.1871

December 29, 2024

TO WHOM IT MAY CONCERN

**RE: BENCH ACCOUNTING, INC. AND 10SHEET SERVICES INC. (the "Companies")**

DLA Piper (Canada) LLP is counsel to the Companies.  This letter is being provided to you further to and in reliance on the mutual non-disclosure agreement which you executed with the Companies in respect of a sale and investor solicitation process (the "**SISP**") for the Companies, their shares, or their businesses and assets, currently being conducted by the Companies.  It is anticipated that any sale transaction will ultimately have to be completed pursuant to Court order under applicable insolvency legislation.

Because of the Companies' present circumstances, the Companies have set **SUNDAY DECEMBER 29, 2024 AT 12:00 P.M. PACIFIC TIME (the "Bid Deadline")**, as the deadline for receipt of binding offers, in the forms of binding letters of intent ("**LOI**"), setting out the purchase price and principal deal terms, and preferred transaction structure.  Bidders should expect to pay a material non-refundable and fully earned deposit ("the "**Deposit**") upon being selected as the successful bidder, so an indication of that deposit amount in the LOI will be a relevant factor.

For greater certainty, given the Companies' secured indebtedness to National Bank of Canada (the "**Bank**"), the Companies will need to review offers received with KSV Restructuring Inc. ("**KSV**"), the advisor to the Bank, and the Bank, in order to determine whether any of the LOIs are acceptable and capable of being completed, whether any refinements/revisions to any LOI's are required, the successful bidder, if any, and  the ultimate transaction structure and timelines, which may, in the circumstances require an interim arrangement being put in place with the successful bidder upon payment of the Deposit, and the closing of a sale transaction taking place as soon as possible as the necessary Court processes will allow.

Given the compressed timelines and very limited Company resources, LOI bids with NO conditions to closing, other than Court approval of a transaction, will be viewed more favourably than once containing closing conditions of any kind. In all circumstances, any Deposit paid will not be refundable upon acceptance of the LOI.

If you have any questions please contact Sarah Hinkfuss at shinkfuss@baincapital.com or Shawn Abbott at sabbott@inoviacapital.com.

**DLA Piper (Canada) LLP**

Per:

Edmond Lamek

Cc:     Bobby Kofman, KSV Restructuring Inc.
        Kayli Maguire, Bench Accounting, Inc.
        Sarak Hinkfuss, Bain Capital
        Shawn Abbott, Inovia Capital

Appendix **"C"**

# Letter of Intent
## Dated as of December 31, 2024

We, Recruiter.com Ventures Inc ("***Recruiter.com***"), are pleased to present for your and your Board's consideration this letter of intent regarding a potential acquisition of all or substantially all the assets (the "***Transaction***") of Bench Accounting Inc. and 10Sheet Services Inc. (the "***Companies***"). Pursuant to our discussions, we submit this Letter of Intent ("***LOI***") which outlines our intentions with respect to the contemplated Transaction.

1.  Confidential Information. This LOI and the discussions between the parties related to the Transaction will be considered confidential information as defined in and protected by the Non-Disclosure Agreement previously signed by the parties.

2.  Purchase Price and Form of Consideration. Recruiter.com, via a wholly owned subsidiary (collectively, the "***Purchaser***"), proposes to acquire substantially all of the assets of the Companies at the Closing Date, including, without limitation, (i) customer accounts receivable existing as of the date of this LOI ("***Existing AR***") and (ii) any other assets mutually agreed upon between the parties (collectively, with the Existing AR, the "***Acquired Assets***"). For the avoidance of doubt, Acquired Assets shall exclude (a) cash and cash equivalents, and (b) tax refunds and tax credits generated by, owing to, or earned by the Companies for the period before December 31, 2024. The Purchaser shall acquire the Acquired Assets on the Closing Date on a debt-free basis for the total consideration of thirteen million Canadian dollars (CAD$13,000,000), paid by way of CAD$1,000,000 of non-refundable deposits (as set forth in Section 3 below), and CAD$12,000,000 in cash on the closing of the Transaction (the "***Purchase Price***"). The Purchase Price is not subject to any working capital requirements or adjustments of any kind. The Companies' deferred revenue shall not be considered debt and shall not result in a purchase price deduction.

3.  Deposits. (i) No later than one (1) business day after December 31, 2024, (A) a payment in the amount of CAD$500,000 shall be paid to the Companies by Altos Ventures on behalf of the Purchaser and (B) the Purchaser shall pay CAD$300,000 to the Companies; and (ii) on or before January 14, 2025, the Purchaser shall pay to the Companies in a further payment of CAD$200,000 (each of the payments described in this Section 3, a "***Deposit***" and together the "***Deposits***"). Each Deposit is fully earned and non-refundable upon receipt by the Companies.

4.  Treatment of Deposits.  In the event of the consummation of the Transaction, and effective as of the Closing Date, the Deposits shall be credited against the Purchase Price.

5.  Transaction Form. It is currently contemplated that the Transaction will take the form of a purchase of substantially all of the assets of the Companies, but, given the abbreviated diligence period prior to issuing this LOI, the transaction form is subject to change.

6.  Customer Consent for Data Transfer. In anticipation of the Transaction, the Companies have engaged the Purchaser as a consultant to provide various transition services. As part of those services, customers may opt to transfer their data to Recruiter.com. Any such transfer will be contingent upon obtaining explicit consent from customers. This consent will be acquired by requiring customers to click "I Consent" when they log into the Companies' app. No customer data will be transferred without such consent.

7.  Closing Date. The Purchaser believes it can, with the assistance of the Companies: (i) complete its due diligence, negotiate and execute a purchase agreement and (ii) close on the Transaction, as soon

**7**

as February 28, 2025 (such closing date, the "***Closing Date***").

8. <u>Closing Conditions</u>. Recruiter.com and the Purchaser's obligation to consummate the Transaction is conditioned upon:

    a.   The negotiation, execution and delivery of a mutually acceptable purchase agreement by the respective parties (which for greater certainty in the case of the Companies may include the Companies' Trustee in Bankruptcy or Court Appointed Receiver). It is expressly understood and acknowledged by the parties hereto that (i) this LOI does not state all of the essential terms and conditions of a Transaction and (ii) the Transaction will be subject to customary representations and warranties for a transaction of this nature, including, without limitation, that the Acquired Assets will be purchased on an "as is, where is" basis as they shall exist as of the closing of the transaction; and

    b.   The delivery of all Court and creditor or inspector approvals necessary to allow the orderly consummation of the Transaction.

9. <u>Post-LOI Company Expenses</u>. On and from 12:01 am Pacific Time on January 1, 2025, Recruiter.com shall assume responsibility for and pay all operating expenses directly related to the ongoing operation of the Companies' business.  For greater certainty, should a go forward provider of goods or services requested by the Purchaser require payment of arrears predating this LOI as a condition of such future supply, all such arrears payment shall be for the account of and paid by the Purchaser from and after the date hereof. The Purchaser shall also be responsible for the payment of all cure costs required by the Court to be paid upon the assignment of any Company contract to the Purchaser that the Purchaser has requested be assigned to it in connection with the Transaction.

10. <u>Existing AR and Post-LOI Revenue</u>. All amounts collected by the Companies on or after December 31, 2024 on account of Existing AR shall be segregated and deposited by the Companies in a designated bank account ("***Collected AR***"). On and conditional upon the closing of the Transaction, the Companies shall transfer the Collected AR to the Purchaser.  In the event that this agreement is terminated by the Purchaser, or the Purchaser defaults in a Deposit payment, or Closing does not occur before February 28, 2025, the Collected AR shall be for the account of the Companies. Any revenue generated by the Purchaser or by the Companies resulting from new customer sales or services fulfilment provided by the Purchaser or the Companies from and after the date of this LOI shall before the account of the Purchaser, subject to section 9 hereof.

11. <u>Buyer's Financial Capability</u>. Recruiter.com represents that it has sufficient cash and credit resources readily available to successfully close the Transaction, ensuring that the balance of the purchase price will be paid in full at Closing without any financing contingencies.

12. <u>Prohibition Against Consideration of Other Acquisition Proposals</u>. Until the earlier of (i) January 15, 2025, or if all Deposits have been paid in accordance <u>Section 3</u> hereof, February 28, 2025, (ii) the date on which Purchaser and the Companies enter into the definitive purchase agreement, or (iii) the date on which Purchaser advises the Companies in writing that Purchaser is terminating its negotiations regarding the Transaction contemplated by this LOI, the Companies shall not:
    a.   enter into any agreement, understanding or arrangement with any third party relating to any Acquisition Proposal (as defined below);
    b.   engage in any discussions or negotiations with any third party relating to any Acquisition Proposal;
    c.   provide any information regarding the Companies or its business or operations to any third party (other than to representatives of Purchaser) in connection with an Acquisition Proposal;

    d.   solicit or encourage the submission of any Acquisition Proposal; or

    e.   permit any representative or affiliate of the Companies or any stockholder of the Companies to do any of the foregoing.

The term "**_Acquisition Proposal_**" refers to any proposal, plan, agreement, understanding or arrangement contemplating (i) any merger, consolidation, reorganization, recapitalization or similar transaction involving the Companies or any of its affiliates, (ii) any transfer or issuance of more than fifteen percent (15%) of the capital stock or other securities of the Companies or any of its affiliates (other than the Stock to Purchaser as contemplated by this LOI, stock in satisfaction of the exercise of stock options, stock to spouses of Stockholders, or stock to trusts created by Stockholders), or (iii) any transfer, via sale, license or otherwise, of any material asset of the Companies or any of its affiliates.

13.  <u>Additional Provisions</u>. This LOI is good until noon, Pacific Time, Wednesday January 1, 2025, and if not countersigned and returned to the Purchaser by then shall terminate. This LOI, if executed, will represent an expression of intent only, and does not set forth all of the matters upon which agreement must be reached in order for the proposed transactions to be consummated. The respective rights and obligations of Purchaser and the Companies will remain to be defined in the definitive purchase agreement and related documents (the terms and provisions of which will be subject to approval by Purchaser and the Companies), and the parties do not intend to be legally bound or otherwise to incur any obligations with respect to the proposed transactions until such time, if ever, as the purchase agreement is executed and delivered. This LOI constitutes a binding commitment subject only to the closing conditions explicitly stated herein, primarily Court approval of the transaction under applicable Canadian insolvency legislation. The parties acknowledge that this LOI does not constitute the final, comprehensive agreement between the parties, which will be set forth in a definitive purchase agreement to be negotiated and executed by the parties. The provisions related to the Deposit, Post-LOI Operating Expenses, Post-LOI Receivables, Confidential Information, and Prohibition Against Consideration of Other Acquisition Proposals shall be immediately binding upon execution of this LOI.

**Bench Accounting, Inc. and 10Sheet Services Inc.**

By:

Name:    Shawn Abbott

Title:    Vice President

Date:    1/1/2025


**Recruiter.com**

By:

Name:    Jesse Tinsley

Title:    Founder/CEO

Date:    1/1/2025

Appendix **"D"**

# TRANSITION SERVICES AGREEMENT

This Transition Services Agreement (this "***Agreement***"), dated effective as of January 17, 2025 (the "***Effective Date***"), is entered into by KSV Restructuring Inc. in its capacities as licensed insolvency trustee of Bench Accounting, Inc. ("***Bench***") and 10Sheet Services Inc. ("***10Sheet***" and together with Bench, the "***Companies***" and each a "***Company***"), as seller (the "***Trustee***"), and Recruiter.com Ventures Inc., as buyer (the "***Buyer***", and together with the Trustee each a "***Party***", and collectively, the "***Parties***").

WHEREAS, the Buyer and the Companies entered into that certain Letter of Intent, dated as of January 1, 2025 (the "***LOI***"), pursuant to which the Companies agreed, subject to the necessary approvals, including any approvals required as a result of any bankruptcies of the Companies, to sell and assign to the Buyer, and the Buyer agreed to purchase and assume from the Companies or the Trustee, substantially all of the assets of the Companies pursuant to a definitive purchase agreement to be negotiated and entered into by the Trustee, as seller, and the Buyer by February 28, 2025 (the "***Purchase Agreement***");

AND WHEREAS, on January 7, 2025 (the "***Bankruptcy Date***"), the Companies each made an assignment in bankruptcy and the Trustee was appointed the licensed insolvency trustee of each of the Companies' bankruptcy estates;

AND WHEREAS, the  Companies, and now the Trustee, have made certain assets, contracts, systems, services, Licensed IP (as hereinafter defined) and employees available (collectively the "***Transition Services***") for the use of the Buyer during the Term (as defined below) in anticipation of and to facilitate the transfer of the Purchased Assets (as defined below) on closing of the sale transactions contemplated by the LOI, and the Buyer and the Trustee, as seller, have agreed to enter into this Agreement, pursuant to which (i) the Buyer will receive the benefit of the Transition Services (as permitted by this Agreement) prior to the consummation of the sale transactions contemplated by the LOI and (ii) the Trustee and the Companies will receive benefit from the continued operation of the Companies' Business (as defined below), enabling the Buyer to proceed with entering into the Purchase Agreement, all subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises, provisions and mutual agreements herein contained and for other good and valuable consideration including the Trustee and the Buyer negotiating the Purchase Agreement in accordance with the LOI, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **Provision of Services**.

    a.  Subject at all times to the Buyer's compliance with the terms of this Agreement and the LOI, the Trustee agrees to make the Transition Services available to the Buyer during the Term; provided that, if the Buyer is in compliance with the terms of this Agreement and the LOI, the Trustee hereby agrees that it shall not provide Licensed IP to any other third-party during the Term.

    b.  Each of the Buyer and the Trustee acknowledges, agrees and understands that almost all of the Companies' employees were terminated prior to the Bankruptcy Date and that many of these employees have been hired by the Buyer independent of and prior to the date of this Agreement. In the event this Agreement is terminated, the Buyer shall have no obligation to terminate the employment of such individuals.

    c.  The Buyer and the Trustee acknowledge and agree that this Agreement does not create a fiduciary relationship, employer-employee relationship, partnership, joint venture or

relationships of trust or agency between the parties and that the relationship between the Buyer and the Trustee is that of an independent contractor and a customer and the Buyer and the Trustee shall continue to perform all actions legally required to maintain such status as an independent contractor.

d.    At all times and in all respects under this Agreement, Buyer may, in its sole discretion, utilize the Transition Services, and shall conduct the Companies' business in a professional, timely and business-like manner and in compliance with all applicable laws and regulations applicable to the Transition Services, for use of such in Companies' business (the "***Companies' Business***"). The Buyer is, and will remain, in compliance in all respects with all laws, regulations, and permits applicable to Buyer's performance of its obligations or exercise its rights under this Agreement, including, without limitation, the Buyer's use of any services, or its use or operation of the Companies' assets and business and the Transition Services (including, without limitation, obtaining fully informed consent compliant with applicable law from customers in respect of customer data taking into account the nature and type of such data).

e.    The Buyer's affiliates, subsidiaries, and other related entities (collectively, "***Buyer's Affiliates***") shall be entitled to the same rights and benefits under this Agreement as the Buyer, to the extent such rights and benefits are necessary for the provision or receipt of the Transition Services, including the license granted in Section 2(a). However, any such rights and benefits extended to Buyer's Affiliates are subject to the following conditions:

   i.    Buyer's Affiliates shall comply with all restrictions, obligations, and limitations set forth in this Agreement, including but not limited to confidentiality, use of Licensed IP, and any other provisions governing the Transition Services. Any breach of this Agreement by a Buyer Affiliate shall be deemed a breach by the Buyer.

   ii.    The Buyer shall remain fully liable for any actions or omissions of Buyer's Affiliates under this Agreement. Buyer's Affiliates shall also be directly liable for any breaches of this Agreement to the same extent as the Buyer.

   iii.    The inclusion of Buyer's Affiliates under this Agreement shall not impose any additional obligations, liabilities, or costs on the Seller or its affiliates beyond those expressly set forth herein.

2.    **Grant of License**.

   a.    For the Term of this Agreement, and subject to Buyer's compliance with the terms and conditions of this Agreement, the Trustee, on its own behalf and on behalf of each of the Companies, hereby grants to the Buyer a non-exclusive, royalty-free, transferable and sublicensable (solely in accordance with Section 1(e)), worldwide license to use the Transition Services and the following intellectual property solely (and for no other purpose) for the ongoing operation of the Companies' Business:

   i.    All domain names, websites, URLs, and associated online properties owned or controlled by each Company;
   ii.    All trademarks, service marks, trade names, logos, trade dress, and branding elements, including associated goodwill;
   iii.    All copyrights, including copyrighted works, materials, designs, software, documentation, and databases;

iv.  All patents, including issued patents, patent applications, inventions (whether or not patentable), and related know-how;

v.  All Confidential Information (as defined below); and

vi.  All other intellectual property rights of any kind, whether registered or unregistered, including any applications, registrations, or renewals thereof, owned or controlled by the Trustee, on behalf of each Company, as of the Effective Date and as may arise during the term of this Agreement (collectively (i-vi), the "*Licensed IP*").

b.  Provided this Agreement has not been terminated and the Buyer has not breached the terms of this Agreement, the Trustee shall not license the Licensed IP to any other party during the Term except as otherwise provided herein.

c.  The Trustee retains all right, title, and interest in and to the Transition Services licensed herein, including all associated goodwill, subject only to the limited non-exclusive license expressly granted to the Buyer under this Agreement. Any intellectual property or related right or benefit therein generated in the provision of the Transition Services will be exclusively owned by the Trustee (or the applicable Company). The Buyer hereby will, and does, automatically assign, transfer and convey all right, title and interest therein (and waive and cause the waiver of any moral or similar right and perpetually, exclusively and unconditionally license any right, title or interest in favour of the Trustee, to the Trustee, upon creation, development or first reduction to practice (and will have agreements in place with any of Buyer's personnel or contractors to comply with the foregoing). No other rights, whether by implication, estoppel, or otherwise, are granted by the Trustee under this Agreement.  For certainty, if the Trustee, on its own behalf or on behalf of the Companies, does not enter into the Purchase Agreement in accordance with the provisions, and timeframes, set out in the LOI, the Buyer shall have no rights whatsoever in any of the Transitions Services or otherwise to any Confidential Information.  The Buyer shall not be entitled to use or retain any copy any of such property or Confidential Information.

d.  In the event this Agreement is terminated or expires for any reason, the Buyer's license to the Transition Services shall terminate automatically without further notice, and the Buyer shall cease any further use of the Transition Services; provided that, if this Agreement is terminated pursuant to <u>Section 6(d)</u>, the Buyer shall have twenty-four (24) hours to cease using the Transition Services (including the Licensed IP).

e.  The Buyer acknowledges that any and all use or operation of the Transition Services is entirely at the risk of the Buyer. The Trustee makes no representation, warranty or condition of any kind regarding any Transition Services whatsoever, all of which are made available to the Buyer on an "as is" basis.

f.  All information, data and materials related to the Transition Services, Licensed IP, the Companies and the Companies' assets and business is the Confidential Information of each Company and is the sole property of the Trustee, and the Buyer must: (i) treat the Confidential Information as confidential and sensitive; (ii) not use the Confidential Information for any purpose other than in connection with the Transition Services and the Licensed IP; (iii) prevent unauthorized disclosure of any Confidential Information; (iv) store the Confidential Information and material in a secure environment to ensure confidentiality; and (v) subject to <u>Section 6(e)(iii)</u>, upon the earlier of the conclusion of this Agreement, or at the written direction of the Trustee, the Buyer will destroy all Confidential Information of the Companies entirely in such a way that it can no longer be

used except any copies that the Buyer is otherwise required by law to retain only for so long as the applicable law requires such retention, but without further right to use such Confidential Information. The Trustee, on its own behalf and on behalf of each of the Companies, shall not disclose any Confidential Information related to Buyer's (or its affiliates) business to any third party without Buyer's prior written consent. The non-disclosure obligations of the Buyer and the Trustee (and each of the Companies) will survive any termination or expiration of this Agreement.  The requirements in <u>Section 2(f)(v)</u> hereof shall only be applicable if the Transaction is not completed by February 28, 2025, unless otherwise agreed by the Trustee and the Buyer.

g.  "***Confidential Information***" means any technical, business, financial, personal, employee, operational, scientific, research, intellectual property described in <u>Section 2(a)(i)-(v)</u>, personal information or other information of a Party or its affiliates, in whatsoever form or media, whether in writing, in electronic form or communicated orally or visually, that, at the time of disclosure is designated as confidential, or by its nature ought reasonably to be understood to be treated as confidential, or if it were information of the other Party, would be treated as confidential information by the other Party (including any third party information).

3.  **AWS**.
   a.  During the Term of this Agreement, the Buyer, and its employees and/or independent contractors, shall be entitled to access and use the Companies' AWS interface solely for purposes of the operation of the Companies' Business in accordance with the terms of this Agreement.

   b.  In the event this Agreement is terminated for any reason, the Buyer shall (i) immediately cease all use of the Companies' AWS interface and revoke all access granted to the interface within twenty-four (24) hours following termination and (ii) not retain any access to the AWS interface or maintain any copies, extracts, or derivatives of the data, code, or any other materials contained therein. Any improvements, modifications, or enhancements made by the Buyer to the code base or other materials warehoused within the AWS interface during the Term shall remain the sole and exclusive property of the Companies.

   c.  For the avoidance of doubt, the Buyer's rights to access and use the Companies' AWS interface are strictly limited to the Term and shall terminate immediately upon the expiration or termination of this Agreement.

4.  **Expenses**.
   a.  As of the Effective Date, the Buyer shall assume responsibility for the payment of all operating expenses related to the Transition Services (including the use of the Licensed IP) that Buyer, in its sole discretion, deems necessary to the ongoing operation of the Companies' Business ("***Operating Expenses***"). The Buyer shall promptly pay all such Operating Expenses directly to the applicable vendor, supplier or other third-party. For the avoidance of doubt, "***Operating Expenses***" shall expressly exclude any arrears or outstanding liabilities incurred by the Trustee, on behalf of each of the Companies, prior to the Effective Date, except to the extent such arrears or outstanding liabilities are owed to a provider of goods or services that the Buyer, in its sole discretion, agrees to continue utilizing in connection with the Companies' Business and/or Licensed IP (a "***Transition Vendor***") and such Transition Vendor requires payment of arrears predating the LOI as a condition of such future supply. The payment of any such arrears shall be for the account of and paid by the Buyer directly to such Transition Vendor, and not the Trustee.

Notwithstanding the foregoing, the Buyer shall not be responsible for any expenses (including, without limitation, Operating Expenses, arrears, or other liabilities) owed to the Companies' vendors, suppliers, or related third parties that are not designated as Transition Vendors. The Trustee shall have the right to terminate any existing relationships or contracts of the Companies with parties that the Buyer does not agree to designate as Transition Vendors.

b. The Buyer shall be entitled to (i) source the goods and/or services in connection with the operation of the Companies' Business from new vendors, suppliers or related third parties or (ii) enter into new contracts with the Companies' existing vendors, supplier or related third parties for the provision of such goods and/or services (any such contract or arrangement, an "***Employer Sourced Contract***"). The Buyer will be responsible for the full amount of such costs and shall be entitled to pay any such costs directly to the applicable vendor, supplier or other third-party.  In all other circumstances, the expenses associated with the provision and use of the Transition Services are to be funded in accordance with Section 4(a) above.

c. For certainty, no costs, amounts or liabilities assumed, incurred or paid by Buyer under or related to this Agreement will be deductible against any amounts paid or payable to the Trustee under the Purchase Agreement as contemplated by the LOI.  The Trustee shall have no obligation to fund any expenses on behalf of the Buyer unless funding is provided by the Buyer, in advance.

5. **Indemnity**.
   a. The Buyer will indemnify, defend, and hold harmless the Trustee and its affiliates, officers, directors, employees, agents, and representatives, from and against any and all claims, demands, actions, suits, proceedings, damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees) arising out of or related to any acts, omissions, or obligations of the Buyer, or any events, circumstances, or liabilities, in connection with the operation of the use of the Transition Services (including the Licensed IP) by the Buyer as of and following the Effective Date; provided that, the foregoing indemnity shall not apply to the extent that such claims or liabilities arise solely from the gross negligence or willful misconduct of the Trustee.

   b. This Section 5 shall survive the termination or expiration of this Agreement. Notwithstanding any other provision of this Agreement, the Trustee, either personally or on behalf of either Company, will have no liability whatsoever or howsoever arising under or related to this Agreement.

6. **Term; Termination**.
   a. This Agreement shall commence on the Effective Date and end on the earlier of (i) the date the Purchase Agreement is executed by the Parties; or (ii) the date this Agreement is terminated in accordance with this Section 6 (the "***Term***").

   b. The Buyer may terminate this Agreement for any reason by providing fifteen (15) days' prior written notice to the Trustee.   Notwithstanding such termination, the Buyer shall be responsible for all costs incurred by the Buyer in its operation of the Companies' Business or use of the Transition Services as described in this Agreement, including without limitation, for costs in the fifteen (15) days notice period.

    c.   The Trustee may terminate this Agreement on seven (7) days' prior written notice for any reason by providing written notice to the Buyer without cost, charge or liability arising out of such termination. The Buyer has arranged its business and affairs on the understanding of such termination right.

    d.   In addition to any other termination rights, the Buyer or the Trustee may terminate this Agreement immediately upon written notice to the other parties if: (i) the other party materially breaches any provision of this Agreement and fails to cure such breach within five (5) days after receiving written notice of the breach; (ii) the other party engages in fraud, gross negligence, or willful misconduct in connection with its obligations under this Agreement; or (iii) pursuant to a court order.

    e.   Upon the termination or expiration of this Agreement for any reason:

        i.   The Trustee shall immediately cease providing, and the Buyer shall immediately cease using, the Transition Services (including the Licensed IP), and neither the Trustee nor the Companies shall have any further obligation to utilize or provide any Transition Services after the date of termination or expiration; provided that, if this Agreement is terminated pursuant to <u>Section 6(d)</u>, the Buyer shall have twenty-four (24) hours to cease using the Transition Services (including the Licensed IP).

        ii.   The Buyer shall remain responsible for; (I) any Operating Expenses properly incurred and/or invoiced prior to the termination or expiration date, and (II) for the costs and other vendor obligations under any Employer Sourced Contract.

        iii.   All licenses and rights of the Buyer granted by the Trustee on behalf of each Company under this Agreement shall cease immediately without further notice. Notwithstanding the foregoing or anything else to the contrary herein, the Buyer shall be entitled to retain copies of all Confidential Information for a period of sixty (60) days following the termination or expiration of this Agreement for the sole purpose of providing customers access to retrieve such customer's Confidential Information. Upon the expiration of such sixty (60) day period, the Buyer shall permanently delete all retained Confidential Information in accordance with <u>Section 2(f)</u>.

2.  **<u>Miscellaneous</u>**.
    a.   The Parties agree to execute and deliver, or cause to be executed and delivered, such additional documents, instruments, certifications, and agreements, and to take such further actions as the other Parties may reasonably request to effectuate the purposes and intent of this Agreement. The Parties shall make reasonable efforts to comply with such requests promptly and in good faith.

    b.   This Agreement is governed by and will be construed in accordance with the laws of the Province of British Columbia (without regard to the principles thereof governing conflicts of laws). The Parties irrevocably and unconditionally agree that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against such party of the foregoing in any way relating to this Agreement or the transactions relating hereto or thereto, in any forum other than the courts of the Province of British Columbia, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the

jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such British Columbian court or, to the fullest extent permitted by applicable law, in such federal court. The Parties agree that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Parties irrevocably and unconditionally waive, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to herein. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. The Parties irrevocably consent to service of process in the manner provided for notices in this Agreement. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

c.  This Agreement (i) may be executed in one or more counterparts, including via electronic transmission (including DocuSign and similar electronic signature services), each of which shall be an original and all of which, taken together, shall constitute one and the same instrument, (ii) constitutes the entire understanding and agreement of the parties and supersedes and replaces any and all previous and contemporaneous understandings, agreements, proposals or representations, written or oral, between the parties, as to the subject matter hereof, including the LOI, and no term or provision hereof may be amended, changed, waived, discharged or terminated orally or otherwise, except in writing signed by each such Party, (iii) shall be binding and inure to the benefit of the parties hereto and their respective successors and permitted assigns, and (v) may not be assigned or transferred by any Party without the prior written consent of the Parties not to be unreasonably withheld or delayed.

[Signature Pages Follow]

**IN WITNESS WHEREOF,** this Agreement has been duly executed as of the date first written above.

**KSV RESTRUCTURING INC. IN ITS CAPACITY AS LICENSED INSOLVENCY TRUSTEE OF BENCH ACCOUNTING, INC. AND NOT IN ITS PERSONAL OR CORPORATE CAPACITIES**

By: *Robert Kofman*
      Name:  Robert Kofman
      Title:  President

**KSV RESTRUCTURING INC. IN ITS CAPACITY AS LICENSED INSOLVENCY TRUSTEE OF 10SHEET SERVICES INC. AND NOT IN ITS PERSONAL OR CORPORATE CAPACITIES**

By: *Robert Kofman*
      Name:  Robert Kofman
      Title:  President

**BUYER:**

**RECRUITER.COM VENTURES INC.**

By: *Jesse Tinsley*
      Name:  Jesse Tinsley
      Title:  CEO

Appendix **"E"**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into as of the 25th day of February, 2025:

**BETWEEN:**

> **KSV RESTRUCTURING INC.**, in its capacity as the appointed trustee of the estate of **BENCH ACCOUNTING, INC.**, a corporation incorporated pursuant to the laws of the State of Delaware ("***Bench***") and **10SHEET SERVICES INC.**, a corporation incorporated pursuant to the federal laws of Canada ("***10Sheet***", and together with Bench, the "***Companies***" and each a "**Company**"), and not in its personal or corporate capacity;
>
> (the "***Trustee***")
>
> – and –
>
> **RECRUITER.COM VENTURES INC.**, a Delaware corporation, as purchaser
>
> (the "***Purchaser***").

**WHEREAS:**

A.      The Companies made a voluntary assignment into bankruptcy pursuant to section 49 of the ***Bankruptcy and Insolvency Act*** (Canada), R.S.C. 1985 c. B-3 (the "***BIA***"), and pursuant to the Certificates of Appointment issued January 7, 2025, the Trustee was appointed as trustee of the Companies.

B.      On January 1, 2025 (the "***LOI Date***"), the Companies, in consultation with NBC, executed a letter of intent (the "***LOI***") with the Purchaser for the sale of the Companies' assets and business, which sets forth the Purchaser's, NBC's and the Companies' agreement in principle to the terms of this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby irrevocably acknowledged, the Parties hereby acknowledge and agree as follows:

## ARTICLE 1
## INTERPRETATION

**1.1      Definitions**

Unless something in the subject matter or context is inconsistent therewith, the terms defined herein shall have the following meanings:

> "***Accounts Receivable***" means all accounts receivable, trade accounts, notes receivable and other debts and other amounts due, owing or accruing due to either of the Companies as of any time from and after the LOI Date, and the full benefit of all security for such accounts, notes or debts, but excluding any Taxes receivable by either of the Companies for the period ending December 31, 2024.
>
> "***Affiliate***" means, with respect to any specified Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such specified Person. For purposes of this definition, the term "***control***" (including the terms

"*controlled by*" and "*under common control with*") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"*Agreement*" means this asset purchase agreement, as may be amended and restated from time to time in accordance with the terms hereof, and "*Article*" and "*Section*" mean and refer to the specified article, section and subsection of this Agreement.

"*Applicable Law*" means, in respect of any Person, property, transaction or event, any: (a) domestic or foreign statute, law (including the common law), ordinance, rule, regulation, treaty, restriction, regulatory policy, standard, code or guideline, by-law or order; (b) judicial, arbitral, administrative, ministerial, departmental or regulatory judgments, orders, decisions, rulings, instruments or awards of any Governmental Authority; and (c) policies, practices, standards, guidelines and protocols having the force of law, that applies in whole or in part to such Person, property, transaction or event.

"*Approval and Vesting Order*" means an order by the BC Court, in form and substance satisfactory to the Purchaser and the Trustee, acting reasonably, among other things, approving and authorizing this Agreement and the Transaction, vesting title to the Purchased Assets in the Purchaser or its permitted designee on Closing, free and clear of all Encumbrances.

"*Assignment and Assumption Agreement*" means an assignment and assumption agreement effecting the assignment to, and assumption by, the Purchaser of the Assigned Contracts and the Assumed Liabilities, in form and substance satisfactory to the Parties, acting reasonably.

"*Assignment Order*" means an order of the BC Court, in form and substance satisfactory to the Purchaser and the Trustee, acting reasonably, assigning to the Purchaser the rights and obligations of the Companies under the Assigned Contracts for which a consent, approval or waiver necessary for the assignment of such Assigned Contracts has not been obtained, and which will include, if necessary, a mechanism for the resolution of any disputed Cure Costs.

"*Assigned Contracts*" means the Contracts listed under the header "Assigned Contracts" in Schedule A attached hereto.

"*Assumed Liabilities*" means (a) any Cure Costs which are not paid at Closing; and (b) Liabilities relating to the Purchased Assets and Assigned Contracts, solely in respect of the period from and after the Closing Effective Time and not relating to the period prior to the Closing Effective Time.

"*Authorization*" means any authorization, approval, consent, concession, exemption, license, lease, grant, permit, franchise, right, privilege or no-action letter from any Governmental Authority having jurisdiction with respect to any specified Person, property, transaction or event, or with respect to any of such Person's property or business and affairs or from any Person in connection with any easements, contractual rights or other matters.

"*Bankruptcy Proceedings*" means the proceeding before the BC Court initiated or to be initiated by the Trustee in order to apply for the Approval and Vesting Order.

"*BC Court*" means the Supreme Court of British Columbia.

"*BIA*" has the meaning set out in the Recitals.

"***Books and Records***" means all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise), including Tax and accounting books and records used or intended for use by, or in the possession of the Companies including information, documents and records relating to the Assigned Contracts, customer lists, customer information and account records, sales records, computer files, data processing records, employment and personnel records, sales literature, advertising and marketing data and records, cost and pricing information, production reports and records, equipment logs, operating guides and manuals, credit records, records relating to present and former suppliers and contractors, plans and projections and all other records, data and information stored electronically, digitally or on computer-related media.

"***Business***" means the businesses conducted by the Companies as of January 7, 2025.

"***Business Day***" means a day on which banks are open for business in New York City, New York and the Province of British Columbia, but does not include a Saturday, Sunday or statutory holiday in New York City, New York, or the Province of British Columbia.

 "***Claims***" means any civil, criminal, administrative, regulatory, arbitral or investigative inquiry, action, suit, investigation or proceeding and any claim of any nature or kind (including any cross-claim or counterclaim), demand, investigation, audit, chose in or cause of action, suit, default, assessment, litigation, prosecution, third party action, arbitral proceeding or proceeding, complaint or allegation, by or before any Person.

"***Closing***" means the closing and consummation of the Transaction.

"***Closing Date***" means the fifth (5th) Business Day following obtaining the Recognition Order, unless otherwise agreed by the Parties in writing.

"***Closing Effective Time***" means 12:01 a.m. (Eastern Standard Time) on the Closing Date, or such other time as the Parties may agree to in writing.

"***Contracts***" means all pending and executory contracts, agreements, leases, understandings and arrangements (whether oral or written) to which any of the Companies are a party or by which such entity is bound or in which such entity has, or will at the Closing Effective Time have, any rights or by which any of its property or assets are or may be affected.

"***Cure Costs***" means, in respect of the Assigned Contracts, all amounts, costs, fees and expenses (i) required to be paid to remedy monetary defaults in relation to the Assigned Contracts, other than those arising by reason only of the Companies' (A) bankruptcy, insolvency (including the commencement of the Bankruptcy Proceedings) or (B) failure to perform a non-monetary obligation; (ii) required to secure a counterparty's consent to the assignment of an Assigned Contract and agreed to by the Purchaser in its sole discretion; or (iii) as may be required pursuant to the Approval and Vesting Order or the Assignment Order, as applicable, and which for greater certainty, may be an amount agreed to by the Purchaser and the counterparty to an Assigned Contract, subject to the approval of the Trustee.

"***Delaware Court***" means the United States Bankruptcy Court for the District of Delaware.

"***Deposit***" has the meaning set out in <u>Section 3.2</u>.

"***Excluded Assets***" means the Excluded Contracts and all other assets of the Companies as of the Closing Effective Time other than the Purchased Assets, including, without limitation, the assets listed on <u>Schedule B</u> attached hereto.

– 4 –

"***Excluded Contracts***" means all Contracts other than the Assigned Contracts.

"***Excluded Liabilities***" has the meaning set out in <u>Section 2.3</u>.

"***Encumbrance***" means any security interest, lien, Claim, charge, Court Charge, right of retention, deemed trust, judgement, writ of seizure, writ of execution, notice of seizure, notice of execution, notice of sale, hypothec, reservation of ownership, pledge, encumbrance, mortgage or right of a third party (including any contractual rights such as purchase options, rights of first refusal, rights of first offer or any other pre-emptive contractual right) or encumbrance of any nature or kind whatsoever and any agreement, option or privilege (whether by law, contract or otherwise) capable of becoming any of the foregoing, (including any conditional sale or title retention agreement, or any capital or financing lease).

"***Excise Tax Act***" means the *Excise Tax Act*, R.S.C, 1985, c. E-15.

"***General Conveyances***" means one or more general conveyances evidencing the conveyance to the Purchaser of the Companies' interest in and to the Purchased Assets, in form and substance satisfactory to the Parties, acting reasonably.

"***Governmental Authority***" means any domestic or foreign government, whether federal, provincial, state, territorial or municipal; and any governmental agency, ministry, department, court (including the BC Court), tribunal, commission, stock exchange, bureau, board or other instrumentality exercising or purporting to exercise legislative, judicial, regulatory or administrative functions of, or pertaining to, government or securities market regulation.

"***GST/HST***" means all goods and services tax imposed under Part IX of the Excise Tax Act.

"***Income Tax Act***" means the Income Tax Act, R.S.C., 1985, c. 1 (5th Supp.).

"***Intellectual Property***" means all intellectual property and industrial property used by the Companies in the Business, whether or not registrable, patentable or otherwise formally protectable, and whether or not registered, patented, otherwise formally protected or the subject of a pending application for registration, patent or any other formal protection, including all rights, titles, interests, and benefits in and to: (a) trademarks, service marks, trade dress, corporate, partnership and business names, fictitious names and other trade names; (b) inventions, patent rights, arts, processes, machines, manufactures, compositions of matter, utility models; (c) works, copyrights (including, without limitation, copyrights related to the Companies' website content marketing materials), neighbouring rights, moral rights, software (whether source code or object code) and databases; (d) designs and industrial designs; (e) know-how, show-how, trade secrets, proprietary information, formulae, recipes, algorithms, specifications, schematics, systems, methods and techniques and related documentation, patient, customer and supplier information and records, and market and survey information; (f) telephone numbers, domain names, websites and website portals and social media identities and accounts, including, without limitation, digital marketing materials and online branding assets; (g) integrative circuit topographies and mask works, (h) packaging designs, product labeling, advertising copy, brochures, promotional materials, marketing collateral, signage, and any other materials used to promote or market the Business, and (i) all derivatives, modifications, enhancements, and improvements of the foregoing, as well as all goodwill associated therewith. "***Intellectual Property***" shall further include all re-examinations, reissues, continuations, extensions, and divisions of any of the foregoing, and all income, royalties, damages, and payments now and hereafter due or payable with respect to any of the foregoing (including damages and payments for past or future infringements, dilutions, misappropriations,

misuse, or unauthorized use of any of the foregoing), and all rights to sue, counterclaim, and recover for past, present, and future infringements, dilutions, misappropriations, misuse, or unauthorized use of any of the foregoing.

"*LOI*" has the meaning set out in the Recitals.

"*LOI Date*" has the meaning set out in the Recitals.

"*Liability*" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"*NBC*" means National Bank of Canada.

"*Organizational Documents*" means any trust document, charter, certificate or articles of incorporation or amalgamation, articles of amendment, articles of association, articles of organization, articles of continuance, bylaws, as amended, partnership agreement or similar formation or governing documents of a Person (excluding individuals).

"*Outside Date*" means 11:59 pm (Eastern Standard Time) on April 15, 2025, or such later date and time as the Trustee and the Purchaser may agree to in writing.

"*Parties*" means the Trustee and the Purchaser.

"*Permits and Licenses*" means the orders, permits, licenses, Authorizations, approvals, registrations, consents, waivers or other evidence of authority issued to, granted to, conferred upon, or otherwise created for the Companies by any Governmental Authority related to the Business, the Purchased Assets and Assigned Contracts.

"*Person*" means any individual, partnership, limited partnership, limited liability company, joint venture, syndicate, sole proprietorship, company or corporation with or without share capital, unincorporated association, trust, trustee, executor, administrator or other legal personal representative, Governmental Authority or other entity however designated or constituted.

"*Personal Information*" means any information in the possession or control of the Companies about an identifiable person other than name, title, business address or telephone number.

"*Purchased Assets*" has the meaning set out in Section 2.1.

"*Purchase Price*" has the meaning set out in Section 3.1.

"*Purchaser*" means Recruiter.com Ventures Inc., a Delaware corporation, or its permitted assignee under Section 9.9 hereof.

"*Recognition Proceedings*" means proceedings before the Delaware Court, pursuant to Chapter 15 of the United States' Bankruptcy Code, recognizing the Bankruptcy Proceedings and giving effect to the Approval and Vesting Order in the United States of America.

"**_Recognition Order_**" means an order of the Delaware Court in the Recognition Proceedings recognizing and giving full force and effect to the Approval and Vesting Order in the United States of America.

"**_Service Provider_**" means any individual that provided services to the Companies, whether as an employee, contractor, advisor or other similar capacity.

"**_Taxes_**" means, with respect to any Person, all national, federal, provincial, local or other taxes, including income taxes, capital gains taxes, value added taxes, severance taxes, ad valorem taxes, property taxes, capital taxes, net worth taxes, production taxes, sales taxes, use taxes, license taxes, excise taxes, environmental taxes, transfer taxes, withholding or similar taxes, payroll taxes, employment taxes, employer health taxes, pension plan premiums and contributions, workers' compensation premiums, employment insurance or compensation premiums, stamp taxes, occupation taxes, premium taxes, alternative or add-on minimum taxes, GST/HST, customs duties or other taxes of any kind whatsoever imposed or charged by any Governmental Authority, together with any interest, penalties, or additions with respect thereto and any interest in respect of such additions or penalties.

"**_Trademark Assignment Agreement_**" means an assignment of trademark agreement evidencing the assignment to the Purchaser of the Companies' rights, title, and interest in any and all trademarks forming part of such Companies' Intellectual Property.

"**_Transaction_**" means all of the transactions contemplated by this Agreement including the purchase and sale transaction whereby the Purchaser will acquire the Purchased Assets.

"**_Transfer Taxes_**" means all present and future transfer taxes, sales taxes, use taxes, production taxes, value-added taxes, goods and services taxes, land transfer taxes, registration and recording fees, and any other similar or like taxes and charges imposed by a Governmental Authority in connection with the sale, transfer or registration of the transfer of the Purchased Assets, including GST/HST.

"**_Trustee_**" has the meaning set out in the Recitals hereto.

"**_Trustee's Certificate_**" means a certificate to be filed in the BC Court by the Trustee and delivered by the Trustee to the Purchaser confirming that the Purchaser has delivered the Purchase Price to the Trustee and that all conditions precedent to this Agreement have been satisfied or waived, all in accordance with the Approval and Vesting Order, and in form and substance satisfactory to the Purchaser and the Trustee, acting reasonably.

"**_TSA_**" means that certain Transition Services Agreement, dated as of January 17, 2025, by and between the Trustee and the Purchaser.

## 1.2    Interpretation Not Affected by Headings, etc.

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

## 1.3    General Construction

The terms "this Agreement", "hereof", "herein" and "hereunder" and similar expressions refer to this Agreement and not to any particular section hereof. The expression "Section" or reference to another subdivision followed by a number mean and refer to the specified Section or other subdivision of this

Agreement. The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

## 1.4    Extended Meanings

Words importing the singular include the plural and vice versa and words importing gender include all genders. The term "including" means "including, without limitation," and such terms as "includes" have similar meanings and the term "third party" means any other Person other than the Trustee or the Purchaser, or any Affiliates thereof.

## 1.5    Currency

All references in this Agreement to dollars, monetary amounts, or to $, are expressed in Canadian currency unless otherwise specifically indicated.

## 1.6    Statutes

Except as otherwise provided in this Agreement, any reference in this Agreement to a statute refers to such statute and all rules, regulations and interpretations made under it, as it or they may have been or may from time to time be modified, amended or re-enacted.

## 1.7    Schedules & Amendments to Schedules

The following exhibits and schedules are attached hereto and incorporated in and form part of this Agreement:

**SCHEDULES**

Schedule A    -    Purchased Assets

Schedule B    -    Excluded Assets

Unless the context otherwise requires, words and expressions defined in this Agreement will have the same meanings in the Exhibits and Schedules and the interpretation provisions set out in this Agreement will apply to the Exhibits and Schedules. Unless the context otherwise requires, or a contrary intention appears, references in the Exhibits and Schedules to a designated Article, Section, or other subdivision refer to the Article, Section, or other subdivision, respectively, of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE OF PURCHASED ASSETS

## 2.1    Purchase and Sale of Purchased Assets

At the Closing, subject to the terms and conditions set forth in this Agreement, the Trustee, on behalf of the Companies, shall sell, assign, transfer and convey to the Purchaser, and the Purchaser shall purchase, acquire and assume from the Trustee each of the Companies' respective right, title and interest in, to and under all of the personal and tangible and intangible assets, which are used or held for use in connection with, the Business (collectively, the "***Purchased Assets***"), free and clear of all Encumbrances, including without limitation:

(a)    all Assigned Contracts as set out in **Schedule A** attached hereto;

(b)     each Company's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(c)     originals, or where not available, copies, of all Books and Records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that exclusively relate to the Purchased Assets or Assigned Contracts; and

(d)     all Intellectual Property owned by each of the Companies and used in connection with the Business, including any registrations related thereto, including without limitation, all rights, title and interest in and to all primary, secondary, and supportive platforms, services, and integrations that facilitate the platform and service integral to the Companies' Business (including, for the avoidance of doubt, the Companies' AWS interface (including all access codes, object code, source code, and documentation));

(e)     all Accounts Receivable;

(f)     all Permits and Licenses;

(g)     the goodwill of the Business, including all right, title and interest of the Companies in, to and in respect of all elements which contribute to the goodwill of the Business, including the goodwill represented by packaging, labelling, advertising, marketing and promotional materials and the right to use the name "Bench" and "10Sheet"; and

(h)     all other assets of the Companies set forth on Schedule A attached hereto that are not otherwise captured by clauses (a) – (g) above.

## 2.2    Excluded Assets

Notwithstanding Section 2.1, the Purchased Assets shall not include the Excluded Assets.

## 2.3    Transfer of Purchased Assets and Assumption of Liabilities

Provided that Closing occurs and subject to the terms and conditions of this Agreement, possession, risk, legal and beneficial ownership of the Purchased Assets shall transfer from the Companies to the Purchaser on the Closing Date, and the Purchaser agrees to assume, discharge, perform and fulfill all of the Assumed Liabilities from and after the Closing Date. For certainty, the Purchaser is not assuming any Liabilities of the Companies other than the Assumed Liabilities (collectively, the "***Excluded Liabilities***") and shall have no liability to any Person therefor.

## 2.4    Assigned Contracts

(a)     Until the Closing Effective Time, the Purchaser shall be entitled to make additions, deletions and modifications to the Contracts classified as "Assigned Contracts", in its sole discretion. For greater certainty: (i) any Assigned Contract subsequently designated by the Purchaser as an Excluded Contract after the date of this Agreement shall be deemed to no longer be an Assigned Contract, and shall be an Excluded Contract; and (ii) any Contract subsequently designated by the Purchaser as an Assigned Contract after the date of this Agreement shall be deemed an Assigned Contract for the purposes of this Agreement.

– 9 –

(b)     Each of the Parties, at the sole cost and expense of the Purchaser, shall use reasonable commercial efforts to obtain, as may be required by the terms of such Assigned Contracts, all consents and approvals required to assign the Assigned Contracts to the Purchaser.

(c)     To the extent that any Assigned Contract is not assignable without the consent or approval of the counterparty or any other Person, and such consent or approval has not been obtained prior to the Closing: (i) any Company's interest in, to and under such Assigned Contract may be conveyed to the Purchaser pursuant to an Assignment Order; (ii) at the sole cost and expense of the Purchaser, the Trustee will use commercially reasonable efforts to obtain an Assignment Order in respect of such Assigned Contract on or prior to the Closing; and (iii) if an Assignment Order is obtained in respect of such Assigned Contract, the Purchaser shall accept the assignment of such Assigned Contract on such terms.

(d)     To the extent that any Cure Costs are payable with respect to any Assigned Contract, the Purchaser shall be solely responsible for and shall pay such Cure Costs.  The Cure Costs shall be paid, in the Purchaser's sole discretion unless otherwise required by applicable law, either directly to the applicable counterparty or to the Trustee in trust. For greater certainty, the Cure Costs shall be in addition to the Purchase Price payable to the Vendor. Notwithstanding the foregoing, unless the Parties otherwise agree, to the extent that any Cure Cost is payable with respect to any Assigned Contract, where such Assigned Contract is assigned pursuant to an Assignment Order, the Purchaser shall pay such Cure Costs in accordance with such Assignment Order, and where such Assigned Contract is not assigned pursuant to an Assignment Order, the Purchaser shall pay such Cure Costs in the manner set out in the consent of the applicable counterparty or as otherwise may be agreed to by the Purchaser and such counterparty.

(e)     It shall be the sole obligation of the Purchaser, at the Purchaser's sole cost and expense, to provide any and all financial assurances, deposits or security, including without limitation any Cure Costs, that may be required by Governmental Authorities or any third parties to permit the transfer of the Purchased Assets, including the Assigned Contracts, to the Purchaser.

**2.5     Service Providers**.

The Trustee and the Purchaser each acknowledge, agree and understand that: (i) substantially all the Service Providers were terminated prior to the LOI Date; (i) the Purchaser has advised the Trustee that many of such Service Providers were subsequently hired or engaged by the Purchaser independent of and prior to the date of this Agreement; and (iii) that the hiring or engagement of such Service Providers by the Purchaser does not constitute a breach of this Agreement

**ARTICLE 3
PURCHASE PRICE**

**3.1     Purchase Price**

The aggregate purchase price for the Purchased Assets shall be CAD$13,000,000 (the "***Purchase Price***") *plus* the assumption by the Purchaser of the Assumed Liabilities and Cure Costs (the "***Purchase Consideration***"). The Purchase Price (net of the Deposit) shall be paid on the Closing Date, in full, by wire transfer of immediately available funds to an account designated by the Trustee.

3.2    **Deposit and Satisfaction of Purchase Price**

(a)    The Parties acknowledge that, prior to the date hereof, the Purchaser has paid a non-refundable, upfront deposit equal to CAD$1,000,000 in accordance with the terms of the LOI (the "***Deposit***") and that such Deposit shall be deducted from the Purchase Price to be paid by the Purchaser on the Closing Date.

(b)    The Parties further acknowledge and agree that, if this Agreement is terminated for any reason, (i) the Deposit constitutes a genuine pre-estimate of liquidated damages representing the Trustee's and Companies' losses as a result of Closing not occurring and (ii) the Purchaser hereby waives any claim or defense that the Deposit is a penalty or is otherwise not a genuine pre estimate of the Trustee's and Companies' damages.

3.3    **Transfer Taxes**

The Parties agree that:

(a)    The Purchase Price does not include Transfer Taxes and the Purchaser shall be liable for and shall pay any and all Transfer Taxes, if any, pertaining to the Purchaser's acquisition of the Purchased Assets.

(b)    Where the Trustee or the Companies are required under Applicable Law to collect or pay Transfer Taxes, the Purchaser will pay the amount of such Transfer Taxes to the Trustee on the Closing Date. The Trustee shall pay such Transfer Taxes directly to the appropriate Governmental Authority or other entity within the required time period and shall file all necessary documentation with respect to such Transfer Taxes when due.

(c)    Except where the Trustee or the Companies are required under Applicable Law to collect or pay such Transfer Taxes, the Purchaser shall pay such Transfer Taxes directly to the appropriate Governmental Authority or other entity within the required time period and shall file all necessary documentation with respect to such Transfer Taxes when due. The Trustee will do and cause to be done such things as are reasonably requested to enable the Purchaser to comply with such obligation in a timely manner. If the Trustee or the Companies are required under Applicable Law to pay any such Transfer Taxes which are not paid by the Purchaser on the Closing Date, the Purchaser shall promptly reimburse the Trustee the full amount of such Transfer Taxes upon delivery to the Purchaser of copies of receipts showing payment of such Transfer Taxes.

(d)    The Purchaser shall indemnify the Trustee and the Companies for, from and against any Transfer Taxes (including any interest or penalties imposed by a Governmental Authority) that the Trustee may pay or for which the Trustee may become liable as a result of any failure by the Purchaser to pay or remit such Transfer Taxes.

(e)    Notwithstanding the foregoing, if available, the Purchaser and the Trustee shall jointly execute an election under section 167 of the *Excise Tax Act* in connection with the transfer of the Purchased Assets contemplated herein, and the Purchaser shall file such election with its applicable Tax return for the reporting period in which the sale of the Purchased Assets takes place. Any GST/HST or similar excise Taxes payable under Applicable Laws incurred in connection with the purchase and sale of the Purchased Assets contemplated by this Agreement, including where an election pursuant to subsection 167(1) of the *Excise Tax Act* is not or cannot be validly made in respect of the Purchased Assets, shall be borne by Purchaser.

**3.4    Allocation of Purchase Price**

No later than two (2) Business Days prior to Closing, the Trustee and the Purchaser shall have agreed to an allocation of the Purchase Price among the Purchased Assets. The Trustee and the Purchaser shall each file their respective tax returns and elections in accordance with such allocation and the Trustee and the Purchaser shall not dispute such allocation in connection with any tax audit or other proceeding.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES**

**4.1    Representations and Warranties of the Trustee**

The Trustee hereby represents and warrants as of the date hereof and as of the Closing Date as follows, and acknowledges that the Purchaser is relying on such representations and warranties in connection with entering into this Agreement and performing its obligations hereunder:

(a)    <u>Bankruptcy Proceedings</u>. As of the Closing Date, the Approval and Vesting Order and Recognition Order will be in full force and effect and will not be subject to any appeal or leave to appeal application(s). The Trustee and the Companies have not been discharged from bankruptcy and the bankruptcy of either Company has not been annulled.

(b)    <u>Proceedings</u>. There are no proceedings pending against the Trustee or the Companies, to the knowledge of the Trustee, threatened, with respect to, or in any manner affecting, the Companies' respective titles to the Purchased Assets, or which would reasonably be expected to enjoin, delay, restrict or prohibit the transfer of all or any part of the Purchased Assets or the Closing of the Transaction as contemplated by this Agreement, or which would reasonably be expected to delay, restrict or prevent the Trustee from fulfilling any of its obligations set forth in this Agreement.

(c)    <u>No Consents or Authorizations</u>. Subject only to obtaining the Approval and Vesting Order and the Recognition Order, and any consents, approvals or waivers required in connection with the assignment of the Assigned Contracts, the Trustee does not require any consent, approval, waiver or other Authorization from any Governmental Authority or any other Person, as a condition to the lawful completion of the Transaction.

(d)    <u>Residency</u>. The Trustee is not a non-resident of Canada for purposes of the *Income Tax Act* or the *Excise Tax Act*, as applicable.

**4.2    Representations and Warranties of the Purchaser**

The Purchaser hereby represents and warrants to and in favour of the Trustee as of the date hereof and as of the Closing Date, and acknowledges that the Trustee are relying on such representations and warranties in connection with entering into this Agreement and performing its obligations hereunder:

(a)    <u>Incorporation and Status</u>. The Purchaser is a corporation incorporated and existing under the State of Delaware and the Delaware General Corporate Law, is in good standing under such act and has the power and authority to enter into, deliver and perform its obligations under this Agreement.

(b)    <u>Corporate Authorization</u>. The execution, delivery and performance by the Purchaser of this Agreement has been authorized by all necessary corporate action on the part of the Purchaser.

– 12 –

(c)     No Conflict. The execution, delivery and performance by the Purchaser of this Agreement do not (or would not with the giving of notice, the lapse of time, or both, or the happening of any other event or condition) result in a breach or a violation of, or conflict with, or allow any other Person to exercise any rights under, any terms or provisions of the Organizational Documents of the Purchaser.

(d)     Execution and Binding Obligation. This Agreement has been duly executed and delivered by the Purchaser and constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms subject only to the Approval and Vesting Order and Recognition Order.

(e)     Proceedings. There are no proceedings pending, or to the knowledge of the Purchaser, threatened, against the Purchaser before any Governmental Authority, which prohibit or seek to enjoin delay, restrict or prohibit the Closing of the Transaction, as contemplated by this Agreement, or which would reasonably be expected to delay, restrict or prevent the Purchaser from fulfilling any of its obligations set forth in this Agreement.

(f)     No Consents or Authorizations. Subject only to (i) obtaining the Approval and Vesting Order, (ii) obtaining the Recognition Order, and (iii) obtaining any consents, approvals or waivers required in connection with the assignment of the Assigned Contracts or the Assignment Order, as applicable, the Purchaser does not require any consent, approval, waiver or other Authorization from any Governmental Authority or any other Person, as a condition to the lawful completion of the Transaction.

(g)     Residency. The Purchaser is a non-resident of Canada for purposes of the *Income Tax Act*.

## 4.3    As is, Where is

The representations and warranties of the Trustee shall not merge on Closing. Despite any other provision of this Agreement, the Purchaser expressly acknowledges that the Trustee, on behalf of the Companies, is selling the Purchased Assets on an "as is, where is" basis as the Purchased Assets shall exist as at the Closing Effective Time. The Purchaser further acknowledges that it has entered into this Agreement on the basis that the Trustee does not guarantee title to the Purchased Assets and that the Purchaser has conducted such inspections of title to the Purchased Assets as it deems appropriate and has satisfied itself with regard to these matters and it has inspected the Purchased Assets and will accept the same on the Closing Date, in their then current state, condition and location. No representation, warranty or condition is express or can be implied as to title, encumbrances, description, fitness for purpose, merchantability, condition, quantity or quality or in respect of any other matter or thing whatsoever concerning the Purchased Assets or the right of the Trustee to sell or assign the same save and except as expressly represented or warranted herein. Without limiting the generality of the foregoing any and all conditions, warranties or representations expressed or implied pursuant to applicable sale of goods legislation or other similar legislation do not apply hereto and have been waived by the Purchaser. The description of the Purchased Assets contained in the Agreement are for purpose of identification only and, no representation, warranty or condition has or will be given by the Trustee concerning completeness or accuracy of such descriptions

– 13 –

# ARTICLE 5.
# COVENANTS

**5.1     Closing Date**

The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing on or before the Outside Date.

**5.2     Permits and Licenses**

The Parties shall cooperate and work together in good faith, assist with submissions, share information and make any other efforts required to obtain any approval, Authorization, third-party consent, or permits and licences from any Governmental Authority necessary to effect the Closing.

**5.3     Application for Approval and Vesting Order and Recognition Order**

As soon as practicable, the Trustee shall serve and file with the BC Court an application for the issuance of the Approval and Vesting Order and, if applicable, the Assignment Order, seeking relief that will, inter alia, approve this Agreement and the Transaction, and proceedings in the Delaware Court for the Recognition Order.

**5.4     Insurance Matters**

Until Closing, the Trustee shall keep in full force and effect all existing insurance policies of the Companies and give any notice or present any Claim under any such insurance policies consistent with past practice in the ordinary course of business.

**5.5     Transition Services Agreement**

(a)     Concurrently with the execution of this Agreement, the parties to the TSA shall enter into an amending agreement to the TSA, in a form mutually agreeable to the Trustee and the Purchaser.

(b)     Effective contemporaneously with the Closing and in accordance with Section 6(a)(i) of the TSA, the Trustee and the Purchaser hereby agree that the TSA shall automatically terminate. Upon termination of the TSA, neither the Trustee nor the Purchaser shall have any further obligations, responsibilities, or liabilities under the TSA, except for those obligations that expressly survive termination pursuant to the terms of the TSA.

**5.6     Name Changes**

The Trustee shall, within ten (10) days after the Closing Date, provide written confirmation and evidence to the Purchaser of the name change of the Companies to names that do not include the words "Bench Accounting" and "10Sheet"

**5.7     Accounts Receivable**

Within two (2) Business Days after the Closing Date, the Trustee will transfer all Accounts Receivable collected by the Trustee or the Companies up until the Closing Date to the Purchaser or as the Purchaser may direct in writing.  The Trustee shall, within two (2) weeks following the receipt of any Accounts Receivable by the Trustee or the Companies following the Closing Effective Time, remit such Accounts Receivable by cheque, wire transfer or direct deposit of immediately available funds to such place as directed by the Purchaser, from time to time.

– 14 –

## ARTICLE 6
## CLOSING ARRANGEMENTS

**6.1     Closing**

Closing shall take place on the Closing Date effective as of the Closing Effective Time electronically (or as otherwise determined by mutual agreement of the Parties in writing), by the exchange of deliverables (in counterparts or otherwise) by electronic transmission in PDF format.

**6.2     Trustee's Closing Deliveries**

At or before the Closing, the Trustee shall deliver or cause to be delivered to the Purchaser the following:

(a)     a true copy of the Approval and Vesting Order, as issued and entered by the BC Court;

(b)     a true copy of the Assignment Order, if applicable, as issued and entered by the BC Court;

(c)     a true copy of the Recognition Order, as issued by the Delaware Court;

(d)     a copy of Trustee's Certificate;

(e)     all Tax elections contemplated by Section 3.3, duly executed by the Trustee;

(f)     the General Conveyance, duly executed by the Trustee;

(g)     the Assignment and Assumption Agreement, duly executed by the Trustee;

(h)     the Trademark Assignment Agreement, duly executed by the Trustee;

(i)     the complete source code, object code, and documentation for the software platform (including all previous versions, code branches, developer notes, designs, specifications, and other documents in the Companies' possession or control);

(j)     the complete source code, object code, and documentation for the Companies' AWS interface (including all previous versions, code branches, developer notes, designs, specifications, and other documents in the Companies' possession or control);

(k)     a certificate of an officer of the Trustee dated as of the Closing Date confirming that all of the representations and warranties of the Trustee contained in this Agreement are true in all material respects as of the Closing Date, with the same effect as though made at and as of the Closing Date, and that the Trustee has performed in all material respects the covenants to be performed by it prior to the Closing Date;

(l)     discharges or no interest letters in each case in form and substance satisfactory to the Purchaser, acting reasonably, with respect to any Encumbrances;

(m)     the Books and Records that relate to the Purchased Assets and Assigned Contracts; and

(n)     such other agreements, documents and instruments as may be reasonably required by the Purchaser to complete the Transaction, all of which shall be in form and substance satisfactory to the Parties, acting reasonably.

**6.3    Purchaser's Closing Deliveries**

At or before the Closing Date, the Purchaser shall deliver or cause to be delivered to the Trustee, the following:

(a)    payment of the Purchase Price (net of the Deposit);

(b)    payment of all Transfer Taxes payable on Closing to the Trustee or the Companies (or evidence of payment by the Purchaser thereof to the relevant Governmental Authorities) in accordance with Section 3.3;

(c)    payment of the Cure Costs to be paid by the Purchaser pursuant to Section 2.4 to the Trustee, or evidence that such Cure Costs have been or will be paid directly to the applicable counterparty;

(d)    all tax elections contemplated by Section 3.3, duly executed by the Purchaser;

(e)    the Assignment and Assumption Agreement, duly executed by the Purchaser;

(f)    a certificate of an officer of the Purchaser dated as of the Closing Date confirming that all of the representations and warranties of the Purchaser contained in this Agreement are true in all material respects as of the Closing Date, with the same effect as though made at and as of the Closing Date, and that the Purchaser has performed in all material respects the covenants to be performed by it prior to the Closing Date; and

(g)    such other agreements, documents and instruments as may be reasonably required by the Trustee to complete the Transaction, all of which shall be in form and substance satisfactory to the Parties, acting reasonably.

**ARTICLE 7
CONDITIONS OF CLOSING**

**7.1    Conditions Precedent in favour of the Parties**

The obligation of the Parties to complete the Transaction is subject to the following joint conditions being satisfied, fulfilled or performed on or prior to the Closing Date:

(a)    Approval and Vesting Order. The BC Court shall have issued and entered the Approval and Vesting Order, which Approval and Vesting Order shall not have been stayed, set aside, or vacated and no application, motion or other proceeding shall have been commenced seeking the same, in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonably.

(b)    Recognition Order. The Delaware Court shall have issued the Recognition Order, which Recognition Order shall not have been stayed, set aside, or vacated and no application, motion or other proceeding shall have been commenced seeking the same, in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonably

(c)    Assignment Order. The BC Court shall have issued and entered the Assignment Order, if applicable, which Assignment Order shall not have been stayed, set aside, or vacated and no application, motion or other proceeding shall have been commenced seeking the same,

in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonably.

(d)     <u>No Order.</u> No Applicable Law and no judgment, injunction, order or decree shall have been issued by a Governmental Authority or otherwise in effect that restrains or prohibits the completion of the Transaction; and

(e)     <u>No Restraint.</u> No motion, action or proceedings shall be pending by or before a Governmental Authority to restrain or prohibit the completion of the Transaction contemplated by this Agreement.

The foregoing conditions are for the mutual benefit of the Parties. If any condition set out in <u>Section 7.1</u> is not satisfied, performed or mutually waived on or prior to the Outside Date, any Party may elect on written notice to the other Parties to terminate this Agreement.

**7.2     Conditions Precedent in favour of the Purchaser**

The obligation of the Purchaser to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a)     <u>Trustee's Deliverables.</u> The Trustee shall have executed and delivered or caused to have been executed and delivered to the Purchaser all the documents and payments contemplated in <u>Section 6.2</u>.

(b)     <u>No Breach of Representations and Warranties</u>. Each of the representations and warranties contained in <u>Section 4.1</u> shall be true and correct in all material respects: (i) as of the Closing Date as if made on and as of such date, or (ii) if made as of a date specified therein, as of such date.

(c)     <u>No Breach of Covenants</u>. The Trustee shall have performed in all material respects all covenants, obligations and agreements contained in this Agreement required to be performed by the Trustee on or before the Closing.

The foregoing conditions are for the exclusive benefit of the Purchaser. These conditions may be waived by the Purchaser in whole or in part. Any such waiver shall be binding on the Purchaser only if made in writing. If the conditions set out in this <u>Section 7.2</u> are not satisfied or performed on or prior to the Outside Date, the Purchaser may elect on written notice to the Trustee to terminate this Agreement.

**7.3     Conditions Precedent in favour of the Trustee**

The obligation of the Trustee to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a)     <u>Purchaser's Deliverables.</u> The Purchaser shall have executed and delivered or caused to have been executed and delivered to the Trustee at the Closing all the documents and payments contemplated in <u>Section 6.3</u>.

(b)     <u>No Breach of Representations and Warranties</u>. Each of the representations and warranties contained in <u>Section 4.2</u> shall be true and correct in all material respects: (i) as of the Closing Date as if made on and as of such date, or (ii) if made as of a date specified therein, as of such date.

(c)     <u>No Breach of Covenants</u>. The Purchaser shall have performed in all material respects all covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

The foregoing conditions are for the exclusive benefit of the Trustee. Any condition in this <u>Section 7.3</u> may be waived by the Trustee in whole or in part, without prejudice to any of its rights of termination in the event of non-fulfilment of any other condition in whole or in part. Any such waiver shall be binding on the Trustee only if made in writing, provided that delivery of the Trustee's Certificate will constitute such written waiver. If any condition set forth in this <u>Section 7.3</u> is not satisfied or performed on or prior to the Outside Date, the Trustee may elect on written notice to the Purchaser to terminate the Agreement.

**7.4     Appeal of Approval and Vesting Order**

In the event any variation is sought or leave to appeal is sought, an appeal is taken or a stay pending appeal is requested with respect to the Approval and Vesting Order, the Trustee shall promptly notify the Purchaser of such application for leave to appeal, appeal or stay request and shall promptly provide to the Purchaser a copy of the related notice(s) or order(s). Notwithstanding any such appeal or application for leave to appeal, the parties will complete the Transaction on the Closing Date without regard to any appeal or application for leave to appeal to vary or set aside the Approval and Vesting Order, unless the Approval and Vesting Order has been stayed by further BC Court order or is otherwise in effect. In the event a stay of the Approval and Vesting Order is in effect, the Closing Date shall be automatically extended by thirty (30) days, and the parties will use commercially reasonable efforts to obtain a further order of the BC Court approving the Transaction, and, following issuance of such order, will complete the Transaction as soon as reasonably possible thereafter. In the event that such BC Court order is not obtained within thirty (30) days of the aforementioned stay, the Purchaser may, on written notice to the Trustee, terminate this Agreement.

**ARTICLE 8**
**TERMINATION**

**8.1     Grounds for Termination**

This Agreement may be terminated on or prior to the Closing Date:

(a)     by the mutual written agreement of the Trustee and the Purchaser;

(b)     by the Purchaser, upon written notice to the Trustee, if there has been a material breach by the Trustee of any material representation, warranty or covenant contained in this Agreement, which breach has not been waived by the Purchaser, and: (i) such breach is not curable and has rendered the satisfaction of any condition in <u>Section 7.2</u> impossible by the Outside Date; or (ii) if such breach is curable, the Purchaser has provided prior written notice of such breach to the Trustee, and such breach has not been cured within ten (10) days (or, if not curable within ten (10) days, such longer period as is reasonable under the circumstances, not to exceed thirty (30) days) following the date upon which the Trustee received such notice;

(c)     by the Purchaser, upon written notice to the Trustee, any time after the Outside Date, if (A) the Approval and Vesting Order has not been obtained, or (B) the Closing has not occurred by the Outside Date and such failure to close was not caused by or as a result of the Purchaser's breach of this Agreement;

(d)     by the Trustee, upon written notice to the Purchaser, if there has been a material breach by the Purchaser of any material representation, warranty or covenant contained in this

Agreement, which breach has not been waived by the Trustee, and: (i) such breach is not curable and has rendered the satisfaction of any condition in Section 7.3 impossible by the Outside Date; or (ii) if such breach is curable, the Trustee has provided prior written notice of such breach to the Purchaser, and such breach has not been cured within ten (10) days (or, if not curable within ten (10) days, such longer period as is reasonable under the circumstances, not to exceed thirty (30) days) following the date upon which the Purchaser received such notice; or

(e)     by the Trustee, upon written notice to the Purchaser, any time after the Outside Date, if (A) the Approval and Vesting Order has not been obtained, or (B) the Closing has not occurred by the Outside Date and such failure to close was not caused by or as a result of the breach of this Agreement by the Trustee.

## 8.2     Effect of Termination

If this Agreement is terminated pursuant to Section 8.1, all further obligations of the Parties under this Agreement will terminate and no Party will have any Liability or further obligations hereunder.

**ARTICLE 9**
**GENERAL**

## 9.1     Privacy Matters

The collection, use and disclosure of Personal Information by any of the parties in respect of this Agreement prior to the Closing is restricted to those purposes that relate to the transactions contemplated by this Agreement. Each of the Parties acknowledges and confirms that the disclosure of Personal Information was necessary for the purposes of determining if the Parties shall proceed with the transactions contemplated hereby and that the disclosure of Personal Information relates solely to the evaluation of the transactions contemplated hereby, the completion of the transactions contemplated hereby or the carrying on of the Business. At all times, to the extent it continues to hold Personal Information, the Purchaser shall safeguard all Personal Information collected from the Trustee and the Companies in a manner consistent with the degree of sensitivity of the Personal Information and maintain at all times the security and integrity of the Personal Information. The Purchaser shall not make copies or excerpts of or from the Personal Information or in any way re-create the substance or contents of the Personal Information if the transactions contemplated hereby are not completed for any reason, and shall return all Personal Information to the Trustee and the Companies, as applicable, or destroy such Personal Information at the Trustee's request.

## 9.2     Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the Province of British Columbia and the laws of the Canada applicable therein and each of the Parties irrevocably attorns to the exclusive jurisdiction of the BC Court, and any appellate courts of the Province of British Columbia therefrom.

## 9.3     Notice

Any notice or other communication under this Agreement shall be in writing and may be delivered by email, addressed:

(a)     in the case of the Purchaser, as follows:

Recruiter.com Ventures Inc.
2261 Market St. #5056,
San Francisco, CA 94114

Attention:   Zack James and Kayli Maguire
Email:       zack@zjameslaw.com/ kayli.maguire@bench.co

with a copy to:

Legal Scale LLP
2 Park Avenue, 20th Floor
New York, NY 10016

Attention:   Bryan Judd and Udi Ben Ari
Email:       bryan@legalscale.com; udi@legalscale.com

and to:

Lawson Lundell LLP
1600 – 925 West Georgia Street
Vancouver, BC V6C 3L2

Attention:   Bryan Gibbons and Julia Winters
Email:       bgibbons@lawsonlundell.com; jwinters@lawsonlundell.com

(b)      in the case of the Trustee, as follows:

KSV Restructuring Inc.
220 Bay Street, 13th Floor, PO Box 20,
Toronto, Ontario, M5J 2W4

Attention:   Bobby Kofman / Jason Knight
Email:       bkofman@ksvadvisory.com / jknight@ksvadvisory.com

with a copy to:

Fasken Martineau DuMoulin LLP
550 Burrard Street, Suite 2900
Vancouver, BC, V6C 0A3

Attention:   Kibben Jackson
Email:       kjackson@fasken.com

Any such notice or other communication, if transmitted by email before 5:00 p.m. (Eastern Standard Time) on a Business Day, will be deemed to have been given on such Business Day, and if transmitted by email after 5:00 p.m. (Eastern Standard Time) on a Business Day, will be deemed to have been given on the Business Day after the date of the transmission. In the case of a communication by email or other electronic means, if an autoreply is received indicating that the email is no longer monitored or in use, delivery must be followed by the dispatch of a copy of such communication pursuant to one of the other methods described above; provided however that any communication originally delivered by electronic means shall be deemed to have been given on the date stipulated above for electronic delivery.

Sending a copy of a notice or other communication to a Party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the notice or other communication to that Party. The failure to send a copy of a notice or other communication to legal counsel does not invalidate delivery of that notice or other communication to a Party. A Person may change its address for service by notice given in accordance with the foregoing and any subsequent communication must be sent to such Person at its changed address.

**9.4    Public Announcements**

The Trustee shall be entitled to disclose this Agreement to the BC Court, the Delaware Court and parties in interest in the Bankruptcy Proceedings, other than any information which the Purchaser advises the Trustee in writing as being confidential, and this Agreement may be posted on the Trustee's website maintained in connection with the Bankruptcy Proceedings. Other than as provided in the preceding sentence or statements made in BC Court or Delaware Courts (or in pleadings filed therein) or where required to meet timely disclosure obligations of the Trustee or any of its Affiliates under Applicable Laws (provided that the Purchaser shall be given prior written notice of any such disclosures), the Trustee shall not issue (prior to or after the Closing) any press release or make any public statement or public communication with respect to this Agreement or the Transactions contemplated hereby without the prior consent of the other Parties, which shall not be unreasonably withheld or delayed.

**9.5    Time**

Time shall, in all respects, be of the essence hereof, provided that the time for doing or completing any matter provided for herein may be extended or abridged by an agreement in writing signed by the Parties.

**9.6    Survival**

The representations and warranties of the Parties contained in this Agreement shall not merge on Closing. The covenants of the Parties contained herein to be performed after the Closing shall survive Closing and remain in full force and effect.

**9.7    Benefit of Agreement**

This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

**9.8    Entire Agreement**

This Agreement and the Exhibits and Schedules attached hereto, constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior negotiations, understandings and agreements. This Agreement may not be amended or modified in any respect except by written instrument executed by the Trustee and the Purchaser.

**9.9    Paramountcy**

In the event of any conflict or inconsistency between the provisions of this Agreement, and any other agreement, document or instrument executed or delivered in connection with the transactions contemplated by this Agreement, the TSA or the LOI, the provisions of this Agreement shall prevail to the extent of such conflict or inconsistency.

**9.10    Assignment**

This Agreement may be assigned by the Purchaser five (5) days prior to the hearing scheduled for the issuance of the Approval and Vesting Order, in whole or in part, without the prior written consent of the

Trustee, provided that: (a) such assignee is a related party or subsidiary of the Purchaser; (b) the Purchaser provides prior notice of such assignment to the Trustee; and (c) such assignee agrees to be bound by the terms of this Agreement to the extent of the assignment; provided, however, that any such assignment shall not relieve the Purchaser of its obligations hereunder.

## 9.11    Further Assurances

Each of the Parties shall (including following Closing), at the request and expense of the requesting Party, take or cause to be taken such action and execute and deliver or cause to be executed and delivered to the other such conveyances, transfers, documents and further assurances as may be reasonably necessary or desirable to give effect to this Agreement and the transactions contemplated herein.

## 9.12    Counterparts

This Agreement may be executed electronically in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same agreement. Transmission by e-mail of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

## 9.13    Severability

Notwithstanding any provision herein, if a condition to complete the Transaction, or a covenant or an agreement herein is prohibited or unenforceable pursuant to Applicable Law, then such condition, covenant or agreement shall be ineffective to the extent of such prohibition or unenforceability without invalidating the other provisions hereof.

## 9.14    Trustee's Capacity

In addition to all of the protections granted to the Trustee under the BIA or any order of the BC Court in the Bankruptcy Proceedings, the Purchaser acknowledges and agrees that the Trustee, acting in its capacity as Trustee in respect of the Companies and not in its personal capacity, will have no liability, in its personal capacity or otherwise, in connection with this Agreement or the Transaction contemplated herein whatsoever as Trustee.

*[**Signature Page Follows**]*

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the day and year first above written.

> **KSV RESTRUCTURING INC.** in its capacity as the appointed bankruptcy trustee of the estate of **BENCH ACCOUNTING, INC.,** and **10SHEET SERVICES INC.**
>
> Per: _____
> Name:    Robert Kofman
> Title:    President
>
>
> **RECRUITER.COM VENTURES INC.**
>
> Per: _Jesse Tinsley_____
> Name:    Jesse Tinsley
> Title:    CEO

## SCHEDULE A
## PURCHASED ASSETS

1. **Assigned Contracts**:

2. **Trademarks**:

| Trademark | Country | App. Date App. No. | Reg. Date Reg. No | Case No. |
|---|---|---|---|---|
| BENCH | Canada | April 2, 2013 1620815 | Sept. 14, 2016 TMA949251 | 49898-TM2001 |
| Shield Logo  | Canada | Dec. 13, 2013 1656367 | July 16, 2015 TMA908765 | 49898-TM2003 |
| (Device Only)  | EUTM | Dec. 13, 2013 12428082 | May 19 2014 12428082 | 49898-TM2004 |
| BENCH | EUTM | March 15, 2013 011662723 | August 7, 2013 011662723 | 49898-TM2002 |
| (Device Only)  | United Kingdom | Dec. 13, 2013 UK00912428082 | May 19, 2014 UK00912428082 | 49898-TM2004 |
| BENCH | United Kingdom | March 15, 2013 UK00911662723 | August 7, 2013 UK00911662723 | 49898-TM2002 |
| (Device Only)  | USA | Dec. 11, 2013 86140776 | August 19, 2014 4587902 | 49898-TM1003 |
| BENCH | USA | March 1, 2013 85981170 | April 15, 2014 4516471 | 49898-TM1002 |

| BENCH TAX | USA | August 28, 2020<br><br>90145835 | July 30, 2024<br><br>7463736 | 49898-TM1005 |
|---|---|---|---|---|
| Girl at Desk 1 | USA | Dec. 23, 2015<br><br>VA0001982311 | Dec. 23, 2015<br><br>VA0001982311 | 49898-CR1001 |
| Girl at Desk 2 | USA | Dec 23 2015<br><br>VA0001998928 | Dec 23 2015<br><br>VA0001998928 | 49898-CR1002 |

3. **Website Domain Names:**
    i. bench.co
    ii. tensheet.com
    iii. 10sheet.com
    iv. 10sheets.com
    v. 10sheet.ca
    vi. taxdeadlinereminder.com
    vii. benchco.ai
    viii. benchaccounting.ai
    ix. bench.app
    x. meetbench.com
    xi. 10sheet.app
    xii. benchlabs.dev
    xiii. benchception.co
    xiv. 10sheep.ca


4. **Code:**
    i. All codebases at https://github.com/BenchLabs; and
    ii. All other self-hosted codebases.

5. **Software Licenses:** All third-party licenses currently utilized in the Companies' Business, including, but not limited to, the following:
    i. Mobile device management software
    ii. Google Workspace
    iii. Paro, Inc.
    iv. Plaid Inc.
    v. Gusto
    vi. Retool, Inc.
    vii. Rutter
    viii. Profound Platform Inc. aka Finch
    ix. Marketo, Inc.
    x. 1Password
    xi. Knock
    xii. Stream
    xiii. GitHub, Inc.
    xiv. Salesforce.com Canada Corporation
    xv. AWS
    xvi. Adobe Acrobat

xvii. Ambassador
xviii. AppCues
xix. Auth0
xx. Calendly
xxi. Confluence
xxii. Drake Software
xxiii. Atlassian
xxiv. OKTA
xxv. Slack + Slack AI
xxvi. Split
xxvii. Zoom (Meeting)
xxviii. Miro
xxix. Microsoft Canada, Inc.
xxx. Tableau
xxxi. Retool
xxxii. Docusign
xxxiii. Slack
xxxiv. Heap
xxxv. Synk.io
xxxvi. Figma
xxxvii. Zapier
xxxviii. Karbon
xxxix. OpenAI
xl. Atlassian
xli. SkillsMap
xlii. CultureAmp
xliii. WebFlow

6. **Engineering and Observability Tools:**
    i. All AWS development environments and Workspaces
    ii. All licenses for code environments (IntelliJ)
    iii. JFrog Artifactory
    iv. Jellyfish
    v. Datadog
    vi. New Relic

7. **Tech Assets:**

| Category | Asset Type | Asset Name | Description |
|---|---|---|---|
| System | AWS Infra | AWS | All Amazon Web Services (AWS) organization accounts (72 of them) and all the data and configuration across all regions in all AWS services. This includes, but is not limited to, S3 data buckets, RDS instances, EC2 instances, EventBridge system & data, Dynamo data, Redshift data, Servless system, Lambdas,Cognito, OpsGenie, etc. |

| Data | Data Set | Categorized Transaction Data | Categorized transaction data represents a structured dataset of ~287 million transactions processed for ~56,000 clients over 11 years, with an average of ~3 million transactions categorized monthly. This data is invaluable for training machine learning models, both generally and within our proprietary systems. It serves as the foundation for building and refining models that power automated transaction categorization, trend analysis, and financial forecasting.This dataset offers a unique opportunity to enhance the accuracy and scalability of AI-driven solutions, leveraging the depth and diversity of historical categorization. Its strategic value lies in supporting advanced product development, improving efficiency in financial workflows, and enabling more precise customer insights and predictive analytics. |
|------|----------|------------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Data | Data Set | Customer Document Library | The Customer Document Library is a repository of customer-uploaded documents, including financial statements, receipts, tax forms, and other bookkeeping-related materials. This library, built over years of customer interactions, serves as a valuable dataset for automating document processing and classification using AI/ML tools. It supports enhanced operational efficiency by providing training data for categorization models and enabling faster, more accurate document handling. Represents a significant asset for driving innovation in automation and improving customer service capabilities |
| Data | Data Set | CRT    Knowledge Base | CRT Knowledge Base: A repository containing over 2,500 entries and 255,000+ words, designed to support the Customer Response Team (CRT) in delivering accurate and efficient client support. This knowledge base includes detailed instructions, troubleshooting guides, and best practices across various bookkeeping scenarios. It also holds significant value for training large language models (LLMs), as its structured and detailed content provides a robust dataset for refining AI tools to enhance automated support, improve response accuracy, and reduce resolution times. |
| Data | Data Set | Customer Messages | Customer message data captures ~3 million outgoing messages from Bench to clients and ~1.9 million incoming messages from clients to Bench, spanning bookkeeping inquiries, support requests, and transactional clarifications. This dataset offers a comprehensive view of customer interaction patterns, providing rich insights into client behavior, common challenges, and areas for improving service delivery. It is pivotal for training AI models to automate responses, streamline support workflows, and anticipate customer needs.This dataset is a strategic asset for optimizing customer engagement, refining communication processes, and driving operational excellence in bookkeeping and client support. |

| Data | Data Set | Uncategorized Transaction Data | Uncategorized transaction data comprises ~287 million raw financial transactions processed over 11 years for ~56,000 clients, with ~3 million transactions added monthly. This dataset offers immense value by enabling the identification of spending patterns, financial behaviors, and emerging trends across industries. It provides a rich foundation for building predictive analytics models, generating actionable business insights, and exploring untapped opportunities in customer segmentation and product development. With its historical depth and scale, the dataset is a unique asset for enhancing financial intelligence and driving innovation in data-driven solutions. |
| --- | --- | --- | --- |
| Data | Data Set | Unconverted Leads and Contacts Data | A dataset of 464,877 unconverted Standard Leads, 7,701 CPA Leads, and 5,532 BD Leads, along with 81,102 Standard Contacts, 1,538 BenchTax DocuSign Contacts, 1,225 Obsolete Contacts, 327 CPA Contacts, and 1,006 BD Contacts segmented by record type within the Salesforce CRM. This dataset provides insights into the lead and contact pool's size and composition, highlighting potential opportunities for marketing and sales efforts. Based on the size and age of the lead pool, a significant portion may no longer be marketable or valid. |
| Data | Data Set | Firmographic Data | The firmographic dataset of ~56,000 historical clients provides a view of SMB financial behaviors, including revenue, expenses, industry verticals, geographic distribution, and entity types. It spans diverse sectors such as retail, professional services, healthcare, construction, and technology, with a strong representation in North America's major economic hubs. |
| Engineering | Machine Learning Model | Similar Transactions Clustering Model | Similar Transactions Categorization ML Model: A machine-learning model designed to cluster similar transactions based on shared attributes, enabling bulk categorization. The model is trained on transaction events, identifying patterns and grouping related transactions. It triggers updates through an event-driven architecture, with results stored in DynamoDB for efficient retrieval. This ML-powered solution reduces manual categorization effort, improves accuracy, and provides the foundation for seamless integration into Bench's customer-facing tools. |
| Engineering | Machine Learning Model | Customer Based Categorization Model | The Customer-Based Categorization (CBC) model is a foundational machine learning solution that streamlines transaction categorization by identifying patterns within a customer's historical ledger. Using a clustering-based algorithm, CBC groups similar transactions and predicts their categories with precision, significantly reducing the need for manual intervention. By addressing gaps left by other methods such as Client Rules and DoNNa, CBC has successfully automated approximately 17% of previously manual transaction volume, driving greater efficiency. |

| Engineering | Machine Learning Model | Customer Based Categorization Model V2 | The Better Customer-Based Categorization (BCBC) model is a next-generation enhancement of Bench's Customer-Based Categorization (CBC) system, leveraging advanced machine learning techniques like TF-IDF and dynamic thresholding to deliver improved transaction categorization. BCBC addresses limitations in the original clustering-based CBC by reducing computational demands, improving accuracy, and adapting categorization thresholds to individual customer profiles. Key benefits include a 17.46 percentage point increase in system coverage, significantly reducing manual categorization efforts, and an estimated labor cost reduction of 15-25%. BCBC integrates seamlessly into Bench's new architecture, offering faster processing speeds (5x improvement), reduced infrastructure costs, and broader transaction history coverage. This scalable solution demonstrates strong potential for operational efficiency and cost savings, aligning with Bench's commitment to delivering precise, automated bookkeeping. |
|---|---|---|---|
| Engineering | Machine Learning Model | DoNNa ML Categorization Model | The DoNNa Model is a machine learning categorization system designed to classify transactions with high accuracy and scalability, utilizing TensorFlow and Google CloudML. It incorporates a Deep/Wide Neural Network architecture, combining deep learning for generalization and linear features for specific patterns, such as client-specific categorizations. DoNNa processes transaction data using advanced preprocessing scripts and vocabulary generation techniques to optimize training. It achieves 91% categorization coverage for high-confidence transactions (confidence > 90%) and up to 97.8% coverage for suggested categorizations (confidence > 50%). The system supports incremental training on CloudML and allows hyper-parameter tuning for model optimization. It integrates seamlessly with Bench's Financial Data domain, aligning vendor and transaction information into ledger-ready journal entries, enhancing bookkeeping precision. Bench owns the infrastructure and logic for transforming transaction data while leveraging CloudML's scalable environment for training and deployment. |
| Engineering | Machine Learning Model | Automated Document Sorting | The Automated Document Sorting System is a proprietary machine learning integration that automates the classification and metadata extraction of uploaded documents, such as statements and receipts, using tools like Amazon Textract and OpenAI GPT. This system reduces manual processing costs, improves operational efficiency, and enhances customer experience by delivering faster insights. It integrates with Bench's systems via EventBridge and SQS. |

| Engineering | API Integration | Finch Integration | The Finch integration at Bench automates payroll data ingestion by seamlessly connecting payroll providers to Bench's financial systems, replacing manual data entry processes. Bench owns the infrastructure for securely managing connections, synchronizing data, and translating payroll information into actionable bookkeeping insights. Key components include microservices such as the Finch Gateway for handling webhooks, Customer and Specialist Manage Connections BFFs for managing connection lifecycles, and Sync Control for event-driven data synchronization. Data is securely stored in S3 and transformed for ledger integration. While Finch provides API endpoints and webhook triggers, Bench adds value through its modular architecture, event-driven processing, and alignment with future-proof North Star principles, enabling faster payroll management, reduced errors, and improved customer satisfaction. |
| --- | --- | --- | --- |
| Engineering | API Integration | Stripe Integration | Bench's Stripe API integration leverages Stripe's payment infrastructure and raw transaction data to transform, store, and utilize it within Bench's proprietary financial data pipeline. Bench owns the processes and systems that translate Stripe's data model into actionable bookkeeping assets, including categorized transactions, ledger balances, and reconciliations. This includes the financial-data database, custom sync logic, and user-facing tools that provide clients with insights and reports. While Stripe controls the underlying payment systems, raw data, and API, Bench adds value through its proprietary transformation, validation, and reporting infrastructure tailored for accurate and efficient financial management. |
| Engineering | API Integration | Shopify Integration | Bench's Shopify API integration facilitates seamless bookkeeping by leveraging Shopify's platform for automating payment data import and reconciliation. Bench owns the infrastructure and processes that connect Shopify accounts via OAuth, retrieve and transform Shopify payment data into Bench's financial data system, and support bookkeepers with efficient workflows. Key assets include the financial-data database, transformed data stored within Bench's systems, and custom tools for transaction reconciliation. While Shopify controls the payment infrastructure, app listing, and account-specific connection limitations, Bench enhances value by automating data ingestion, creating scalable connection workflows, and providing tailored insights to clients for accurate financial reporting and management. |
| Engineering | API Integration | Plaid OCR Integration | The Plaid OCR Gateway integration streamlines financial data ingestion for Bench by leveraging Plaid's technology to automate document upload and processing. Bench owns the infrastructure and services for transforming Plaid's raw data into actionable bookkeeping information, including handling tokens, storing transactions, and generating events. Core assets include callback, listener, and trigger Lambda functions that validate webhooks, process statements, and manage secure storage in S3. Bench ensures data security with encrypted payloads and a micro-event store for reliable event tracking, while collaborating gateways mediate internal and external data flows. Plaid owns the raw document upload flow and API |

| | | | |
|---|---|---|---|
| | | | services, while Bench adds value through proprietary transformation, event management, and tailored client insights. |
| Engineering | API Integration | Plaid Transactions Integration | The Plaid Transaction API integration at Bench automates the ingestion and processing of financial data from clients' connected bank and credit card accounts. Bench owns the infrastructure to securely import, validate, and standardize up to 24 months of financial transactions using the Financial Data Service (FDS). This system ensures data accuracy by enriching transactions and producing ledger-ready, reconcilable entries. While Plaid provides the API and connection capabilities, Bench adds value through backend systems that transform raw transaction data into actionable financial records, ensuring seamless bookkeeping workflows and accurate reconciliations. Reference balances are critical to validation, and Bench's system verifies these for consistent financial reporting. |
| Engineering | API Integration | Square Integration | The Square integration at Bench automates the ingestion of payments and payouts into Bench's financial systems, aligning Square's data model with Bench's Financial Data domain. Bench owns the infrastructure that transforms Square API data into ledger-ready journal entries, including payments, fees, cash transactions, and balances. Key processes include syncing merchant and location data, pulling payments and payouts, and constructing artificial balances to ensure seamless ledger management. Square provides merchant processors and APIs for data retrieval, while Bench adds value by translating complex transaction relationships into actionable bookkeeping insights, validating constructed balances, and maintaining alignment with Square's systems. This integration ensures efficient reconciliation and real-time financial reporting for clients. |
| Engineering | API Integration | Gusto Integration | The Gusto integration at Bench automates payroll data ingestion by connecting Gusto's payroll systems to Bench's financial data infrastructure. Bench owns the services that securely manage payroll data synchronization, processing, and storage while ensuring compliance with financial reporting standards. Key components include a Gusto Gateway for API interactions, connection management BFFs for handling connection lifecycles, and event-driven workflows for processing payroll data. Data retrieved from Gusto is translated into ledger-ready formats and stored in secure S3 buckets. While Gusto provides payroll APIs and webhook triggers, Bench enhances the integration with proprietary automation, modular architecture, and robust data processing, enabling faster payroll updates, error reduction, and comprehensive financial insights for clients. |

| Engineering | API Integration | Powered By Bench APIs | The Bench API enables integration between Bench's financial services and partner platforms, supporting account creation, financial reporting, and real-time notifications. Partners can use the API to automate account setup, display financial statements like income and balance sheets, and notify users of bookkeeping tasks such as document uploads or transaction categorizations. This integration allows partners to embed bookkeeping functionalities into their own apps, enhancing user experience, improving operational efficiency, and driving engagement and retention through a shared ownership model. |
|---|---|---|---|
| Engineering | Automation | Mito Matching | The MITO and Transaction Categorization System automates the classification of journal entries and transactions, ensuring accurate ledger assignments and reducing manual effort. It manages the Money in Transit Outstanding (MITO) ledger, which holds unmatched or partially matched transactions, and supports workflows for client input, AA review, and final categorization |
| Engineering | Core Platform Service | Email Infrastructure | The Email Infrastructure manages incoming and outgoing email communications for Bench's applications and services. Incoming emails, handled via Mailgun, enable features like message feed replies and transaction comments by triggering events across Bench services. Outgoing emails, processed by the Milkman service and delivered through Mandrill, include notifications such as receipt uploads, client care updates, and payment alerts. The system integrates with services like Cowbell and Mainapp for processing and relies on validated domains (bench.co, jenkins.bench.co, and mail.bench.co) with DNS records managed via AWS Route53. Additional functionality includes the "Dropbox Receipt" feature, which allows clients to email receipts directly to the app for document processing. |
| Engineering | Documentation | Architectural Knowledge Library | The Confluence-Based Architecture Knowledge Library is a repository of technical documentation, including system blueprints, API schemas, integration workflows, and decision records, that outlines the foundation of Bench's platform and operations. This library not only provides a deep understanding of Bench's architecture but also serves as a launchpad for innovation. With detailed insights into systems and processes, it enables teams to build upon existing infrastructure, streamline enhancements, and explore new features or integrations.This library is a valuable resource for driving future innovation and scaling the platform effectively while minimizing development ramp-up time. |
| Engineering | Documentation | Engineering Documentation | Centralized repository of engineering workflows, frontend architecture, coding standards, and ADRs. |
| Engineering | Documentation | Best Practices Repository | Guidelines for TypeScript, React, accessibility, clean code, and reusable components in app development. |
| Engineering | Documentation | Architectural Decision Records | Centralized log of architectural decisions and rationale to promote transparency and consistency. |

| Engineering | Documentation | Testing Framework | Structured guidelines for unit and integration testing to ensure code reliability and quality assurance. |
|---|---|---|---|
| Engineering | Documentation | Third-Party Library Standards | Criteria for evaluating external libraries based on security, size, and maintainability. |
| Product | Software | FLO Client Dashboard | FLO Client Dashboard: A real-time dashboard providing visibility into client data and work status, tracking automation and manual workflows. It enables synchronized portfolio management, identifies bottlenecks, and breaks down outstanding tasks across clients to optimize operational efficiency. |
| Product | Software | Client App | Bench Client App: A mobile-responsive web application designed to help small business owners and entrepreneurs efficiently manage their personal and business finances. The app integrates with Bench's internal tools and external platforms like Plaid to provide seamless account connections, secure data imports, and transaction categorization. Features include advanced document management, real-time status tracking, and access to detailed financial reports such as income statements, balance sheets, profit and loss summaries, and top expenses. Users can manage Personal Busines Crossover accounts, 1099 reporting, set preferences, and explore upsell opportunities directly within the platform. The app also offers communication tools for engaging with a dedicated bookkeeping team, ensuring timely support and responses. |
| Product | Software | BK Tools Client Managment Platform | BKTools (Client Management Platform): BKTools is Bench's centralized client management platform designed to optimize bookkeeping operations across multiple portfolios. It integrates essential functionalities such as account management, general ledger tracking, categorization, adjustments, client profiles, and real-time messaging into a single, streamlined system. BKTools enhances efficiency by automating routine tasks, reducing errors, and enabling timely communication between clients and teams. Its scalable and customizable design supports Bench's evolving workflows, ensuring accurate financial management and exceptional client service. |
| Product | Software | Task Managment Centre | Task Manager (Priority Task Management System): Bench's Priority Task Management system streamlines bookkeeping by breaking work into smaller, trackable units (Jobs and Tasks) assigned through dynamic workflows. The event-driven system ensures efficiency, accuracy, and scalability by automating task transitions and state tracking. Key features include customizable prioritization logic, real-time job progress visibility, and support for distributed teams handling complex tasks. The system is built on an event-driven architecture using Amazon EventBridge, with secure, role-based access and monitoring via Heap and Datadog for performance tracking. This scalable tool improves client service by enabling faster resolutions and consistent quality. |

| Product | Software | LLM Categorization Assistant | CatBot (LLM Categorization Assistant): An AI-powered agent that assists customers in categorizing transactions through natural language interactions. It leverages licensed GPT models (GPT-4 and GPT-3.5 Turbo) integrated with Bench's proprietary infrastructure to provide accurate and context-aware recommendations. Bench owns the prompt design, conversational workflows, escalation logic, and integration with internal tools like BKTools and ledger management systems, as well as the proprietary data sources used to enhance categorization accuracy. CatBot enables customers to identify appropriate categories, confirm ledger codes, and escalate unresolved cases to human review when needed. Licensed GPT models are accessed via secure APIs and operatewithin Bench's secure environment, ensuring privacy and compliance while delivering a seamless, user-friendly experience. |
|---|---|---|---|
| Product | Software | Bookkeeping Assistant | BKTools AI Assistant: An AI-powered tool integrated within BKTools to support customer-facing associates in efficiently managing client communications. The assistant utilizes licensed GPT models to summarize customer questions, generate tailored responses, and streamline communication workflows. Key features include displaying recent customer messages, providing context-aware suggestions, and generating message drafts with customizable input. This tool integrates customer, business, and BPA notes into a centralized view for efficient decision-making. |
| Product | Software | BenchBot (AI Powered Bookkeeping Assistant) | Bench GPT: An AI-powered system leveraging licensed GPT models (GPT-4 and GPT-3.5 Turbo) integrated into Bench's proprietary infrastructure. Bench GPT supports natural language processing for client communication, task categorization, and operational insights. Bench owns the prompt design, workflows, integration logic, and proprietary data sources, including internal knowledge bases and customer interaction histories. Licensed models are accessed via secure APIs and operate exclusively within Bench's secure environment, ensuring privacy and compliance. This system enhances efficiency and accuracy while aligning with Bench's proprietary tools and processes. |
| Product | Software | White Label Client App | White Label Bench: A customizable bookkeeping solution that allows partners to deliver a fully branded experience by tailoring navigation, colors, logos, and copy to their branding. Supported by scalable configurations, White Label Bench enables seamless integration for multiple partners without disrupting Bench's core functionality. Features include a Theme Resolver for partner-specific JSON configurations, feature flags for flexible activation and deployment, and design system updates for branded styling. Robust security measures mitigate risks like spoofing and unauthorized access, enhancing partner-client loyalty and revenue opportunities. |

| Product | Software | Bench Tax Retool App | Bench Retool Tax App: The Bench Retool Tax App is a proprietary solution that integrates Bench's APIs and operational workflows with Retool's low-code platform, enabling streamlined tax management for customers and internal teams. This app facilitates seamless customer engagement by providing tax document requests, task tracking, and progress updates directly within a Bench-branded interface. It leverages AWS Cognito for secure authentication and authorization, ensuring data integrity. While the app uses Retool's licensed framework for rapid development, all workflows, API integrations, and user experiences are uniquely tailored to Bench's requirements, making it a critical tool for improving tax filing efficiency and customer satisfaction. |
|---|---|---|---|
| Product | Software | Bench App for Stripe | Bench App for Stripe: An integration built for Stripe's new marketplace that leverages the Powered by Bench (Embedded) API to streamline bookkeeping for Stripe users. The app enables new client sign-ups, displays income statements directly within the Stripe UI, and provides deep linking to the Bench platform for comprehensive financial management. Built using Stripe's UI Extension SDK, the app integrates seamlessly into the Stripe environment, enhancing user experience and simplifying financial workflows. |
| Product | Software | Mobile App (iOS) | The Bench iOS App, built using React Native, provides clients with convenient mobile access to key bookkeeping features, including Pulse for real-time insights and Reports for tracking financial performance. Designed to complement the Bench experience, the app enables users to stay informed about their financial data while on the go. However, due to a high rate of feature expansion and a primary focus on web-based development, updates to the React Native app have not been consistently maintained. Limited resources dedicated to iOS and React Native development have led to a pause in aligning the app with new capabilities introduced on Bench's web platform. |
| Product | Design Framework | Design System | A centralized framework of reusable design components, guidelines, and standards that ensure consistency across Bench's user interfaces and digital experiences. It includes UI elements, typography, color palettes, and interaction patterns, enabling efficient product development and a cohesive brand experience. |
| Product | Documentation | Service Blueprints | Detailed service blueprints mapping the end-to-end bookkeeping workflow, integrating human services with software automation. These blueprints outline customer touchpoints, internal processes, supporting technologies, and handoffs between teams and systems. |
| Product | Software Feature | Auto-ledger Creation | The Auto-Ledger Creation service at Bench automates the creation of ledger accounts when clients sign up and connect a new Plaid account. Upon account synchronization, it calculates an anchor balance using Plaid transaction data and current bank balances, producing a ledger, anchor balance statement, and journal entry. Leveraging AWS EventBridge, it coordinates notifications between services to ensure timely and accurate |

| | | | ledger creation. This modular approach supports future enhancements, ensuring efficient onboarding and seamless integration of financial data for clients. |
|---|---|---|---|
| Product | Software Feature | Document Management | The Document Management System (DMS) enables efficient handling of customer documents within the Bench platform. It facilitates secure storage, streamlined uploads, and intelligent matching of documents to customer requests. Designed to optimize both user and internal workflows, the DMS integrates legacy systems with modern event-driven architecture to ensure accurate and timely document processing. |
| Product | Software Feature | Statements Parser | The Statement Parser is an internally developed tool that automates data extraction from bank statements (PDF format) into structured formats like .xls or .csv. It significantly reduces manual workload for the Data Processing (DP) team, enabling faster and more accurate reconciliation of financial transactions. The parser addresses key operational challenges, including bottlenecks caused by increasing statement volume and inconsistencies between scraped bank data (e.g., Yodlee) and verified statement data. |
| Product | Software Feature | Data Processing Service | The Data-Processing App (DP App) is a legacy platform at Bench designed to transform PDF bank statements into structured CSV files for reconciliation tasks. It facilitates task management, automates data extraction via a statement parser, and enables communication between Bench's main application and data processors using Amazon Message Queue (AMQ). |
| Product | Software Feature | LLM Vendor Descriptions | The Vendor Description Micro-Application is a specialized service integrated into BkTools to streamline transaction categorization by providing vendor descriptions. It utilizes the Open AI Gateway ESG and integrates with Serper to enhance vendor data generation by leveraging AI for real-time insights. This micro-application presents suggested vendor descriptions directly to bookkeepers, reducing the need for manual research and improving operational efficiency. Bookkeepers can review, validate, or flag incorrect descriptions, fostering continuous improvement and ensuring accurate categorization. This asset supports scalable, automated workflows, enhancing productivity and decision-making in transaction management. |
| Product | Software Feature | Receipt Matching | The Automated Receipt Matching Feature seamlessly integrates receipts entered into the Document Entry User Interface (DEUI) with transactions in the general ledger. This feature matches key attributes such as date, amount, and transaction description to identify and link corresponding entries. |

| Product | Software Feature | 1099 Tagging | The 1099 Tagging and Reporting Feature streamlines the preparation and management of 1099 reports for Bench clients. It allows Accounting Associates (AAs) to tag transactions throughout the year with 1099-related fields, such as contractor and source, ensuring data is well-organized before the tax season. Clients gain year-round visibility into tagged transactions via the app, with tools to provide in-line feedback on incomplete or unknown data. The feature automates the enablement of 1099 reports and includes educational content to improve client understanding of IRS 1099 requirements. |
|---|---|---|---|
| Product | Software Feature | MFE Template | A standardized template for building and deploying micro frontend modules. Includes pre-configured settings for routing, state management, and API integration to ensure consistency across micro frontends in the Bench platform. Designed to streamline development and enforce best practices, enabling rapid feature development and deployment.<br><br>Dependencies: Micro Frontend Registry, shared compon |
| Product | Software Feature | Micro Frontend Registry | Centralized registry for managing and orchestrating micro frontend components across the Bench platform. Enables modular development, independent deployments, and seamless integration of frontend features, improving scalability and maintainability. Facilitates version control and ensures consistency across web applications. |
| Product | Onboarding Tools | Onboarding Questionnaires | The Onboarding Questionnaire System automates client onboarding by integrating tools like Retool, JotForm, and Knock to streamline enrollment, reminders, and data collection. Clients are bulk-enrolled using a Retool app, which generates dynamic JotForm links containing pre-filled fields like business ID and questionnaire type. Automated email notifications managed through Knock send enrollment and daily reminders until the questionnaire is completed or the client is unenrolled. Completion statuses are tracked in Airtable, differentiating between pending and submitted questionnaires. The system reduces manual follow-ups, provides tailored questions for better client clarity, and ensures efficient coordination for onboarding teams. |
| Product | Onboarding Tools | Signup Funnel | The Signup Funnel is a publicly accessible, internet-facing web application hosted at signup.bench.co. It provides a multi-step form-based interface for new users to create accounts and begin onboarding. Designed to streamline the customer signup process, the app integrates with various internal and external systems, including the legacy database, Cognito, Stripe, Marketo, and Salesforce. |
| Product | Design Resources | Design Files | A collection of Figma design files that include prototypes, mockups, and design specifications for Bench's products and features. These files serve as a collaborative resource for product teams, ensuring alignment on visual and functional aspects during development. |

| Product | Documentation | Feature Documentation & Roll Out | Comprehensive repository detailing feature specifications, implementation processes, and rollout strategies for new product features. This includes step-by-step guides, testing protocols, and deployment plans to ensure consistent and efficient feature delivery across teams. |
|---|---|---|---|
| Product | Documentation | Business Case Library | The Product Business Case Library provides centralized access to a collection of detailed business cases for product initiatives, offering insights into strategic decisions, market opportunities, cost-benefit analyses, and implementation plans. It serves as a resource for understanding the rationale and potential impact of past, current, and proposed product investments, supporting informed decision-making and alignment across teams. |
| Product | Documentation | Customer Insights and Research Repository | The Customer Insights and Research Repository is a centralized resource housing comprehensive research, customer feedback, and data-driven insights collected across various channels and touchpoints. It includes detailed reports on customer needs, behaviors, preferences, and pain points, as well as findings from usability studies, surveys, and market research. This repository supports data-informed decision-making, enabling teams to align product and service strategies with customer expectations. |
| Infrastructure | System Management | Feature Flags | The Feature Flags System is a dynamic control mechanism that enables selective activation and deactivation of software features across environments without requiring code changes or redeployments. This system provides flexibility for testing, rolling out, or deprecating features, ensuring stable and scalable development processes. |
| Infrastructure | Data Processing System | Segment | The Segment Integration at Bench is a strategically significant asset that streamlines data collection, processing, and integration across Bench's applications and third-party services. This infrastructure enables efficient tracking, analytics, and functionality enhancement, providing a robust foundation for data-driven decision-making and user engagement. |
| Infrastructure | Analytics Platform | Heap Analytics | Integrated with the Bench app and website, Heap Analytics automatically captures user interactions to provide comprehensive behavioral data. Supports in-depth analysis of user journeys, funnel optimization, and product performance insights. Historical data and reporting are available for long-term trend analysis and decision-making.Dependencies: Integration with Bench's web and mobile platforms, data warehouses (e.g., Snowflake, Redshift), and optional connections to third-party tools like Salesforce and Slack. |
| Infrastructure | Authentication Service | Login (Cognito) | A scalable and secure authentication service managing user logins, access control, and identity federation with support for MFA, OAuth 2.0, and SAML. Ensures compliance with SOC 2 and GDPR standards. Dependencies: Backend APIs, AWS Lambda, API Gateway. |

| Infrastructure | Authentication Service | Login (Auth0) | A flexible authentication and authorization platform supporting user login, access management, and identity federation. Features include MFA, SSO, OAuth 2.0, and OpenID Connect integration, with built-in scalability and robust security compliance (SOC 2, GDPR, HIPAA). |
| | | | Dependencies: Backend APIs, custom rules, Auth0 SDKs. |
| Infrastructure | Authentication Service | Login (Okta) | Enterprise-grade identity and access management solution providing secure user authentication, SSO, and identity federation. Supports MFA, adaptive authentication, and integration with OAuth 2.0 and SAML for seamless user access across systems. Ensures compliance with SOC 2, GDPR, and other security standards. |
| | | | Dependencies: Backend APIs, Okta SDKs, and integrations with third-party applications. |
| Infrastructure | Authentication Service | Multi-Factor Auth | Provides an additional layer of security for the Bench platform by requiring users to verify their identity through a second factor (e.g., SMS, email, authenticator app, or hardware token) in addition to their password. Ensures compliance with industry security standards such as SOC 2 and GDPR. |
| | | | Dependencies: Authentication Service, SMS/email delivery systems, and authenticator apps. |
| Infrastructure | Core Platform Service | User Management System | The User Management System defines and manages user roles, permissions, and states within Bench's ecosystem. It facilitates role-based access control, client lifecycle management, and task assignments across internal and external users. The system is a core infrastructure component, ensuring scalability, data integrity, and seamless integration with other Bench applications and tools. |
| Infrastructure | Data Processing System | Financial Data System | The Financial Data System (FDS) is a critical infrastructure asset designed to automate the synchronization, reconciliation, and validation of financial data. FDS ensures accurate financial records by retrieving data, calculating balances, and generating monthly reconciliation files with categorized transactions. It includes a validation process that flags discrepancies for resolution, reducing manual intervention and improving data accuracy. By streamlining workflows and supporting scalability, FDS plays a key role in maintaining reliable financial operations and enabling efficient bookkeeping processes. |
| Infrastructure | Quality Assurance & Monitoring | Synthetic Tests | Synthetic Tests at Bench are automated, pre-scripted tests designed to proactively monitor and evaluate the performance, availability, and functionality of Bench's applications and infrastructure. These tests simulate user interactions and network conditions, providing valuable insights into system reliability before clients encounter issues. |
| Infrastructure | Core Platform Service | Infrastructure as code | Infrastructure as code for SOC2 Compliant prod environments |

| Infrastructure | Webserver & Traffic Management | Nginx Infrastructure | The Nginx Infrastructure at Bench serves as a robust asset for managing web traffic, optimizing performance, and ensuring the reliability of Bench's online services. Nginx acts as a versatile and high-performance HTTP server, reverse proxy, and load balancer, supporting seamless delivery of applications and services to clients. |
|---|---|---|---|
| Operations | Training Guide | Bench Academy Training | Comprehensive guides for training employees on Bench's proprietary systems and bookkeeping workflows. |
| Infrastructure | System Management | Micro Frontend Registry | The Micro Frontend Registry at Bench is a centralized system for managing metadata, configuration, and versioning of micro frontends (MFEs) used across Bench's platform. This registry ensures efficient orchestration of independent micro frontend modules while maintaining consistency and seamless integration within the larger application ecosystem. |
| Developer Tools | Testing Tool | PBB Sample Client | A Sample Client in the context of Bench's Powered By Bench (PBB) platform is a demonstration tool or application designed to interact with the PBB API. It serves as a reference implementation for developers, showcasing how to integrate with and utilize the PBB platform's features. The Sample Client allows developers and partners to test and validate their integrations in a controlled environment, such as a sandbox, ensuring compatibility and functionality before deploying their solutions in production. |
| Contracts | Vendor Contract | Plaid Contract - Transactions | Negotiated contract for pricing of transaction & account connections via Plaids Transactions API |
| Contracts | Vendor Contract | Plaid Contract - OCR | Negotiated contract for pricing of statement processing Plaid's OCR API |
| Contracts | Vendor Contract | Finch Contract | Negotiated contract for client payroll data via Finch's Payroll API |
| Contracts | Vendor Contract | Rutter Contract | Negotiated contract for client merchant data Rutter's API |
| Operations | Workflows | Bookkeeping Workflows & Process Maps | Detailed documentation of proprietary bookkeeping processes, designed to optimize client management. |

**SCHEDULE B**
**EXCLUDED ASSETS**

Nil

Appendix **"F"**

Estate File No.: 11-3171493

**IN THE MATTER OF THE BANKRUPTCY OF**
**BENCH ACCOUNTING, INC.**
**OF THE CITY OF VANCOUVER, IN THE PROVINCE OF BRITISH COLUMBIA**

**RESOLUTION #1 PASSED AT THE SECOND MEETING OF INSPECTORS**
**HELD MARCH 4, 2025**

**BACKGROUND**

At the first meeting of inspectors held on February 14, 2025 (the "**First Inspector Meeting**"), KSV Restructuring Inc., in its capacity as the trustee in bankruptcy of Bench Accounting, Inc. ("**Bench**") (in such capacity, the "**Trustee**") provided an update on the potential sale to Recruiter.com Ventures Inc. (the "**Recruiter**").

Since the First Inspector Meeting, the Trustee has provided updates to the Inspector concerning the status of the Transaction.

After notifying the Inspector, the Trustee, as seller, and Recruiter, as purchaser, entered into an asset purchase agreement dated February 25, 2025 (the "**APA**"), pursuant to which Recruiter will acquire substantially all of the property, assets and undertaking of Bench and its wholly owned subsidiary, 10Sheet Services Inc. ("**10Sheet**", and together with Bench, the "**Companies**").

The APA is subject to an Approval and Vesting Order (the "**AVO**") by the Supreme Court of British Columbia (the "**BC Court**"), and recognition of the AVO by the United States District Court for the State of Delaware (the "**US Court**"), in proceedings to be commenced in the US Court pursuant to chapter 15 ("**Chapter 15**") of title 11 of the *United States Code*, 11 U.S.C.§§ 101-1532 (the "**US Bankruptcy Code**").

A copy of the APA is attached hereto as **Schedule "A"**.

**RESOLVED THAT:**

The Trustee is authorized to bring an application in the BC Court seeking approval of the APA and the AVO by the BC Court and to commence recognition proceedings under Chapter 15 of the US Bankruptcy Code for the purpose of recognizing and giving full force and effect to the AVO in the United States.

**ENACTED THE 4TH DAY OF MARCH, 2025**

Signed by:

*John Borch*

DAEBB06C52294E7

John Borch, Inspector

# Schedule A

## [ATTACHED]

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into as of the 25th day of February, 2025:

**BETWEEN:**

> **KSV RESTRUCTURING INC.**, in its capacity as the appointed trustee of the estate of **BENCH ACCOUNTING, INC.**, a corporation incorporated pursuant to the laws of the State of Delaware ("**Bench**") and **10SHEET SERVICES INC.**, a corporation incorporated pursuant to the federal laws of Canada ("**10Sheet**", and together with Bench, the "**Companies**" and each a "**Company**"), and not in its personal or corporate capacity;
>
> (the "**Trustee**")
>
> − and −
>
> **RECRUITER.COM VENTURES INC.**, a Delaware corporation, as purchaser
>
> (the "**Purchaser**").

**WHEREAS:**

A.      The Companies made a voluntary assignment into bankruptcy pursuant to section 49 of the **Bankruptcy and Insolvency Act** (Canada), R.S.C. 1985 c. B-3 (the "**BIA**"), and pursuant to the Certificates of Appointment issued January 7, 2025, the Trustee was appointed as trustee of the Companies.

B.      On January 1, 2025 (the "**LOI Date**"), the Companies, in consultation with NBC, executed a letter of intent (the "**LOI**") with the Purchaser for the sale of the Companies' assets and business, which sets forth the Purchaser's, NBC's and the Companies' agreement in principle to the terms of this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby irrevocably acknowledged, the Parties hereby acknowledge and agree as follows:

## ARTICLE 1
## INTERPRETATION

**1.1      Definitions**

Unless something in the subject matter or context is inconsistent therewith, the terms defined herein shall have the following meanings:

> "**Accounts Receivable**" means all accounts receivable, trade accounts, notes receivable and other debts and other amounts due, owing or accruing due to either of the Companies as of any time from and after the LOI Date, and the full benefit of all security for such accounts, notes or debts, but excluding any Taxes receivable by either of the Companies for the period ending December 31, 2024.
>
> "**Affiliate**" means, with respect to any specified Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such specified Person. For purposes of this definition, the term "**control**" (including the terms

"***controlled by***" and "***under common control with***") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"***Agreement***" means this asset purchase agreement, as may be amended and restated from time to time in accordance with the terms hereof, and "***Article***" and "***Section***" mean and refer to the specified article, section and subsection of this Agreement.

"***Applicable Law***" means, in respect of any Person, property, transaction or event, any: (a) domestic or foreign statute, law (including the common law), ordinance, rule, regulation, treaty, restriction, regulatory policy, standard, code or guideline, by-law or order; (b) judicial, arbitral, administrative, ministerial, departmental or regulatory judgments, orders, decisions, rulings, instruments or awards of any Governmental Authority; and (c) policies, practices, standards, guidelines and protocols having the force of law, that applies in whole or in part to such Person, property, transaction or event.

"***Approval and Vesting Order***" means an order by the BC Court, in form and substance satisfactory to the Purchaser and the Trustee, acting reasonably, among other things, approving and authorizing this Agreement and the Transaction, vesting title to the Purchased Assets in the Purchaser or its permitted designee on Closing, free and clear of all Encumbrances.

"***Assignment and Assumption Agreement***" means an assignment and assumption agreement effecting the assignment to, and assumption by, the Purchaser of the Assigned Contracts and the Assumed Liabilities, in form and substance satisfactory to the Parties, acting reasonably.

"***Assignment Order***" means an order of the BC Court, in form and substance satisfactory to the Purchaser and the Trustee, acting reasonably, assigning to the Purchaser the rights and obligations of the Companies under the Assigned Contracts for which a consent, approval or waiver necessary for the assignment of such Assigned Contracts has not been obtained, and which will include, if necessary, a mechanism for the resolution of any disputed Cure Costs.

"***Assigned Contracts***" means the Contracts listed under the header "Assigned Contracts" in Schedule A attached hereto.

"***Assumed Liabilities***" means (a) any Cure Costs which are not paid at Closing; and (b) Liabilities relating to the Purchased Assets and Assigned Contracts, solely in respect of the period from and after the Closing Effective Time and not relating to the period prior to the Closing Effective Time.

"***Authorization***" means any authorization, approval, consent, concession, exemption, license, lease, grant, permit, franchise, right, privilege or no-action letter from any Governmental Authority having jurisdiction with respect to any specified Person, property, transaction or event, or with respect to any of such Person's property or business and affairs or from any Person in connection with any easements, contractual rights or other matters.

"***Bankruptcy Proceedings***" means the proceeding before the BC Court initiated or to be initiated by the Trustee in order to apply for the Approval and Vesting Order.

"***BC Court***" means the Supreme Court of British Columbia.

"***BIA***" has the meaning set out in the Recitals.

"***Books and Records***" means all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise), including Tax and accounting books and records used or intended for use by, or in the possession of the Companies including information, documents and records relating to the Assigned Contracts, customer lists, customer information and account records, sales records, computer files, data processing records, employment and personnel records, sales literature, advertising and marketing data and records, cost and pricing information, production reports and records, equipment logs, operating guides and manuals, credit records, records relating to present and former suppliers and contractors, plans and projections and all other records, data and information stored electronically, digitally or on computer-related media.

"***Business***" means the businesses conducted by the Companies as of January 7, 2025.

"***Business Day***" means a day on which banks are open for business in New York City, New York and the Province of British Columbia, but does not include a Saturday, Sunday or statutory holiday in New York City, New York, or the Province of British Columbia.

"***Claims***" means any civil, criminal, administrative, regulatory, arbitral or investigative inquiry, action, suit, investigation or proceeding and any claim of any nature or kind (including any cross-claim or counterclaim), demand, investigation, audit, chose in or cause of action, suit, default, assessment, litigation, prosecution, third party action, arbitral proceeding or proceeding, complaint or allegation, by or before any Person.

"***Closing***" means the closing and consummation of the Transaction.

"***Closing Date***" means the fifth (5th) Business Day following obtaining the Recognition Order, unless otherwise agreed by the Parties in writing.

"***Closing Effective Time***" means 12:01 a.m. (Eastern Standard Time) on the Closing Date, or such other time as the Parties may agree to in writing.

"***Contracts***" means all pending and executory contracts, agreements, leases, understandings and arrangements (whether oral or written) to which any of the Companies are a party or by which such entity is bound or in which such entity has, or will at the Closing Effective Time have, any rights or by which any of its property or assets are or may be affected.

"***Cure Costs***" means, in respect of the Assigned Contracts, all amounts, costs, fees and expenses (i) required to be paid to remedy monetary defaults in relation to the Assigned Contracts, other than those arising by reason only of the Companies' (A) bankruptcy, insolvency (including the commencement of the Bankruptcy Proceedings) or (B) failure to perform a non-monetary obligation; (ii) required to secure a counterparty's consent to the assignment of an Assigned Contract and agreed to by the Purchaser in its sole discretion; or (iii) as may be required pursuant to the Approval and Vesting Order or the Assignment Order, as applicable, and which for greater certainty, may be an amount agreed to by the Purchaser and the counterparty to an Assigned Contract, subject to the approval of the Trustee.

"***Delaware Court***" means the United States Bankruptcy Court for the District of Delaware.

"***Deposit***" has the meaning set out in <u>Section 3.2</u>.

"***Excluded Assets***" means the Excluded Contracts and all other assets of the Companies as of the Closing Effective Time other than the Purchased Assets, including, without limitation, the assets listed on <u>Schedule B</u> attached hereto.

– 4 –

"***Excluded Contracts***" means all Contracts other than the Assigned Contracts.

"***Excluded Liabilities***" has the meaning set out in <u>Section 2.3</u>.

"***Encumbrance***" means any security interest, lien, Claim, charge, Court Charge, right of retention, deemed trust, judgement, writ of seizure, writ of execution, notice of seizure, notice of execution, notice of sale, hypothec, reservation of ownership, pledge, encumbrance, mortgage or right of a third party (including any contractual rights such as purchase options, rights of first refusal, rights of first offer or any other pre-emptive contractual right) or encumbrance of any nature or kind whatsoever and any agreement, option or privilege (whether by law, contract or otherwise) capable of becoming any of the foregoing, (including any conditional sale or title retention agreement, or any capital or financing lease).

"***Excise Tax Act***" means the *Excise Tax Act*, R.S.C, 1985, c. E-15.

"***General Conveyances***" means one or more general conveyances evidencing the conveyance to the Purchaser of the Companies' interest in and to the Purchased Assets, in form and substance satisfactory to the Parties, acting reasonably.

"***Governmental Authority***" means any domestic or foreign government, whether federal, provincial, state, territorial or municipal; and any governmental agency, ministry, department, court (including the BC Court), tribunal, commission, stock exchange, bureau, board or other instrumentality exercising or purporting to exercise legislative, judicial, regulatory or administrative functions of, or pertaining to, government or securities market regulation.

"***GST/HST***" means all goods and services tax imposed under Part IX of the Excise Tax Act.

"***Income Tax Act***" means the Income Tax Act, R.S.C., 1985, c. 1 (5th Supp.).

"***Intellectual Property***" means all intellectual property and industrial property used by the Companies in the Business, whether or not registrable, patentable or otherwise formally protectable, and whether or not registered, patented, otherwise formally protected or the subject of a pending application for registration, patent or any other formal protection, including all rights, titles, interests, and benefits in and to: (a) trademarks, service marks, trade dress, corporate, partnership and business names, fictitious names and other trade names; (b) inventions, patent rights, arts, processes, machines, manufactures, compositions of matter, utility models; (c) works, copyrights (including, without limitation, copyrights related to the Companies' website content marketing materials), neighbouring rights, moral rights, software (whether source code or object code) and databases; (d) designs and industrial designs; (e) know-how, show-how, trade secrets, proprietary information, formulae, recipes, algorithms, specifications, schematics, systems, methods and techniques and related documentation, patient, customer and supplier information and records, and market and survey information; (f) telephone numbers, domain names, websites and website portals and social media identities and accounts, including, without limitation, digital marketing materials and online branding assets; (g) integrative circuit topographies and mask works, (h) packaging designs, product labeling, advertising copy, brochures, promotional materials, marketing collateral, signage, and any other materials used to promote or market the Business, and (i) all derivatives, modifications, enhancements, and improvements of the foregoing, as well as all goodwill associated therewith. "***Intellectual Property***" shall further include all re-examinations, reissues, continuations, extensions, and divisions of any of the foregoing, and all income, royalties, damages, and payments now and hereafter due or payable with respect to any of the foregoing (including damages and payments for past or future infringements, dilutions, misappropriations,

misuse, or unauthorized use of any of the foregoing), and all rights to sue, counterclaim, and recover for past, present, and future infringements, dilutions, misappropriations, misuse, or unauthorized use of any of the foregoing.

 "***LOI***" has the meaning set out in the Recitals.

"***LOI Date***" has the meaning set out in the Recitals.

"***Liability***" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"***NBC***" means National Bank of Canada.

"***Organizational Documents***" means any trust document, charter, certificate or articles of incorporation or amalgamation, articles of amendment, articles of association, articles of organization, articles of continuance, bylaws, as amended, partnership agreement or similar formation or governing documents of a Person (excluding individuals).

"***Outside Date***" means 11:59 pm (Eastern Standard Time) on April 15, 2025, or such later date and time as the Trustee and the Purchaser may agree to in writing.

"***Parties***" means the Trustee and the Purchaser.

"***Permits and Licenses***" means the orders, permits, licenses, Authorizations, approvals, registrations, consents, waivers or other evidence of authority issued to, granted to, conferred upon, or otherwise created for the Companies by any Governmental Authority related to the Business, the Purchased Assets and Assigned Contracts.

"***Person***" means any individual, partnership, limited partnership, limited liability company, joint venture, syndicate, sole proprietorship, company or corporation with or without share capital, unincorporated association, trust, trustee, executor, administrator or other legal personal representative, Governmental Authority or other entity however designated or constituted.

"***Personal Information***" means any information in the possession or control of the Companies about an identifiable person other than name, title, business address or telephone number.

"***Purchased Assets***" has the meaning set out in Section 2.1.

"***Purchase Price***" has the meaning set out in Section 3.1.

"***Purchaser***" means Recruiter.com Ventures Inc., a Delaware corporation, or its permitted assignee under Section 9.9 hereof.

 "***Recognition Proceedings***" means proceedings before the Delaware Court, pursuant to Chapter 15 of the United States' Bankruptcy Code, recognizing the Bankruptcy Proceedings and giving effect to the Approval and Vesting Order in the United States of America.

"***Recognition Order***" means an order of the Delaware Court in the Recognition Proceedings recognizing and giving full force and effect to the Approval and Vesting Order in the United States of America.

"***Service Provider***" means any individual that provided services to the Companies, whether as an employee, contractor, advisor or other similar capacity.

"***Taxes***" means, with respect to any Person, all national, federal, provincial, local or other taxes, including income taxes, capital gains taxes, value added taxes, severance taxes, ad valorem taxes, property taxes, capital taxes, net worth taxes, production taxes, sales taxes, use taxes, license taxes, excise taxes, environmental taxes, transfer taxes, withholding or similar taxes, payroll taxes, employment taxes, employer health taxes, pension plan premiums and contributions, workers' compensation premiums, employment insurance or compensation premiums, stamp taxes, occupation taxes, premium taxes, alternative or add-on minimum taxes, GST/HST, customs duties or other taxes of any kind whatsoever imposed or charged by any Governmental Authority, together with any interest, penalties, or additions with respect thereto and any interest in respect of such additions or penalties.

"***Trademark Assignment Agreement***" means an assignment of trademark agreement evidencing the assignment to the Purchaser of the Companies' rights, title, and interest in any and all trademarks forming part of such Companies' Intellectual Property.

"***Transaction***" means all of the transactions contemplated by this Agreement including the purchase and sale transaction whereby the Purchaser will acquire the Purchased Assets.

"***Transfer Taxes***" means all present and future transfer taxes, sales taxes, use taxes, production taxes, value-added taxes, goods and services taxes, land transfer taxes, registration and recording fees, and any other similar or like taxes and charges imposed by a Governmental Authority in connection with the sale, transfer or registration of the transfer of the Purchased Assets, including GST/HST.

"***Trustee***" has the meaning set out in the Recitals hereto.

"***Trustee's Certificate***" means a certificate to be filed in the BC Court by the Trustee and delivered by the Trustee to the Purchaser confirming that the Purchaser has delivered the Purchase Price to the Trustee and that all conditions precedent to this Agreement have been satisfied or waived, all in accordance with the Approval and Vesting Order, and in form and substance satisfactory to the Purchaser and the Trustee, acting reasonably.

"***TSA***" means that certain Transition Services Agreement, dated as of January 17, 2025, by and between the Trustee and the Purchaser.

## 1.2    Interpretation Not Affected by Headings, etc.

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

## 1.3    General Construction

The terms "this Agreement", "hereof", "herein" and "hereunder" and similar expressions refer to this Agreement and not to any particular section hereof. The expression "Section" or reference to another subdivision followed by a number mean and refer to the specified Section or other subdivision of this

Agreement. The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

## 1.4      Extended Meanings

Words importing the singular include the plural and vice versa and words importing gender include all genders. The term "including" means "including, without limitation," and such terms as "includes" have similar meanings and the term "third party" means any other Person other than the Trustee or the Purchaser, or any Affiliates thereof.

## 1.5      Currency

All references in this Agreement to dollars, monetary amounts, or to $, are expressed in Canadian currency unless otherwise specifically indicated.

## 1.6      Statutes

Except as otherwise provided in this Agreement, any reference in this Agreement to a statute refers to such statute and all rules, regulations and interpretations made under it, as it or they may have been or may from time to time be modified, amended or re-enacted.

## 1.7      Schedules & Amendments to Schedules

The following exhibits and schedules are attached hereto and incorporated in and form part of this Agreement:

**SCHEDULES**

Schedule A      -      Purchased Assets

Schedule B      -      Excluded Assets

Unless the context otherwise requires, words and expressions defined in this Agreement will have the same meanings in the Exhibits and Schedules and the interpretation provisions set out in this Agreement will apply to the Exhibits and Schedules. Unless the context otherwise requires, or a contrary intention appears, references in the Exhibits and Schedules to a designated Article, Section, or other subdivision refer to the Article, Section, or other subdivision, respectively, of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE OF PURCHASED ASSETS

## 2.1      Purchase and Sale of Purchased Assets

At the Closing, subject to the terms and conditions set forth in this Agreement, the Trustee, on behalf of the Companies, shall sell, assign, transfer and convey to the Purchaser, and the Purchaser shall purchase, acquire and assume from the Trustee each of the Companies' respective right, title and interest in, to and under all of the personal and tangible and intangible assets, which are used or held for use in connection with, the Business (collectively, the "***Purchased Assets***"), free and clear of all Encumbrances, including without limitation:

(a)      all Assigned Contracts as set out in **Schedule A** attached hereto;

(b)     each Company's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(c)     originals, or where not available, copies, of all Books and Records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that exclusively relate to the Purchased Assets or Assigned Contracts; and

(d)     all Intellectual Property owned by each of the Companies and used in connection with the Business, including any registrations related thereto, including without limitation, all rights, title and interest in and to all primary, secondary, and supportive platforms, services, and integrations that facilitate the platform and service integral to the Companies' Business (including, for the avoidance of doubt, the Companies' AWS interface (including all access codes, object code, source code, and documentation));

(e)     all Accounts Receivable;

(f)     all Permits and Licenses;

(g)     the goodwill of the Business, including all right, title and interest of the Companies in, to and in respect of all elements which contribute to the goodwill of the Business, including the goodwill represented by packaging, labelling, advertising, marketing and promotional materials and the right to use the name "Bench" and "10Sheet"; and

(h)     all other assets of the Companies set forth on <u>Schedule A</u> attached hereto that are not otherwise captured by clauses (a) – (g) above.

## 2.2    Excluded Assets

Notwithstanding <u>Section 2.1</u>, the Purchased Assets shall not include the Excluded Assets.

## 2.3    Transfer of Purchased Assets and Assumption of Liabilities

Provided that Closing occurs and subject to the terms and conditions of this Agreement, possession, risk, legal and beneficial ownership of the Purchased Assets shall transfer from the Companies to the Purchaser on the Closing Date, and the Purchaser agrees to assume, discharge, perform and fulfill all of the Assumed Liabilities from and after the Closing Date. For certainty, the Purchaser is not assuming any Liabilities of the Companies other than the Assumed Liabilities (collectively, the "***Excluded Liabilities***") and shall have no liability to any Person therefor.

## 2.4    Assigned Contracts

(a)     Until the Closing Effective Time, the Purchaser shall be entitled to make additions, deletions and modifications to the Contracts classified as "Assigned Contracts", in its sole discretion. For greater certainty: (i) any Assigned Contract subsequently designated by the Purchaser as an Excluded Contract after the date of this Agreement shall be deemed to no longer be an Assigned Contract, and shall be an Excluded Contract; and (ii) any Contract subsequently designated by the Purchaser as an Assigned Contract after the date of this Agreement shall be deemed an Assigned Contract for the purposes of this Agreement.

(b)     Each of the Parties, at the sole cost and expense of the Purchaser, shall use reasonable commercial efforts to obtain, as may be required by the terms of such Assigned Contracts, all consents and approvals required to assign the Assigned Contracts to the Purchaser.

(c)     To the extent that any Assigned Contract is not assignable without the consent or approval of the counterparty or any other Person, and such consent or approval has not been obtained prior to the Closing: (i) any Company's interest in, to and under such Assigned Contract may be conveyed to the Purchaser pursuant to an Assignment Order; (ii) at the sole cost and expense of the Purchaser, the Trustee will use commercially reasonable efforts to obtain an Assignment Order in respect of such Assigned Contract on or prior to the Closing; and (iii) if an Assignment Order is obtained in respect of such Assigned Contract, the Purchaser shall accept the assignment of such Assigned Contract on such terms.

(d)     To the extent that any Cure Costs are payable with respect to any Assigned Contract, the Purchaser shall be solely responsible for and shall pay such Cure Costs.  The Cure Costs shall be paid, in the Purchaser's sole discretion unless otherwise required by applicable law, either directly to the applicable counterparty or to the Trustee in trust. For greater certainty, the Cure Costs shall be in addition to the Purchase Price payable to the Vendor. Notwithstanding the foregoing, unless the Parties otherwise agree, to the extent that any Cure Cost is payable with respect to any Assigned Contract, where such Assigned Contract is assigned pursuant to an Assignment Order, the Purchaser shall pay such Cure Costs in accordance with such Assignment Order, and where such Assigned Contract is not assigned pursuant to an Assignment Order, the Purchaser shall pay such Cure Costs in the manner set out in the consent of the applicable counterparty or as otherwise may be agreed to by the Purchaser and such counterparty.

(e)     It shall be the sole obligation of the Purchaser, at the Purchaser's sole cost and expense, to provide any and all financial assurances, deposits or security, including without limitation any Cure Costs, that may be required by Governmental Authorities or any third parties to permit the transfer of the Purchased Assets, including the Assigned Contracts, to the Purchaser.

## 2.5     Service Providers.

The Trustee and the Purchaser each acknowledge, agree and understand that: (i) substantially all the Service Providers were terminated prior to the LOI Date; (i) the Purchaser has advised the Trustee that many of such Service Providers were subsequently hired or engaged by the Purchaser independent of and prior to the date of this Agreement; and (iii) that the hiring or engagement of such Service Providers by the Purchaser does not constitute a breach of this Agreement

## ARTICLE 3
## PURCHASE PRICE

### 3.1     Purchase Price

The aggregate purchase price for the Purchased Assets shall be CAD\$13,000,000 (the "**Purchase Price**") *plus* the assumption by the Purchaser of the Assumed Liabilities and Cure Costs (the "**Purchase Consideration**"). The Purchase Price (net of the Deposit) shall be paid on the Closing Date, in full, by wire transfer of immediately available funds to an account designated by the Trustee.

**3.2      Deposit and Satisfaction of Purchase Price**

    (a)    The Parties acknowledge that, prior to the date hereof, the Purchaser has paid a non-refundable, upfront deposit equal to CAD$1,000,000 in accordance with the terms of the LOI (the "**_Deposit_**") and that such Deposit shall be deducted from the Purchase Price to be paid by the Purchaser on the Closing Date.

    (b)    The Parties further acknowledge and agree that, if this Agreement is terminated for any reason, (i) the Deposit constitutes a genuine pre-estimate of liquidated damages representing the Trustee's and Companies' losses as a result of Closing not occurring and (ii) the Purchaser hereby waives any claim or defense that the Deposit is a penalty or is otherwise not a genuine pre estimate of the Trustee's and Companies' damages.

**3.3      Transfer Taxes**

The Parties agree that:

    (a)    The Purchase Price does not include Transfer Taxes and the Purchaser shall be liable for and shall pay any and all Transfer Taxes, if any, pertaining to the Purchaser's acquisition of the Purchased Assets.

    (b)    Where the Trustee or the Companies are required under Applicable Law to collect or pay Transfer Taxes, the Purchaser will pay the amount of such Transfer Taxes to the Trustee on the Closing Date. The Trustee shall pay such Transfer Taxes directly to the appropriate Governmental Authority or other entity within the required time period and shall file all necessary documentation with respect to such Transfer Taxes when due.

    (c)    Except where the Trustee or the Companies are required under Applicable Law to collect or pay such Transfer Taxes, the Purchaser shall pay such Transfer Taxes directly to the appropriate Governmental Authority or other entity within the required time period and shall file all necessary documentation with respect to such Transfer Taxes when due. The Trustee will do and cause to be done such things as are reasonably requested to enable the Purchaser to comply with such obligation in a timely manner. If the Trustee or the Companies are required under Applicable Law to pay any such Transfer Taxes which are not paid by the Purchaser on the Closing Date, the Purchaser shall promptly reimburse the Trustee the full amount of such Transfer Taxes upon delivery to the Purchaser of copies of receipts showing payment of such Transfer Taxes.

    (d)    The Purchaser shall indemnify the Trustee and the Companies for, from and against any Transfer Taxes (including any interest or penalties imposed by a Governmental Authority) that the Trustee may pay or for which the Trustee may become liable as a result of any failure by the Purchaser to pay or remit such Transfer Taxes.

    (e)    Notwithstanding the foregoing, if available, the Purchaser and the Trustee shall jointly execute an election under section 167 of the _Excise Tax Act_ in connection with the transfer of the Purchased Assets contemplated herein, and the Purchaser shall file such election with its applicable Tax return for the reporting period in which the sale of the Purchased Assets takes place. Any GST/HST or similar excise Taxes payable under Applicable Laws incurred in connection with the purchase and sale of the Purchased Assets contemplated by this Agreement, including where an election pursuant to subsection 167(1) of the _Excise Tax Act_ is not or cannot be validly made in respect of the Purchased Assets, shall be borne by Purchaser.

**3.4**      **Allocation of Purchase Price**

No later than two (2) Business Days prior to Closing, the Trustee and the Purchaser shall have agreed to an allocation of the Purchase Price among the Purchased Assets. The Trustee and the Purchaser shall each file their respective tax returns and elections in accordance with such allocation and the Trustee and the Purchaser shall not dispute such allocation in connection with any tax audit or other proceeding.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES**

**4.1**      **Representations and Warranties of the Trustee**

The Trustee hereby represents and warrants as of the date hereof and as of the Closing Date as follows, and acknowledges that the Purchaser is relying on such representations and warranties in connection with entering into this Agreement and performing its obligations hereunder:

    (a)    <u>Bankruptcy Proceedings</u>. As of the Closing Date, the Approval and Vesting Order and Recognition Order will be in full force and effect and will not be subject to any appeal or leave to appeal application(s). The Trustee and the Companies have not been discharged from bankruptcy and the bankruptcy of either Company has not been annulled.

    (b)    <u>Proceedings</u>. There are no proceedings pending against the Trustee or the Companies, to the knowledge of the Trustee, threatened, with respect to, or in any manner affecting, the Companies' respective titles to the Purchased Assets, or which would reasonably be expected to enjoin, delay, restrict or prohibit the transfer of all or any part of the Purchased Assets or the Closing of the Transaction as contemplated by this Agreement, or which would reasonably be expected to delay, restrict or prevent the Trustee from fulfilling any of its obligations set forth in this Agreement.

    (c)    <u>No Consents or Authorizations</u>. Subject only to obtaining the Approval and Vesting Order and the Recognition Order, and any consents, approvals or waivers required in connection with the assignment of the Assigned Contracts, the Trustee does not require any consent, approval, waiver or other Authorization from any Governmental Authority or any other Person, as a condition to the lawful completion of the Transaction.

    (d)    <u>Residency</u>. The Trustee is not a non-resident of Canada for purposes of the *Income Tax Act* or the *Excise Tax Act*, as applicable.

**4.2**      **Representations and Warranties of the Purchaser**

The Purchaser hereby represents and warrants to and in favour of the Trustee as of the date hereof and as of the Closing Date, and acknowledges that the Trustee are relying on such representations and warranties in connection with entering into this Agreement and performing its obligations hereunder:

    (a)    <u>Incorporation and Status</u>. The Purchaser is a corporation incorporated and existing under the State of Delaware and the Delaware General Corporate Law, is in good standing under such act and has the power and authority to enter into, deliver and perform its obligations under this Agreement.

    (b)    <u>Corporate Authorization</u>. The execution, delivery and performance by the Purchaser of this Agreement has been authorized by all necessary corporate action on the part of the Purchaser.

(c)     No Conflict. The execution, delivery and performance by the Purchaser of this Agreement do not (or would not with the giving of notice, the lapse of time, or both, or the happening of any other event or condition) result in a breach or a violation of, or conflict with, or allow any other Person to exercise any rights under, any terms or provisions of the Organizational Documents of the Purchaser.

(d)     Execution and Binding Obligation. This Agreement has been duly executed and delivered by the Purchaser and constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms subject only to the Approval and Vesting Order and Recognition Order.

(e)     Proceedings. There are no proceedings pending, or to the knowledge of the Purchaser, threatened, against the Purchaser before any Governmental Authority, which prohibit or seek to enjoin delay, restrict or prohibit the Closing of the Transaction, as contemplated by this Agreement, or which would reasonably be expected to delay, restrict or prevent the Purchaser from fulfilling any of its obligations set forth in this Agreement.

(f)     No Consents or Authorizations. Subject only to (i) obtaining the Approval and Vesting Order, (ii) obtaining the Recognition Order, and (iii) obtaining any consents, approvals or waivers required in connection with the assignment of the Assigned Contracts or the Assignment Order, as applicable, the Purchaser does not require any consent, approval, waiver or other Authorization from any Governmental Authority or any other Person, as a condition to the lawful completion of the Transaction.

(g)     Residency. The Purchaser is a non-resident of Canada for purposes of the *Income Tax Act*.

## 4.3     As is, Where is

The representations and warranties of the Trustee shall not merge on Closing. Despite any other provision of this Agreement, the Purchaser expressly acknowledges that the Trustee, on behalf of the Companies, is selling the Purchased Assets on an "as is, where is" basis as the Purchased Assets shall exist as at the Closing Effective Time. The Purchaser further acknowledges that it has entered into this Agreement on the basis that the Trustee does not guarantee title to the Purchased Assets and that the Purchaser has conducted such inspections of title to the Purchased Assets as it deems appropriate and has satisfied itself with regard to these matters and it has inspected the Purchased Assets and will accept the same on the Closing Date, in their then current state, condition and location. No representation, warranty or condition is express or can be implied as to title, encumbrances, description, fitness for purpose, merchantability, condition, quantity or quality or in respect of any other matter or thing whatsoever concerning the Purchased Assets or the right of the Trustee to sell or assign the same save and except as expressly represented or warranted herein. Without limiting the generality of the foregoing any and all conditions, warranties or representations expressed or implied pursuant to applicable sale of goods legislation or other similar legislation do not apply hereto and have been waived by the Purchaser. The description of the Purchased Assets contained in the Agreement are for purpose of identification only and, no representation, warranty or condition has or will be given by the Trustee concerning completeness or accuracy of such descriptions

– 13 –

**ARTICLE 5.**
**COVENANTS**

**5.1      Closing Date**

The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing on or before the Outside Date.

**5.2      Permits and Licenses**

The Parties shall cooperate and work together in good faith, assist with submissions, share information and make any other efforts required to obtain any approval, Authorization, third-party consent, or permits and licences from any Governmental Authority necessary to effect the Closing.

**5.3      Application for Approval and Vesting Order and Recognition Order**

As soon as practicable, the Trustee shall serve and file with the BC Court an application for the issuance of the Approval and Vesting Order and, if applicable, the Assignment Order, seeking relief that will, inter alia, approve this Agreement and the Transaction, and proceedings in the Delaware Court for the Recognition Order.

**5.4      Insurance Matters**

Until Closing, the Trustee shall keep in full force and effect all existing insurance policies of the Companies and give any notice or present any Claim under any such insurance policies consistent with past practice in the ordinary course of business.

**5.5      Transition Services Agreement**

(a)      Concurrently with the execution of this Agreement, the parties to the TSA shall enter into an amending agreement to the TSA, in a form mutually agreeable to the Trustee and the Purchaser.

(b)      Effective contemporaneously with the Closing and in accordance with Section 6(a)(i) of the TSA, the Trustee and the Purchaser hereby agree that the TSA shall automatically terminate. Upon termination of the TSA, neither the Trustee nor the Purchaser shall have any further obligations, responsibilities, or liabilities under the TSA, except for those obligations that expressly survive termination pursuant to the terms of the TSA.

**5.6      Name Changes**

The Trustee shall, within ten (10) days after the Closing Date, provide written confirmation and evidence to the Purchaser of the name change of the Companies to names that do not include the words "Bench Accounting" and "10Sheet"

**5.7      Accounts Receivable**

Within two (2) Business Days after the Closing Date, the Trustee will transfer all Accounts Receivable collected by the Trustee or the Companies up until the Closing Date to the Purchaser or as the Purchaser may direct in writing.  The Trustee shall, within two (2) weeks following the receipt of any Accounts Receivable by the Trustee or the Companies following the Closing Effective Time, remit such Accounts Receivable by cheque, wire transfer or direct deposit of immediately available funds to such place as directed by the Purchaser, from time to time.

– 14 –

## ARTICLE 6
## CLOSING ARRANGEMENTS

**6.1    Closing**

Closing shall take place on the Closing Date effective as of the Closing Effective Time electronically (or as otherwise determined by mutual agreement of the Parties in writing), by the exchange of deliverables (in counterparts or otherwise) by electronic transmission in PDF format.

**6.2    Trustee's Closing Deliveries**

At or before the Closing, the Trustee shall deliver or cause to be delivered to the Purchaser the following:

(a)    a true copy of the Approval and Vesting Order, as issued and entered by the BC Court;

(b)    a true copy of the Assignment Order, if applicable, as issued and entered by the BC Court;

(c)    a true copy of the Recognition Order, as issued by the Delaware Court;

(d)    a copy of Trustee's Certificate;

(e)    all Tax elections contemplated by Section 3.3, duly executed by the Trustee;

(f)    the General Conveyance, duly executed by the Trustee;

(g)    the Assignment and Assumption Agreement, duly executed by the Trustee;

(h)    the Trademark Assignment Agreement, duly executed by the Trustee;

(i)    the complete source code, object code, and documentation for the software platform (including all previous versions, code branches, developer notes, designs, specifications, and other documents in the Companies' possession or control);

(j)    the complete source code, object code, and documentation for the Companies' AWS interface (including all previous versions, code branches, developer notes, designs, specifications, and other documents in the Companies' possession or control);

(k)    a certificate of an officer of the Trustee dated as of the Closing Date confirming that all of the representations and warranties of the Trustee contained in this Agreement are true in all material respects as of the Closing Date, with the same effect as though made at and as of the Closing Date, and that the Trustee has performed in all material respects the covenants to be performed by it prior to the Closing Date;

(l)    discharges or no interest letters in each case in form and substance satisfactory to the Purchaser, acting reasonably, with respect to any Encumbrances;

(m)    the Books and Records that relate to the Purchased Assets and Assigned Contracts; and

(n)    such other agreements, documents and instruments as may be reasonably required by the Purchaser to complete the Transaction, all of which shall be in form and substance satisfactory to the Parties, acting reasonably.

**6.3     Purchaser's Closing Deliveries**

At or before the Closing Date, the Purchaser shall deliver or cause to be delivered to the Trustee, the following:

(a)     payment of the Purchase Price (net of the Deposit);

(b)     payment of all Transfer Taxes payable on Closing to the Trustee or the Companies (or evidence of payment by the Purchaser thereof to the relevant Governmental Authorities) in accordance with <u>Section 3.3</u>;

(c)     payment of the Cure Costs to be paid by the Purchaser pursuant to <u>Section 2.4</u> to the Trustee, or evidence that such Cure Costs have been or will be paid directly to the applicable counterparty;

(d)     all tax elections contemplated by <u>Section 3.3</u>, duly executed by the Purchaser;

(e)     the Assignment and Assumption Agreement, duly executed by the Purchaser;

(f)     a certificate of an officer of the Purchaser dated as of the Closing Date confirming that all of the representations and warranties of the Purchaser contained in this Agreement are true in all material respects as of the Closing Date, with the same effect as though made at and as of the Closing Date, and that the Purchaser has performed in all material respects the covenants to be performed by it prior to the Closing Date; and

(g)     such other agreements, documents and instruments as may be reasonably required by the Trustee to complete the Transaction, all of which shall be in form and substance satisfactory to the Parties, acting reasonably.

**ARTICLE 7
CONDITIONS OF CLOSING**

**7.1     Conditions Precedent in favour of the Parties**

The obligation of the Parties to complete the Transaction is subject to the following joint conditions being satisfied, fulfilled or performed on or prior to the Closing Date:

(a)     <u>Approval and Vesting Order.</u> The BC Court shall have issued and entered the Approval and Vesting Order, which Approval and Vesting Order shall not have been stayed, set aside, or vacated and no application, motion or other proceeding shall have been commenced seeking the same, in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonably.

(b)     <u>Recognition Order.</u> The Delaware Court shall have issued the Recognition Order, which Recognition Order shall not have been stayed, set aside, or vacated and no application, motion or other proceeding shall have been commenced seeking the same, in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonably

(c)     <u>Assignment Order.</u> The BC Court shall have issued and entered the Assignment Order, if applicable, which Assignment Order shall not have been stayed, set aside, or vacated and no application, motion or other proceeding shall have been commenced seeking the same,

– 16 –

in each case which has not been fully dismissed, withdrawn or otherwise resolved in a manner satisfactory to the Parties, each acting reasonably.

(d)     <u>No Order.</u> No Applicable Law and no judgment, injunction, order or decree shall have been issued by a Governmental Authority or otherwise in effect that restrains or prohibits the completion of the Transaction; and

(e)     <u>No Restraint.</u> No motion, action or proceedings shall be pending by or before a Governmental Authority to restrain or prohibit the completion of the Transaction contemplated by this Agreement.

The foregoing conditions are for the mutual benefit of the Parties. If any condition set out in <u>Section 7.1</u> is not satisfied, performed or mutually waived on or prior to the Outside Date, any Party may elect on written notice to the other Parties to terminate this Agreement.

**7.2     Conditions Precedent in favour of the Purchaser**

The obligation of the Purchaser to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a)     <u>Trustee's Deliverables.</u> The Trustee shall have executed and delivered or caused to have been executed and delivered to the Purchaser all the documents and payments contemplated in <u>Section 6.2</u>.

(b)     <u>No Breach of Representations and Warranties</u>. Each of the representations and warranties contained in <u>Section 4.1</u> shall be true and correct in all material respects: (i) as of the Closing Date as if made on and as of such date, or (ii) if made as of a date specified therein, as of such date.

(c)     <u>No Breach of Covenants</u>. The Trustee shall have performed in all material respects all covenants, obligations and agreements contained in this Agreement required to be performed by the Trustee on or before the Closing.

The foregoing conditions are for the exclusive benefit of the Purchaser. These conditions may be waived by the Purchaser in whole or in part. Any such waiver shall be binding on the Purchaser only if made in writing. If the conditions set out in this <u>Section 7.2</u> are not satisfied or performed on or prior to the Outside Date, the Purchaser may elect on written notice to the Trustee to terminate this Agreement.

**7.3     Conditions Precedent in favour of the Trustee**

The obligation of the Trustee to complete the Transaction is subject to the following conditions being satisfied, fulfilled, or performed on or prior to the Closing Date:

(a)     <u>Purchaser's Deliverables.</u> The Purchaser shall have executed and delivered or caused to have been executed and delivered to the Trustee at the Closing all the documents and payments contemplated in <u>Section 6.3</u>.

(b)     <u>No Breach of Representations and Warranties</u>. Each of the representations and warranties contained in <u>Section 4.2</u> shall be true and correct in all material respects: (i) as of the Closing Date as if made on and as of such date, or (ii) if made as of a date specified therein, as of such date.

(c)     No Breach of Covenants. The Purchaser shall have performed in all material respects all covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

The foregoing conditions are for the exclusive benefit of the Trustee. Any condition in this <u>Section 7.3</u> may be waived by the Trustee in whole or in part, without prejudice to any of its rights of termination in the event of non-fulfilment of any other condition in whole or in part. Any such waiver shall be binding on the Trustee only if made in writing, provided that delivery of the Trustee's Certificate will constitute such written waiver. If any condition set forth in this <u>Section 7.3</u> is not satisfied or performed on or prior to the Outside Date, the Trustee may elect on written notice to the Purchaser to terminate the Agreement.

## 7.4     Appeal of Approval and Vesting Order

In the event any variation is sought or leave to appeal is sought, an appeal is taken or a stay pending appeal is requested with respect to the Approval and Vesting Order, the Trustee shall promptly notify the Purchaser of such application for leave to appeal, appeal or stay request and shall promptly provide to the Purchaser a copy of the related notice(s) or order(s). Notwithstanding any such appeal or application for leave to appeal, the parties will complete the Transaction on the Closing Date without regard to any appeal or application for leave to appeal to vary or set aside the Approval and Vesting Order, unless the Approval and Vesting Order has been stayed by further BC Court order or is otherwise in effect. In the event a stay of the Approval and Vesting Order is in effect, the Closing Date shall be automatically extended by thirty (30) days, and the parties will use commercially reasonable efforts to obtain a further order of the BC Court approving the Transaction, and, following issuance of such order, will complete the Transaction as soon as reasonably possible thereafter. In the event that such BC Court order is not obtained within thirty (30) days of the aforementioned stay, the Purchaser may, on written notice to the Trustee, terminate this Agreement.

## ARTICLE 8
## TERMINATION

## 8.1     Grounds for Termination

This Agreement may be terminated on or prior to the Closing Date:

(a)     by the mutual written agreement of the Trustee and the Purchaser;

(b)     by the Purchaser, upon written notice to the Trustee, if there has been a material breach by the Trustee of any material representation, warranty or covenant contained in this Agreement, which breach has not been waived by the Purchaser, and: (i) such breach is not curable and has rendered the satisfaction of any condition in <u>Section 7.2</u> impossible by the Outside Date; or (ii) if such breach is curable, the Purchaser has provided prior written notice of such breach to the Trustee, and such breach has not been cured within ten (10) days (or, if not curable within ten (10) days, such longer period as is reasonable under the circumstances, not to exceed thirty (30) days) following the date upon which the Trustee received such notice;

(c)     by the Purchaser, upon written notice to the Trustee, any time after the Outside Date, if (A) the Approval and Vesting Order has not been obtained, or (B) the Closing has not occurred by the Outside Date and such failure to close was not caused by or as a result of the Purchaser's breach of this Agreement;

(d)     by the Trustee, upon written notice to the Purchaser, if there has been a material breach by the Purchaser of any material representation, warranty or covenant contained in this

Agreement, which breach has not been waived by the Trustee, and: (i) such breach is not curable and has rendered the satisfaction of any condition in Section 7.3 impossible by the Outside Date; or (ii) if such breach is curable, the Trustee has provided prior written notice of such breach to the Purchaser, and such breach has not been cured within ten (10) days (or, if not curable within ten (10) days, such longer period as is reasonable under the circumstances, not to exceed thirty (30) days) following the date upon which the Purchaser received such notice; or

(e)      by the Trustee, upon written notice to the Purchaser, any time after the Outside Date, if (A) the Approval and Vesting Order has not been obtained, or (B) the Closing has not occurred by the Outside Date and such failure to close was not caused by or as a result of the breach of this Agreement by the Trustee.

## 8.2     Effect of Termination

If this Agreement is terminated pursuant to Section 8.1, all further obligations of the Parties under this Agreement will terminate and no Party will have any Liability or further obligations hereunder.

**ARTICLE 9**
**GENERAL**

## 9.1     Privacy Matters

The collection, use and disclosure of Personal Information by any of the parties in respect of this Agreement prior to the Closing is restricted to those purposes that relate to the transactions contemplated by this Agreement. Each of the Parties acknowledges and confirms that the disclosure of Personal Information was necessary for the purposes of determining if the Parties shall proceed with the transactions contemplated hereby and that the disclosure of Personal Information relates solely to the evaluation of the transactions contemplated hereby, the completion of the transactions contemplated hereby or the carrying on of the Business. At all times, to the extent it continues to hold Personal Information, the Purchaser shall safeguard all Personal Information collected from the Trustee and the Companies in a manner consistent with the degree of sensitivity of the Personal Information and maintain at all times the security and integrity of the Personal Information. The Purchaser shall not make copies or excerpts of or from the Personal Information or in any way re-create the substance or contents of the Personal Information if the transactions contemplated hereby are not completed for any reason, and shall return all Personal Information to the Trustee and the Companies, as applicable, or destroy such Personal Information at the Trustee's request.

## 9.2     Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the Province of British Columbia and the laws of the Canada applicable therein and each of the Parties irrevocably attorns to the exclusive jurisdiction of the BC Court, and any appellate courts of the Province of British Columbia therefrom.

## 9.3     Notice

Any notice or other communication under this Agreement shall be in writing and may be delivered by email, addressed:

(a)      in the case of the Purchaser, as follows:

Recruiter.com Ventures Inc.
2261 Market St. #5056,
San Francisco, CA 94114

Attention:   Zack James and Kayli Maguire
Email:        zack@zjameslaw.com/ kayli.maguire@bench.co

with a copy to:

Legal Scale LLP
2 Park Avenue, 20th Floor
New York, NY 10016

Attention:   Bryan Judd and Udi Ben Ari
Email:        bryan@legalscale.com; udi@legalscale.com

and to:

Lawson Lundell LLP
1600 – 925 West Georgia Street
Vancouver, BC V6C 3L2

Attention:   Bryan Gibbons and Julia Winters
Email:        bgibbons@lawsonlundell.com; jwinters@lawsonlundell.com

(b)      in the case of the Trustee, as follows:

KSV Restructuring Inc.
220 Bay Street, 13th Floor, PO Box 20,
Toronto, Ontario, M5J 2W4

Attention:   Bobby Kofman / Jason Knight
Email:        bkofman@ksvadvisory.com / jknight@ksvadvisory.com

with a copy to:

Fasken Martineau DuMoulin LLP
550 Burrard Street, Suite 2900
Vancouver, BC, V6C 0A3

Attention:   Kibben Jackson
Email:        kjackson@fasken.com

Any such notice or other communication, if transmitted by email before 5:00 p.m. (Eastern Standard Time) on a Business Day, will be deemed to have been given on such Business Day, and if transmitted by email after 5:00 p.m. (Eastern Standard Time) on a Business Day, will be deemed to have been given on the Business Day after the date of the transmission. In the case of a communication by email or other electronic means, if an autoreply is received indicating that the email is no longer monitored or in use, delivery must be followed by the dispatch of a copy of such communication pursuant to one of the other methods described above; provided however that any communication originally delivered by electronic means shall be deemed to have been given on the date stipulated above for electronic delivery.

Sending a copy of a notice or other communication to a Party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the notice or other communication to that Party. The failure to send a copy of a notice or other communication to legal counsel does not invalidate delivery of that notice or other communication to a Party. A Person may change its address for service by notice given in accordance with the foregoing and any subsequent communication must be sent to such Person at its changed address.

**9.4    Public Announcements**

The Trustee shall be entitled to disclose this Agreement to the BC Court, the Delaware Court and parties in interest in the Bankruptcy Proceedings, other than any information which the Purchaser advises the Trustee in writing as being confidential, and this Agreement may be posted on the Trustee's website maintained in connection with the Bankruptcy Proceedings. Other than as provided in the preceding sentence or statements made in BC Court or Delaware Courts (or in pleadings filed therein) or where required to meet timely disclosure obligations of the Trustee or any of its Affiliates under Applicable Laws (provided that the Purchaser shall be given prior written notice of any such disclosures), the Trustee shall not issue (prior to or after the Closing) any press release or make any public statement or public communication with respect to this Agreement or the Transactions contemplated hereby without the prior consent of the other Parties, which shall not be unreasonably withheld or delayed.

**9.5    Time**

Time shall, in all respects, be of the essence hereof, provided that the time for doing or completing any matter provided for herein may be extended or abridged by an agreement in writing signed by the Parties.

**9.6    Survival**

The representations and warranties of the Parties contained in this Agreement shall not merge on Closing. The covenants of the Parties contained herein to be performed after the Closing shall survive Closing and remain in full force and effect.

**9.7    Benefit of Agreement**

This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

**9.8    Entire Agreement**

This Agreement and the Exhibits and Schedules attached hereto, constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior negotiations, understandings and agreements. This Agreement may not be amended or modified in any respect except by written instrument executed by the Trustee and the Purchaser.

**9.9    Paramountcy**

In the event of any conflict or inconsistency between the provisions of this Agreement, and any other agreement, document or instrument executed or delivered in connection with the transactions contemplated by this Agreement, the TSA or the LOI, the provisions of this Agreement shall prevail to the extent of such conflict or inconsistency.

**9.10    Assignment**

This Agreement may be assigned by the Purchaser five (5) days prior to the hearing scheduled for the issuance of the Approval and Vesting Order, in whole or in part, without the prior written consent of the

Trustee, provided that: (a) such assignee is a related party or subsidiary of the Purchaser; (b) the Purchaser provides prior notice of such assignment to the Trustee; and (c) such assignee agrees to be bound by the terms of this Agreement to the extent of the assignment; provided, however, that any such assignment shall not relieve the Purchaser of its obligations hereunder.

## 9.11    Further Assurances

Each of the Parties shall (including following Closing), at the request and expense of the requesting Party, take or cause to be taken such action and execute and deliver or cause to be executed and delivered to the other such conveyances, transfers, documents and further assurances as may be reasonably necessary or desirable to give effect to this Agreement and the transactions contemplated herein.

## 9.12    Counterparts

This Agreement may be executed electronically in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same agreement. Transmission by e-mail of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

## 9.13    Severability

Notwithstanding any provision herein, if a condition to complete the Transaction, or a covenant or an agreement herein is prohibited or unenforceable pursuant to Applicable Law, then such condition, covenant or agreement shall be ineffective to the extent of such prohibition or unenforceability without invalidating the other provisions hereof.

## 9.14    Trustee's Capacity

In addition to all of the protections granted to the Trustee under the BIA or any order of the BC Court in the Bankruptcy Proceedings, the Purchaser acknowledges and agrees that the Trustee, acting in its capacity as Trustee in respect of the Companies and not in its personal capacity, will have no liability, in its personal capacity or otherwise, in connection with this Agreement or the Transaction contemplated herein whatsoever as Trustee.

*[Signature Page Follows]*

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the day and year first above written.

KSV RESTRUCTURING INC. in its capacity as the appointed bankruptcy trustee of the estate of **BENCH ACCOUNTING, INC.,** and **10SHEET SERVICES INC.**

Per: _____

Name:    Robert Kofman

Title:    President

**RECRUITER.COM VENTURES INC.**

Per: _____

Name:    Jesse Tinsley

Title:    CEO

## SCHEDULE A
## PURCHASED ASSETS

1.  **Assigned Contracts**:


2.  **Trademarks**:

| Trademark | Country | App. Date<br><br>App. No. | Reg. Date<br><br>Reg. No | Case No. |
|---|---|---|---|---|
| BENCH | Canada | April 2, 2013<br><br>1620815 | Sept. 14, 2016<br><br>TMA949251 | 49898-TM2001 |
| Shield Logo<br> | Canada | Dec. 13, 2013<br><br>1656367 | July 16, 2015<br><br>TMA908765 | 49898-TM2003 |
| (Device Only)<br> | EUTM | Dec. 13, 2013<br><br>12428082 | May 19 2014<br><br>12428082 | 49898-TM2004 |
| BENCH | EUTM | March 15, 2013<br><br>011662723 | August 7, 2013<br><br>011662723 | 49898-TM2002 |
| (Device Only)<br> | United Kingdom | Dec. 13, 2013<br><br>UK00912428082 | May 19, 2014<br><br>UK00912428082 | 49898-TM2004 |
| BENCH | United Kingdom | March 15, 2013<br><br>UK00911662723 | August 7, 2013<br><br>UK00911662723 | 49898-TM2002 |
| (Device Only)<br> | USA | Dec. 11, 2013<br><br>86140776 | August 19, 2014<br><br>4587902 | 49898-TM1003 |
| BENCH | USA | March 1, 2013<br><br>85981170 | April 15, 2014<br><br>4516471 | 49898-TM1002 |

| BENCH TAX | USA | August 28, 2020<br><br>90145835 | July 30, 2024<br><br>7463736 | 49898-TM1005 |
|---|---|---|---|---|
| Girl at Desk 1 | USA | Dec. 23, 2015<br><br>VA0001982311 | Dec. 23, 2015<br><br>VA0001982311 | 49898-CR1001 |
| Girl at Desk 2 | USA | Dec 23 2015<br><br>VA0001998928 | Dec 23 2015<br><br>VA0001998928 | 49898-CR1002 |

3. **Website Domain Names:**
   i. bench.co
   ii. tensheet.com
   iii. 10sheet.com
   iv. 10sheets.com
   v. 10sheet.ca
   vi. taxdeadlinereminder.com
   vii. benchco.ai
   viii. benchaccounting.ai
   ix. bench.app
   x. meetbench.com
   xi. 10sheet.app
   xii. benchlabs.dev
   xiii. benchception.co
   xiv. 10sheep.ca

4. **Code:**
   i. All codebases at https://github.com/BenchLabs; and
   ii. All other self-hosted codebases.

5. **Software Licenses:** All third-party licenses currently utilized in the Companies' Business, including, but not limited to, the following:
   i. Mobile device management software
   ii. Google Workspace
   iii. Paro, Inc.
   iv. Plaid Inc.
   v. Gusto
   vi. Retool, Inc.
   vii. Rutter
   viii. Profound Platform Inc. aka Finch
   ix. Marketo, Inc.
   x. 1Password
   xi. Knock
   xii. Stream
   xiii. GitHub, Inc.
   xiv. Salesforce.com Canada Corporation
   xv. AWS
   xvi. Adobe Acrobat

xvii.   Ambassador
xviii.  AppCues
xix.    Auth0
xx.     Calendly
xxi.    Confluence
xxii.   Drake Software
xxiii.  Atlassian
xxiv.   OKTA
xxv.    Slack + Slack AI
xxvi.   Split
xxvii.  Zoom (Meeting)
xxviii. Miro
xxix.   Microsoft Canada, Inc.
xxx.    Tableau
xxxi.   Retool
xxxii.  Docusign
xxxiii. Slack
xxxiv.  Heap
xxxv.   Synk.io
xxxvi.  Figma
xxxvii. Zapier
xxxviii. Karbon
xxxix.  OpenAI
xl.     Atlassian
xli.    SkillsMap
xlii.   CultureAmp
xliii.  WebFlow

6. **Engineering and Observability Tools:**
   i.    All AWS development environments and Workspaces
   ii.   All licenses for code environments (IntelliJ)
   iii.  JFrog Artifactory
   iv.   Jellyfish
   v.    Datadog
   vi.   New Relic

7. **Tech Assets:**

| Category | Asset Type | Asset Name | Description |
|----------|-----------|-----------|-------------|
| System | AWS Infra | AWS | All Amazon Web Services (AWS) organization accounts (72 of them) and all the data and configuration across all regions in all AWS services. This includes, but is not limited to, S3 data buckets, RDS instances, EC2 instances, EventBridge system & data, Dynamo data, Redshift data, Servless system, Lambdas,Cognito, OpsGenie, etc. |

| Data | Data Set | Categorized Transaction Data | Categorized transaction data represents a structured dataset of ~287 million transactions processed for ~56,000 clients over 11 years, with an average of ~3 million transactions categorized monthly. This data is invaluable for training machine learning models, both generally and within our proprietary systems. It serves as the foundation for building and refining models that power automated transaction categorization, trend analysis, and financial forecasting. This dataset offers a unique opportunity to enhance the accuracy and scalability of AI-driven solutions, leveraging the depth and diversity of historical categorization. Its strategic value lies in supporting advanced product development, improving efficiency in financial workflows, and enabling more precise customer insights and predictive analytics. |
|------|----------|-------------------------------|-------------------------------------------------------------------------|
| Data | Data Set | Customer Document Library | The Customer Document Library is a repository of customer-uploaded documents, including financial statements, receipts, tax forms, and other bookkeeping-related materials. This library, built over years of customer interactions, serves as a valuable dataset for automating document processing and classification using AI/ML tools. It supports enhanced operational efficiency by providing training data for categorization models and enabling faster, more accurate document handling. Represents a significant asset for driving innovation in automation and improving customer service capabilities |
| Data | Data Set | CRT Knowledge Base | CRT Knowledge Base: A repository containing over 2,500 entries and 255,000+ words, designed to support the Customer Response Team (CRT) in delivering accurate and efficient client support. This knowledge base includes detailed instructions, troubleshooting guides, and best practices across various bookkeeping scenarios. It also holds significant value for training large language models (LLMs), as its structured and detailed content provides a robust dataset for refining AI tools to enhance automated support, improve response accuracy, and reduce resolution times. |
| Data | Data Set | Customer Messages | Customer message data captures ~3 million outgoing messages from Bench to clients and ~1.9 million incoming messages from clients to Bench, spanning bookkeeping inquiries, support requests, and transactional clarifications. This dataset offers a comprehensive view of customer interaction patterns, providing rich insights into client behavior, common challenges, and areas for improving service delivery. It is pivotal for training AI models to automate responses, streamline support workflows, and anticipate customer needs. This dataset is a strategic asset for optimizing customer engagement, refining communication processes, and driving operational excellence in bookkeeping and client support. |

| | | | |
|------|------|------|------|
| Data | Data Set | Uncategorized Transaction Data | Uncategorized transaction data comprises ~287 million raw financial transactions processed over 11 years for ~56,000 clients, with ~3 million transactions added monthly. This dataset offers immense value by enabling the identification of spending patterns, financial behaviors, and emerging trends across industries. It provides a rich foundation for building predictive analytics models, generating actionable business insights, and exploring untapped opportunities in customer segmentation and product development. With its historical depth and scale, the dataset is a unique asset for enhancing financial intelligence and driving innovation in data-driven solutions. |
| Data | Data Set | Unconverted Leads and Contacts Data | A dataset of 464,877 unconverted Standard Leads, 7,701 CPA Leads, and 5,532 BD Leads, along with 81,102 Standard Contacts, 1,538 BenchTax DocuSign Contacts, 1,225 Obsolete Contacts, 327 CPA Contacts, and 1,006 BD Contacts segmented by record type within the Salesforce CRM. This dataset provides insights into the lead and contact pool's size and composition, highlighting potential opportunities for marketing and sales efforts. Based on the size and age of the lead pool, a significant portion may no longer be marketable or valid. |
| Data | Data Set | Firmographic Data | The firmographic dataset of ~56,000 historical clients provides a view of SMB financial behaviors, including revenue, expenses, industry verticals, geographic distribution, and entity types. It spans diverse sectors such as retail, professional services, healthcare, construction, and technology, with a strong representation in North America's major economic hubs. |
| Engineering | Machine Learning Model | Similar Transactions Clustering Model | Similar Transactions Categorization ML Model: A machine-learning model designed to cluster similar transactions based on shared attributes, enabling bulk categorization. The model is trained on transaction events, identifying patterns and grouping related transactions. It triggers updates through an event-driven architecture, with results stored in DynamoDB for efficient retrieval. This ML-powered solution reduces manual categorization effort, improves accuracy, and provides the foundation for seamless integration into Bench's customer-facing tools. |
| Engineering | Machine Learning Model | Customer Based Categorization Model | The Customer-Based Categorization (CBC) model is a foundational machine learning solution that streamlines transaction categorization by identifying patterns within a customer's historical ledger. Using a clustering-based algorithm, CBC groups similar transactions and predicts their categories with precision, significantly reducing the need for manual intervention. By addressing gaps left by other methods such as Client Rules and DoNNa, CBC has successfully automated approximately 17% of previously manual transaction volume, driving greater efficiency. |

| Engineering | Machine Learning Model | Customer Based Categorization Model V2 | The Better Customer-Based Categorization (BCBC) model is a next-generation enhancement of Bench's Customer-Based Categorization (CBC) system, leveraging advanced machine learning techniques like TF-IDF and dynamic thresholding to deliver improved transaction categorization. BCBC addresses limitations in the original clustering-based CBC by reducing computational demands, improving accuracy, and adapting categorization thresholds to individual customer profiles. Key benefits include a 17.46 percentage point increase in system coverage, significantly reducing manual categorization efforts, and an estimated labor cost reduction of 15-25%. BCBC integrates seamlessly into Bench's new architecture, offering faster processing speeds (5x improvement), reduced infrastructure costs, and broader transaction history coverage. This scalable solution demonstrates strong potential for operational efficiency and cost savings, aligning with Bench's commitment to delivering precise, automated bookkeeping. |
| --- | --- | --- | --- |
| Engineering | Machine Learning Model | DoNNa ML Categorization Model | The DoNNa Model is a machine learning categorization system designed to classify transactions with high accuracy and scalability, utilizing TensorFlow and Google CloudML. It incorporates a Deep/Wide Neural Network architecture, combining deep learning for generalization and linear features for specific patterns, such as client-specific categorizations. DoNNa processes transaction data using advanced preprocessing scripts and vocabulary generation techniques to optimize training. It achieves 91% categorization coverage for high-confidence transactions (confidence > 90%) and up to 97.8% coverage for suggested categorizations (confidence > 50%). The system supports incremental training on CloudML and allows hyper-parameter tuning for model optimization. It integrates seamlessly with Bench's Financial Data domain, aligning vendor and transaction information into ledger-ready journal entries, enhancing bookkeeping precision. Bench owns the infrastructure and logic for transforming transaction data while leveraging CloudML's scalable environment for training and deployment. |
| Engineering | Machine Learning Model | Automated Document Sorting | The Automated Document Sorting System is a proprietary machine learning integration that automates the classification and metadata extraction of uploaded documents, such as statements and receipts, using tools like Amazon Textract and OpenAI GPT. This system reduces manual processing costs, improves operational efficiency, and enhances customer experience by delivering faster insights. It integrates with Bench's systems via EventBridge and SQS. |

| Engineering | API Integration | Finch Integration | The Finch integration at Bench automates payroll data ingestion by seamlessly connecting payroll providers to Bench's financial systems, replacing manual data entry processes. Bench owns the infrastructure for securely managing connections, synchronizing data, and translating payroll information into actionable bookkeeping insights. Key components include microservices such as the Finch Gateway for handling webhooks, Customer and Specialist Manage Connections BFFs for managing connection lifecycles, and Sync Control for event-driven data synchronization. Data is securely stored in S3 and transformed for ledger integration. While Finch provides API endpoints and webhook triggers, Bench adds value through its modular architecture, event-driven processing, and alignment with future-proof North Star principles, enabling faster payroll management, reduced errors, and improved customer satisfaction. |
| --- | --- | --- | --- |
| Engineering | API Integration | Stripe Integration | Bench's Stripe API integration leverages Stripe's payment infrastructure and raw transaction data to transform, store, and utilize it within Bench's proprietary financial data pipeline. Bench owns the processes and systems that translate Stripe's data model into actionable bookkeeping assets, including categorized transactions, ledger balances, and reconciliations. This includes the financial-data database, custom sync logic, and user-facing tools that provide clients with insights and reports. While Stripe controls the underlying payment systems, raw data, and API, Bench adds value through its proprietary transformation, validation, and reporting infrastructure tailored for accurate and efficient financial management. |
| Engineering | API Integration | Shopify Integration | Bench's Shopify API integration facilitates seamless bookkeeping by leveraging Shopify's platform for automating payment data import and reconciliation. Bench owns the infrastructure and processes that connect Shopify accounts via OAuth, retrieve and transform Shopify payment data into Bench's financial data system, and support bookkeepers with efficient workflows. Key assets include the financial-data database, transformed data stored within Bench's systems, and custom tools for transaction reconciliation. While Shopify controls the payment infrastructure, app listing, and account-specific connection limitations, Bench enhances value by automating data ingestion, creating scalable connection workflows, and providing tailored insights to clients for accurate financial reporting and management. |
| Engineering | API Integration | Plaid OCR Integration | The Plaid OCR Gateway integration streamlines financial data ingestion for Bench by leveraging Plaid's technology to automate document upload and processing. Bench owns the infrastructure and services for transforming Plaid's raw data into actionable bookkeeping information, including handling tokens, storing transactions, and generating events. Core assets include callback, listener, and trigger Lambda functions that validate webhooks, process statements, and manage secure storage in S3. Bench ensures data security with encrypted payloads and a micro-event store for reliable event tracking, while collaborating gateways mediate internal and external data flows. Plaid owns the raw document upload flow and API |

| | | | |
|---|---|---|---|
| | | | services, while Bench adds value through proprietary transformation, event management, and tailored client insights. |
| Engineering | API Integration | Plaid Transactions Integration | The Plaid Transaction API integration at Bench automates the ingestion and processing of financial data from clients' connected bank and credit card accounts. Bench owns the infrastructure to securely import, validate, and standardize up to 24 months of financial transactions using the Financial Data Service (FDS). This system ensures data accuracy by enriching transactions and producing ledger-ready, reconcilable entries. While Plaid provides the API and connection capabilities, Bench adds value through backend systems that transform raw transaction data into actionable financial records, ensuring seamless bookkeeping workflows and accurate reconciliations. Reference balances are critical to validation, and Bench's system verifies these for consistent financial reporting. |
| Engineering | API Integration | Square Integration | The Square integration at Bench automates the ingestion of payments and payouts into Bench's financial systems, aligning Square's data model with Bench's Financial Data domain. Bench owns the infrastructure that transforms Square API data into ledger-ready journal entries, including payments, fees, cash transactions, and balances. Key processes include syncing merchant and location data, pulling payments and payouts, and constructing artificial balances to ensure seamless ledger management. Square provides merchant processors and APIs for data retrieval, while Bench adds value by translating complex transaction relationships into actionable bookkeeping insights, validating constructed balances, and maintaining alignment with Square's systems. This integration ensures efficient reconciliation and real-time financial reporting for clients. |
| Engineering | API Integration | Gusto Integration | The Gusto integration at Bench automates payroll data ingestion by connecting Gusto's payroll systems to Bench's financial data infrastructure. Bench owns the services that securely manage payroll data synchronization, processing, and storage while ensuring compliance with financial reporting standards. Key components include a Gusto Gateway for API interactions, connection management BFFs for handling connection lifecycles, and event-driven workflows for processing payroll data. Data retrieved from Gusto is translated into ledger-ready formats and stored in secure S3 buckets. While Gusto provides payroll APIs and webhook triggers, Bench enhances the integration with proprietary automation, modular architecture, and robust data processing, enabling faster payroll updates, error reduction, and comprehensive financial insights for clients. |

| | | | |
|---|---|---|---|
| Engineering | API Integration | Powered By Bench APIs | The Bench API enables integration between Bench's financial services and partner platforms, supporting account creation, financial reporting, and real-time notifications. Partners can use the API to automate account setup, display financial statements like income and balance sheets, and notify users of bookkeeping tasks such as document uploads or transaction categorizations. This integration allows partners to embed bookkeeping functionalities into their own apps, enhancing user experience, improving operational efficiency, and driving engagement and retention through a shared ownership model. |
| Engineering | Automation | Mito Matching | The MITO and Transaction Categorization System automates the classification of journal entries and transactions, ensuring accurate ledger assignments and reducing manual effort. It manages the Money in Transit Outstanding (MITO) ledger, which holds unmatched or partially matched transactions, and supports workflows for client input, AA review, and final categorization |
| Engineering | Core Platform Service | Email Infrastructure | The Email Infrastructure manages incoming and outgoing email communications for Bench's applications and services. Incoming emails, handled via Mailgun, enable features like message feed replies and transaction comments by triggering events across Bench services. Outgoing emails, processed by the Milkman service and delivered through Mandrill, include notifications such as receipt uploads, client care updates, and payment alerts. The system integrates with services like Cowbell and Mainapp for processing and relies on validated domains (bench.co, jenkins.bench.co, and mail.bench.co) with DNS records managed via AWS Route53. Additional functionality includes the "Dropbox Receipt" feature, which allows clients to email receipts directly to the app for document processing. |
| Engineering | Documentation | Architectural Knowledge Library | The Confluence-Based Architecture Knowledge Library is a repository of technical documentation, including system blueprints, API schemas, integration workflows, and decision records, that outlines the foundation of Bench's platform and operations. This library not only provides a deep understanding of Bench's architecture but also serves as a launchpad for innovation. With detailed insights into systems and processes, it enables teams to build upon existing infrastructure, streamline enhancements, and explore new features or integrations.This library is a valuable resource for driving future innovation and scaling the platform effectively while minimizing development ramp-up time. |
| Engineering | Documentation | Engineering Documentation | Centralized repository of engineering workflows, frontend architecture, coding standards, and ADRs. |
| Engineering | Documentation | Best Practices Repository | Guidelines for TypeScript, React, accessibility, clean code, and reusable components in app development. |
| Engineering | Documentation | Architectural Decision Records | Centralized log of architectural decisions and rationale to promote transparency and consistency. |

| Engineering | Documentation | Testing Framework | Structured guidelines for unit and integration testing to ensure code reliability and quality assurance. |
|---|---|---|---|
| Engineering | Documentation | Third-Party Library Standards | Criteria for evaluating external libraries based on security, size, and maintainability. |
| Product | Software | FLO Client Dashboard | FLO Client Dashboard: A real-time dashboard providing visibility into client data and work status, tracking automation and manual workflows. It enables synchronized portfolio management, identifies bottlenecks, and breaks down outstanding tasks across clients to optimize operational efficiency. |
| Product | Software | Client App | Bench Client App: A mobile-responsive web application designed to help small business owners and entrepreneurs efficiently manage their personal and business finances. The app integrates with Bench's internal tools and external platforms like Plaid to provide seamless account connections, secure data imports, and transaction categorization. Features include advanced document management, real-time status tracking, and access to detailed financial reports such as income statements, balance sheets, profit and loss summaries, and top expenses. Users can manage Personal Busines Crossover accounts, 1099 reporting, set preferences, and explore upsell opportunities directly within the platform. The app also offers communication tools for engaging with a dedicated bookkeeping team, ensuring timely support and responses. |
| Product | Software | BK Tools Client Managment Platform | BKTools (Client Management Platform): BKTools is Bench's centralized client management platform designed to optimize bookkeeping operations across multiple portfolios. It integrates essential functionalities such as account management, general ledger tracking, categorization, adjustments, client profiles, and real-time messaging into a single, streamlined system. BKTools enhances efficiency by automating routine tasks, reducing errors, and enabling timely communication between clients and teams. Its scalable and customizable design supports Bench's evolving workflows, ensuring accurate financial management and exceptional client service. |
| Product | Software | Task Managment Centre | Task Manager (Priority Task Management System): Bench's Priority Task Management system streamlines bookkeeping by breaking work into smaller, trackable units (Jobs and Tasks) assigned through dynamic workflows. The event-driven system ensures efficiency, accuracy, and scalability by automating task transitions and state tracking. Key features include customizable prioritization logic, real-time job progress visibility, and support for distributed teams handling complex tasks. The system is built on an event-driven architecture using Amazon EventBridge, with secure, role-based access and monitoring via Heap and Datadog for performance tracking. This scalable tool improves client service by enabling faster resolutions and consistent quality. |

| Product | Software | LLM Categorization Assistant | CatBot (LLM Categorization Assistant): An AI-powered agent that assists customers in categorizing transactions through natural language interactions. It leverages licensed GPT models (GPT-4 and GPT-3.5 Turbo) integrated into Bench's proprietary infrastructure to provide accurate and context-aware recommendations. Bench owns the prompt design, conversational workflows, escalation logic, and integration with internal tools like BKTools and ledger management systems, as well as the proprietary data sources used to enhance categorization accuracy. CatBot enables customers to identify appropriate categories, confirm ledger codes, and escalate unresolved cases to human review when needed. Licensed GPT models are accessed via secure APIs and operate within Bench's secure environment, ensuring privacy and compliance while delivering a seamless, user-friendly experience. |
|---|---|---|---|
| Product | Software | Bookkeeping Assistant | BKTools AI Assistant: An AI-powered tool integrated within BKTools to support customer-facing associates in efficiently managing client communications. The assistant utilizes licensed GPT models to summarize customer questions, generate tailored responses, and streamline communication workflows. Key features include displaying recent customer messages, providing context-aware suggestions, and generating message drafts with customizable input. This tool integrates customer, business, and BPA notes into a centralized view for efficient decision-making. |
| Product | Software | BenchBot (AI Powered Bookkeeping Assistant) | Bench GPT: An AI-powered system leveraging licensed GPT models (GPT-4 and GPT-3.5 Turbo) integrated into Bench's proprietary infrastructure. Bench GPT supports natural language processing for client communication, task categorization, and operational insights. Bench owns the prompt design, workflows, integration logic, and proprietary data sources, including internal knowledge bases and customer interaction histories. Licensed models are accessed via secure APIs and operate exclusively within Bench's secure environment, ensuring privacy and compliance. This system enhances efficiency and accuracy while aligning with Bench's proprietary tools and processes. |
| Product | Software | White Label Client App | White Label Bench: A customizable bookkeeping solution that allows partners to deliver a fully branded experience by tailoring navigation, colors, logos, and copy to their branding. Supported by scalable configurations, White Label Bench enables seamless integration for multiple partners without disrupting Bench's core functionality. Features include a Theme Resolver for partner-specific JSON configurations, feature flags for flexible activation and deployment, and design system updates for branded styling. Robust security measures mitigate risks like spoofing and unauthorized access, enhancing partner-client loyalty and revenue opportunities. |

| Product | Software | Bench Tax Retool App | Bench Retool Tax App: The Bench Retool Tax App is a proprietary solution that integrates Bench's APIs and operational workflows with Retool's low-code platform, enabling streamlined tax management for customers and internal teams. This app facilitates seamless customer engagement by providing tax document requests, task tracking, and progress updates directly within a Bench-branded interface. It leverages AWS Cognito for secure authentication and authorization, ensuring data integrity. While the app uses Retool's licensed framework for rapid development, all workflows, API integrations, and user experiences are uniquely tailored to Bench's requirements, making it a critical tool for improving tax filing efficiency and customer satisfaction. |
|---|---|---|---|
| Product | Software | Bench App for Stripe | Bench App for Stripe: An integration built for Stripe's new marketplace that leverages the Powered by Bench (Embedded) API to streamline bookkeeping for Stripe users. The app enables new client sign-ups, displays income statements directly within the Stripe UI, and provides deep linking to the Bench platform for comprehensive financial management. Built using Stripe's UI Extension SDK, the app integrates seamlessly into the Stripe environment, enhancing user experience and simplifying financial workflows. |
| Product | Software | Mobile App (iOS) | The Bench iOS App, built using React Native, provides clients with convenient mobile access to key bookkeeping features, including Pulse for real-time insights and Reports for tracking financial performance. Designed to complement the Bench experience, the app enables users to stay informed about their financial data while on the go. However, due to a high rate of feature expansion and a primary focus on web-based development, updates to the React Native app have not been consistently maintained. Limited resources dedicated to iOS and React Native development have led to a pause in aligning the app with new capabilities introduced on Bench's web platform. |
| Product | Design Framework | Design System | A centralized framework of reusable design components, guidelines, and standards that ensure consistency across Bench's user interfaces and digital experiences. It includes UI elements, typography, color palettes, and interaction patterns, enabling efficient product development and a cohesive brand experience. |
| Product | Documentation | Service Blueprints | Detailed service blueprints mapping the end-to-end bookkeeping workflow, integrating human services with software automation. These blueprints outline customer touchpoints, internal processes, supporting technologies, and handoffs between teams and systems. |
| Product | Software Feature | Auto-ledger Creation | The Auto-Ledger Creation service at Bench automates the creation of ledger accounts when clients sign up and connect a new Plaid account. Upon account synchronization, it calculates an anchor balance using Plaid transaction data and current bank balances, producing a ledger, anchor balance statement, and journal entry. Leveraging AWS EventBridge, it coordinates notifications between services to ensure timely and accurate |

| | | | ledger creation. This modular approach supports future enhancements, ensuring efficient onboarding and seamless integration of financial data for clients. |
|---|---|---|---|
| Product | Software Feature | Document Management | The Document Management System (DMS) enables efficient handling of customer documents within the Bench platform. It facilitates secure storage, streamlined uploads, and intelligent matching of documents to customer requests. Designed to optimize both user and internal workflows, the DMS integrates legacy systems with modern event-driven architecture to ensure accurate and timely document processing. |
| Product | Software Feature | Statements Parser | The Statement Parser is an internally developed tool that automates data extraction from bank statements (PDF format) into structured formats like .xls or .csv. It significantly reduces manual workload for the Data Processing (DP) team, enabling faster and more accurate reconciliation of financial transactions. The parser addresses key operational challenges, including bottlenecks caused by increasing statement volume and inconsistencies between scraped bank data (e.g., Yodlee) and verified statement data. |
| Product | Software Feature | Data Processing Service | The Data-Processing App (DP App) is a legacy platform at Bench designed to transform PDF bank statements into structured CSV files for reconciliation tasks. It facilitates task management, automates data extraction via a statement parser, and enables communication between Bench's main application and data processors using Amazon Message Queue (AMQ). |
| Product | Software Feature | LLM Vendor Descriptions | The Vendor Description Micro-Application is a specialized service integrated into BkTools to streamline transaction categorization by providing vendor descriptions. It utilizes the Open AI Gateway ESG and integrates with Serper to enhance vendor data generation by leveraging AI for real-time insights. This micro-application presents suggested vendor descriptions directly to bookkeepers, reducing the need for manual research and improving operational efficiency. Bookkeepers can review, validate, or flag incorrect descriptions, fostering continuous improvement and ensuring accurate categorization. This asset supports scalable, automated workflows, enhancing productivity and decision-making in transaction management. |
| Product | Software Feature | Receipt Matching | The Automated Receipt Matching Feature seamlessly integrates receipts entered into the Document Entry User Interface (DEUI) with transactions in the general ledger. This feature matches key attributes such as date, amount, and transaction description to identify and link corresponding entries. |

| Product | Software Feature | 1099 Tagging | The 1099 Tagging and Reporting Feature streamlines the preparation and management of 1099 reports for Bench clients. It allows Accounting Associates (AAs) to tag transactions throughout the year with 1099-related fields, such as contractor and source, ensuring data is well-organized before the tax season. Clients gain year-round visibility into tagged transactions via the app, with tools to provide in-line feedback on incomplete or unknown data. The feature automates the enablement of 1099 reports and includes educational content to improve client understanding of IRS 1099 requirements. |
|---|---|---|---|
| Product | Software Feature | MFE Template | A standardized template for building and deploying micro frontend modules. Includes pre-configured settings for routing, state management, and API integration to ensure consistency across micro frontends in the Bench platform. Designed to streamline development and enforce best practices, enabling rapid feature development and deployment.<br><br>Dependencies: Micro Frontend Registry, shared compon |
| Product | Software Feature | Micro Frontend Registry | Centralized registry for managing and orchestrating micro frontend components across the Bench platform. Enables modular development, independent deployments, and seamless integration of frontend features, improving scalability and maintainability. Facilitates version control and ensures consistency across web applications. |
| Product | Onboarding Tools | Onboarding Questionnaires | The Onboarding Questionnaire System automates client onboarding by integrating tools like Retool, JotForm, and Knock to streamline enrollment, reminders, and data collection. Clients are bulk-enrolled using a Retool app, which generates dynamic JotForm links containing pre-filled fields like business ID and questionnaire type. Automated email notifications managed through Knock send enrollment and daily reminders until the questionnaire is completed or the client is unenrolled. Completion statuses are tracked in Airtable, differentiating between pending and submitted questionnaires. The system reduces manual follow-ups, provides tailored questions for better client clarity, and ensures efficient coordination for onboarding teams. |
| Product | Onboarding Tools | Signup Funnel | The Signup Funnel is a publicly accessible, internet-facing web application hosted at signup.bench.co. It provides a multi-step form-based interface for new users to create accounts and begin onboarding. Designed to streamline the customer signup process, the app integrates with various internal and external systems, including the legacy database, Cognito, Stripe, Marketo, and Salesforce. |
| Product | Design Resources | Design Files | A collection of Figma design files that include prototypes, mockups, and design specifications for Bench's products and features. These files serve as a collaborative resource for product teams, ensuring alignment on visual and functional aspects during development. |

| Product | Documentation | Feature Documentation & Roll Out | Comprehensive repository detailing feature specifications, implementation processes, and rollout strategies for new product features. This includes step-by-step guides, testing protocols, and deployment plans to ensure consistent and efficient feature delivery across teams. |
|---|---|---|---|
| Product | Documentation | Business Case Library | The Product Business Case Library provides centralized access to a collection of detailed business cases for product initiatives, offering insights into strategic decisions, market opportunities, cost-benefit analyses, and implementation plans. It serves as a resource for understanding the rationale and potential impact of past, current, and proposed product investments, supporting informed decision-making and alignment across teams. |
| Product | Documentation | Customer Insights and Research Repository | The Customer Insights and Research Repository is a centralized resource housing comprehensive research, customer feedback, and data-driven insights collected across various channels and touchpoints. It includes detailed reports on customer needs, behaviors, preferences, and pain points, as well as findings from usability studies, surveys, and market research. This repository supports data-informed decision-making, enabling teams to align product and service strategies with customer expectations. |
| Infrastructure | System Management | Feature Flags | The Feature Flags System is a dynamic control mechanism that enables selective activation and deactivation of software features across environments without requiring code changes or redeployments. This system provides flexibility for testing, rolling out, or deprecating features, ensuring stable and scalable development processes. |
| Infrastructure | Data Processing System | Segment | The Segment Integration at Bench is a strategically significant asset that streamlines data collection, processing, and integration across Bench's applications and third-party services. This infrastructure enables efficient tracking, analytics, and functionality enhancement, providing a robust foundation for data-driven decision-making and user engagement. |
| Infrastructure | Analytics Platform | Heap Analytics | Integrated with the Bench app and website, Heap Analytics automatically captures user interactions to provide comprehensive behavioral data. Supports in-depth analysis of user journeys, funnel optimization, and product performance insights. Historical data and reporting are available for long-term trend analysis and decision-making.Dependencies: Integration with Bench's web and mobile platforms, data warehouses (e.g., Snowflake, Redshift), and optional connections to third-party tools like Salesforce and Slack. |
| Infrastructure | Authentication Service | Login (Cognito) | A scalable and secure authentication service managing user logins, access control, and identity federation with support for MFA, OAuth 2.0, and SAML. Ensures compliance with SOC 2 and GDPR standards. Dependencies: Backend APIs, AWS Lambda, API Gateway. |

| | | | |
|---|---|---|---|
| Infrastructure | Authentication Service | Login (Auth0) | A flexible authentication and authorization platform supporting user login, access management, and identity federation. Features include MFA, SSO, OAuth 2.0, and OpenID Connect integration, with built-in scalability and robust security compliance (SOC 2, GDPR, HIPAA). Dependencies: Backend APIs, custom rules, Auth0 SDKs. |
| Infrastructure | Authentication Service | Login (Okta) | Enterprise-grade identity and access management solution providing secure user authentication, SSO, and identity federation. Supports MFA, adaptive authentication, and integration with OAuth 2.0 and SAML for seamless user access across systems. Ensures compliance with SOC 2, GDPR, and other security standards. Dependencies: Backend APIs, Okta SDKs, and integrations with third-party applications. |
| Infrastructure | Authentication Service | Multi-Factor Auth | Provides an additional layer of security for the Bench platform by requiring users to verify their identity through a second factor (e.g., SMS, email, authenticator app, or hardware token) in addition to their password. Ensures compliance with industry security standards such as SOC 2 and GDPR. Dependencies: Authentication Service, SMS/email delivery systems, and authenticator apps. |
| Infrastructure | Core Platform Service | User Management System | The User Management System defines and manages user roles, permissions, and states within Bench's ecosystem. It facilitates role-based access control, client lifecycle management, and task assignments across internal and external users. The system is a core infrastructure component, ensuring scalability, data integrity, and seamless integration with other Bench applications and tools. |
| Infrastructure | Data Processing System | Financial Data System | The Financial Data System (FDS) is a critical infrastructure asset designed to automate the synchronization, reconciliation, and validation of financial data. FDS ensures accurate financial records by retrieving data, calculating balances, and generating monthly reconciliation files with categorized transactions. It includes a validation process that flags discrepancies for resolution, reducing manual intervention and improving data accuracy. By streamlining workflows and supporting scalability, FDS plays a key role in maintaining reliable financial operations and enabling efficient bookkeeping processes. |
| Infrastructure | Quality Assurance & Monitoring | Synthetic Tests | Synthetic Tests at Bench are automated, pre-scripted tests designed to proactively monitor and evaluate the performance, availability, and functionality of Bench's applications and infrastructure. These tests simulate user interactions and network conditions, providing valuable insights into system reliability before clients encounter issues. |
| Infrastructure | Core Platform Service | Infrastructure as code | Infrastructure as code for SOC2 Compliant prod environments |

| Infrastructure | Webserver & Traffic Management | Nginx Infrastructure | The Nginx Infrastructure at Bench serves as a robust asset for managing web traffic, optimizing performance, and ensuring the reliability of Bench's online services. Nginx acts as a versatile and high-performance HTTP server, reverse proxy, and load balancer, supporting seamless delivery of applications and services to clients. |
| --- | --- | --- | --- |
| Operations | Training Guide | Bench Academy Training | Comprehensive guides for training employees on Bench's proprietary systems and bookkeeping workflows. |
| Infrastructure | System Management | Micro Frontend Registry | The Micro Frontend Registry at Bench is a centralized system for managing metadata, configuration, and versioning of micro frontends (MFEs) used across Bench's platform. This registry ensures efficient orchestration of independent micro frontend modules while maintaining consistency and seamless integration within the larger application ecosystem. |
| Developer Tools | Testing Tool | PBB Sample Client | A Sample Client in the context of Bench's Powered By Bench (PBB) platform is a demonstration tool or application designed to interact with the PBB API. It serves as a reference implementation for developers, showcasing how to integrate with and utilize the PBB platform's features. The Sample Client allows developers and partners to test and validate their integrations in a controlled environment, such as a sandbox, ensuring compatibility and functionality before deploying their solutions in production. |
| Contracts | Vendor Contract | Plaid Contract - Transactions | Negotiated contract for pricing of transaction & account connections via Plaids Transactions API |
| Contracts | Vendor Contract | Plaid Contract - OCR | Negotiated contract for pricing of statement processing Plaid's OCR API |
| Contracts | Vendor Contract | Finch Contract | Negotiated contract for client payroll data via Finch's Payroll API |
| Contracts | Vendor Contract | Rutter Contract | Negotiated contract for client merchant data Rutter's API |
| Operations | Workflows | Bookkeeping Workflows & Process Maps | Detailed documentation of proprietary bookkeeping processes, designed to optimize client management. |

**SCHEDULE B**
**EXCLUDED ASSETS**

Nil

## **EXHIBIT C**

**Order, dated March 13, 2025**



Province of British Columbia
Bankruptcy Division
Vancouver Registry

Court No. B-250050
Estate Nos. 11-3171493
11-3171491

## IN THE SUPREME COURT OF BRITISH COLUMBIA
## IN BANKRUPTCY AND INSOLVENCY

### IN THE MATTER OF THE BANKRUPTCY OF
### BENCH ACCOUNTING, INC. AND 10SHEET SERVICES INC.

### <u>ORDER</u>

|  |  |  |  |  |
|---|---|---|---|---|
| BEFORE | ) | THE HONOURABLE CHIEF<br>JUSTICE SKOLROOD | ) | March 13, 2025 |

ON THE APPLICATION of KSV Restructuring Inc., in its capacity as licensed insolvency trustee (the "**Trustee**") of Bench Accounting, Inc. ("**Bench**") and 10Sheet Services Inc. ("**10Sheet**", and together with Bench, the "**Companies**"), coming on for hearing on March 13, 2025 at 800 Smithe Street, Vancouver, British Columbia, and on hearing Kibben Jackson and Heidi Esslinger, counsel for the Trustee, and those other counsel listed on <u>Schedule "A"</u> hereto; AND ON READING the pleadings and other materials filed herein, including the First Report of the Trustee dated March 5, 2025 (the "**Report**"); AND pursuant to the *Bankruptcy and Insolvency Act*, as amended (the "**BIA**"), the *Supreme Court Civil Rules* and the equitable and inherent jurisdiction of this Honourable Court:

THIS COURT ORDERS AND DECLARES that:

**NOTICE**

1.    The time for service of the Notice of Application and supporting materials be and is hereby abridged such that the Notice of Application for this Order is properly returnable this day,

and further that any requirement for service of the Notice of Application is hereby dispensed with.

## SALE APPROVAL

2.     The sale transaction (the "**Transaction**") contemplated by the Asset Purchase Agreement dated February 25, 2025 (the "**Sale Agreement**") between the Trustee and Recruiter.com Ventures Inc. (the "**Purchaser**"), a copy of which is attached as Appendix "E" to the Report, is hereby approved, and the Sale Agreement is commercially reasonable. The execution of the Sale Agreement by the Trustee is hereby authorized and approved, and the Trustee is hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance to the Purchaser of the assets described in the Sale Agreement (the "**Purchased Assets**").

3.     Upon delivery by the Trustee to the Purchaser of a certificate substantially in the form attached as <u>Schedule "B"</u> hereto (the "**Trustee's Certificate**"), all of the Companies' right, title and interest in and to the Purchased Assets described in the Sale Agreement shall vest absolutely in the Purchaser in fee simple, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "**Claims**") including, without limiting the generality of the foregoing: (i) all charges, security interests or claims evidenced by registrations pursuant to the Personal Property Security Act of British Columbia or any other personal property registry system; and (ii) those Claims listed on <u>Schedule "C"</u> hereto (all of which are collectively referred to as the "Encumbrances", and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

4.     For the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Purchased Assets shall stand in the place and stead of the Purchased Assets,

and from and after the delivery of the Trustee's Certificate all Claims shall attach to the net proceeds from the sale of the Purchased Assets with the same priority as they had with respect to the Purchased Assets immediately prior to the sale, as if the Purchased Assets had not been sold and remained in the possession or control of the person having had possession or control immediately prior to the sale.

5.    The Trustee is to file with the Court a copy of the Trustee's Certificate forthwith after delivery thereof.

6.    Pursuant to Section 7(3)(c) of the *Canada Personal Information Protection and Electronic Documents Act* or Section 18(10)(o) of the *Personal Information Protection Act* of British Columbia, the Trustee is hereby authorized and permitted to disclose and transfer to the Purchaser all human resources and payroll information in the company's records pertaining to the Companies' past and current employees.  The Purchaser shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Companies.

7.    Subject to the terms of the Sale Agreement, possession of the Purchased Assets  shall be delivered by the Trustee to the Purchaser at 12:00 noon on the Closing Date (as defined in the Sale Agreement).

8.    The Trustee, with the consent of the Purchaser, shall be at liberty to extend the Closing Date to such later date as those parties may agree without the necessity of a further Order of this Court, provided that the Closing Date occurs within 10 days of the date of this Order.

9.    The vesting of the Purchased Assets in the Purchaser pursuant to this Order shall not be void or voidable by creditors of the Companies, nor shall it constitute or be deemed to be a transfer at undervalue, fraudulent preference, assignment, fraudulent conveyance or other reviewable transaction under the *Bankruptcy and Insolvency Act* or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

**General**

10. THIS COURT REQUESTS the aid and recognition of other Canadian and foreign courts, tribunal, regulatory or administrative bodies, including any court or administrative tribunal of any federal or State Court or administrative body in the United States of America (each a "**Foreign Court**") to act in aid of and to be complementary to this Court in carrying out the terms of this Order where required. All courts, tribunals, agencies and regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Trustee, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Trustee in any foreign proceeding, or to assist the Trustee and its agents in carrying out the terms of this Order.

11. The Trustee shall be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order and the Trustee is authorized and empowered to act as a representative in respect of the within proceedings for the purposes of having these proceedings recognized in a jurisdiction outside Canada, including acting as a foreign representative of the Companies to apply to the United States Bankruptcy Court for relief pursuant to Chapter 15 of the *United States Bankruptcy Code*, 11 U.S.C. § § 101-1532 as amended.

12. THIS COURT DECLARES that, without prejudice to the determination to be made by any Foreign Court as to the companies' centre of main interest, this Court has jurisdiction over the Companies on the basis that the Companies' centre of main interest is Vancouver, British Columbia, Canada.

13. The Trustee or any other party have liberty to apply for such further or other directions or relief as may be necessary or desirable to give effect to this Order.

14. Endorsement of this Order by counsel appearing on this application other than counsel for the Trustee is hereby dispensed with.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT
TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY
CONSENT.

Signature of Kibben Jackson
Lawyer for the Trustee

By the Court

Registrar   IN BANKRUPTCY



## Schedule "A"

### LIST OF COUNSEL

| Litigant/Party Name | Person Represented |
| --- | --- |
| Bryan Gibbons | Recruiter.com Ventures Inc. |
| | |
| | |
| | |
| | |
| | |

- 7 -

## Schedule "B"

## FORM OF TRUSTEE'S CERTIFICATE

Province of British Columbia
Bankruptcy Division
Vancouver Registry

Court No. B-250050
Estate No. 11-3171493
11-3171491

### IN THE SUPREME COURT OF BRITISH COLUMBIA
### IN BANKRUPTCY AND INSOLVENCY

IN THE MATTER OF THE BANKRUPTCY OF
BENCH ACCOUNTING, INC. AND 10SHEET SERVICES INC.

### TRUSTEE'S CERTIFICATE

1. Capitalized terms used but not otherwise defined in this Trustee's Certificate shall have the meanings given to them in the order of the Supreme Court of British Columbia (the "**Court**") pronounced on March [■], 2025 (the "**Approval and Vesting Order**") and the Asset Purchase Agreement dated February 25, 2025 (the "**Sale Agreement**") between KSV Restructuring Inc., in its capacity as trustee in bankruptcy (the "**Trustee**") of Bench Accounting, Inc. ("**Bench**") and 10Sheet Services Inc. ("**10Sheet**", and together with Bench, the "**Companies**") and Recruiter.com Ventures Inc. (the "**Purchaser**").

2. Pursuant to the Approval and Vesting Order, the court ordered that all of the right, title and interest of the Companies in and to the Purchased Assets shall vest in the Purchaser effective upon, among other things, delivery by the Trustee of this Trustee's Certificate to the Purchaser.

**THE TRUSTEE HEREBY CERTIFIES as follows:**

1. The Companies and the Purchaser have each delivered written notice to the Trustee that all applicable conditions under the Sale Agreement have been satisfied and/or waived, as applicable.

2. The Trustee has received the full amount of the Purchase Price under the Sale Agreement.

3. Except for delivery of this Trustee's Certificate, all of the transactions contemplated by the Sale Agreement have been implemented.

267908.00029/312413307.3

- 8 -

**Dated at the City of Vancouver, in the Province of British Columbia, this [█] day of [█], 2025**

<blockquote>

**KSV RESTRUCTURING INC.,** in its capacity as trustee in bankruptcy of Bench Accounting, Inc. and 10Sheet Services Inc., and not in its personal or corporate capacity


Per: _____

Name:

Title:

</blockquote>

## Schedule "C"

### CLAIMS TO BE DELETED/EXPUNGED

NIL.